**ORIGINAL**

ELNORRIS STONE
#V67067
Folsom State Prison
P.O.Box 950
Folsom, CA. 95763
In Propria Persona

**FILED**

AUG  1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELNORRIS STONE,                )
                               )
            PETITIONER,        )        CASE No.: CV 07 6263 TEH (PR)
                               )
        VS.                    )
                               )
M.C. KRAMER, WARDEN,           )
                               )
            RESPONDENT.        )

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION

FOR HABEAS CORPUS.

TABLE OF CONTENTS

STATEMENT OF THE CASE                                                    1

EVIDENCE PRESENTED AT TRIAL                                              2

GROUND ONE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO EFFEC-
            TIVE COUNSEL WAS VIOLATED (Yarborough's testimony)   19

GROUND TWO-PETITIONER'S CONSTITUTIONAL RIGHTS UNDER "BRADY-v-
            MARYLAND" WERE VIOLATED                             29

GROUND THREE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE
            PROCESS AND EFFECTIVE COUNSEL WERE VIOLATED ("BRADY
            -v-MARYLAND")                                        37

GROUND FOUR-PETITIONER'S CONSTITUTIONAL RIGHTS UNDER "BRADY-v-
            MARYLAND" WERE VIOLATED                             40

GROUND FIVE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO EFF-
            ECTIVE COUNSEL WAS VIOLATED (Failure to investigate)
                                                                43

GROUND SIX-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE
            PROCESS, COMPULSORY PROCESS, AND EFFECTIVE COUNSEL
            WERE VIOLATED (Gardiner's prison records)           48

GROUND SEVEN-PETITIONER'S CONSTITUTIONAL RIGHTS UNDER "BRADY
            -v-MARYLAND" WERE VIOLATED (Police diagram)         50

GROUND EIGHT-TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO CROSS-
            EXAMINE & IMPEACH A PROSECUTION WITNESS             52

GROUND NINE-PETITIONER'S FEDERAL CONSTITUTIONAL DUE PROCESS
            RIGHTS WERE VIOLATED BY PERJURED TESTIMONY          58

I

GROUND TEN-PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED BY CONVIC-
          TION ON INSUFFICIENT EVIDENCE                     65

     A. Petitioner's testimony                              66
     B. Evidence corroborating and consistent with self-
        defense and innocence                               68
     C. State Court of Appeals Opinion                       70

        1. Self-defense                                      70
        2. Motive                                            72
        3. Premeditation & deliberation                      73

     D. Prosecution arguments                                73


GROUND ELEVEN-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE
          PROCESS, JURY TRIAL, AND EFFECTIVE COUNSEL WERE
          VIOLATED (Erroneous self-defense instructions)    77


GROUND TWELVE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE
          PROCESS, JURY TRIAL, AND EFFECTIVE COUNSEL WERE
          VIOLATED (Unreasonable self-defense instructions)
                                                            83


GROUND THIRTEEN-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO
          DUE PROCESS, JURY TRIAL, AND EFFECTIVE COUNSEL
          WERE VIOLATED (Erroneous self-defense instructions)
                                                            85


GROUND FOURTEEN-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO
          DUE PROCESS, COMPULSORY PROCESS, AND JURY TRIAL
          WERE VIOLATED (Instruction on self-defense evi-
          dence)                                            89


GROUND FIFTEEN-THE SIXTH AMENDMENT WAS VIOLATED BY THE DENIAL OF
          COUNSEL & COUNSEL'S CONFLICT OF INTEREST          94

        A. Actual conflict                                  95

      B. Adverse effect                                           97

      C. Remedy                                               101

GROUND SIXTEEN-APPELLATE COUNSEL WAS INEFFECTIVE IN VIOLATION
                OF THE SIXTH AMENDMENT                      102

      A. "Brady" claim                                103

      B. Ineffectiveness of Trial Counsel          104

      C. Perjury of Juan Rodriguez             105

GROUND SEVENTEEN-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO
                EFFECTIVE COUNSEL, DUE PROCESS, AND COMPULSORY
                PROCESS WERE VIOLATED (Intimidation of a defense
                witness)                              106

CONCLUSION                                           **107**

Note: Please take notice that Exhibits reffrenced herein have previously been lodged with this Court.

## STATEMENT OF THE CASE

Petitioner,and Romeo Yarborough were charged by information filed July 18.2003,with one count of violating Penal Code section 187,subdivision (a)(murder).It was alleged that Yarborough personally used a firearm, and that Petitioner and Yarborough were armed with a firearm,within the meaning of Penal Code section 12022,subdivision (a)(1).Petitoner was charged with one prior conviction-possesion of a controlled substance- pursuant to Health and Safety Code section 11350,subdivision (a), (CT 654-656.)[1] though Petitioner and Yarborough were charged together, Petitioner was tried alone.Petitioner & Yarborough were together for a number of pretrial motions.Then on September 11,2003,Yarborough moved to change his plea (CT 688.).The probation officer's report indicates that Romeo Yarborough pled guilty to voluntary manslaughter and the use of a firearm,and was sentenced on December 13,2004,to a term in state prison of 13 years.(CT 1012.)

Petitioner proceeded to trial,which began on September 18,2003.(CT 703) However,Petitioner's trial counsel had a family medical emergency and,on October 20,2003,over Petitioner's objection,the court declared a mistrial based on a finding of neccessity,and appointed new counsel.(CT 717,722; RT 10/20/03 at pp. 7-10.).

On March 8,2004,defense counsel moved for discovery of informaiton material to the defense,showing that the victim in this case was violent and agressive.(CT 731-735.) Petitioner's second jury trial began on March 17,2004.(CT 778.) On March 23,2004,defense counsel filed an additional motion regarding evidence of the victims propensity for violence,& requestin jury instructions on the issue.(CT 787-804;See also CT 826-832.).

---

[1]The following abbreviations will be used throughout:CT-Clerk's Transcrip RT-Reporter's Transcripts;PTRT-Prior Trial Reporter's Transcript.

On April 1,2004,Petitioner was convicted of first degree murder, and the principal armed allegation was found to be true.(CT 918 -919; RT 704 - 705.)

A motion for new trial was filed June 28,2004.(CT 938 - 950.)On July 26,2004,Petitioner moved to have defense counsel relieved.(CT 954.) Additional proceedings were held in which defense counsel sought disclosure of information regarding the violent and agressive activities of the victim in this case.(CT 956 - 962,965 - 967,968 - 983,985 - 994.) On December 29,2004,Petitioner's motion for a new trial was denied. (CT 996;RT 767.)

The probation and sentencing hearing was held in this case on January 27,2005.Petitioner was sentenced to a term in state prison of 25 years to life,plus one year for the armed allegation,for a total term of 26 years to life.(CT 1000 - 1002).

## EVIDENCE PRESENTED AT TRIAL

On the night of December 5,2002,Petitioner got into a disagreement with a man named Noble Gardner.[2]For reasons discussed below,Petitioner believed Gardner was dangerous and violent.When Gardner displayed a gun and Petitioner struggled with him,shots were fired by both Petitioner and Romeo Yarborough.Gardner was killed.

**Testimony Regarding the Shooting on December 5,2002**

Kenya smith testified that in December 2002,she lived at 1415 52nd Avenue in Oakland.She had lived there for several years and during that time she met Petitioner and had a sexual relationship with him.

_____

2 Noble Gardner is referred to by several names by various witnesses, including dude,"C,"and Chuck.However,for consistency,Petitioner will refer to him as Gardner,or Mr.Gardner.

- 2 -

She also knew Petitioner's friend Romeo Yarborough,though she was not intimate with him.(RT 128 - 130.)Ms.Smith said that one time Petitioner asked her to work as a prostitute for him,but she turned him down.(RT 131.)

Kenya said that in September 2002,she met Noble Gardner and very soon they began to live together.She worked as a prostitute to support her drug habit.Gardner watched out for her,and she gave him her money.(RT 131 - 133.)When she would run into Petitioner he asked why she refused to work as a prostitute for him,but she did not pay much attention to him.Gardner told her to just ignore Petitioner.He did not make any threats against Petitioner.(RT 133 - 134.)

On December 5,2002,Kenya went out around 8 p.m. to try and make some money.She went to her usual corner at 52nd Avenue and East 14th.[3] At around 8:30 she saw Petitioner and Romeo,and spoke to them.Then Petitioner and Romeo walked down 52nd Avenue in the direction of Kenya's apartment.(RT 135 - 136.)She saw that Gardner was out on the street,keeping an eye on her.She also saw Romeo greet Gardner and walk down the street with him.Kenya knew that Romeo and Gardner were acquainted and she had seen them together in the past.She had not,in the past,seen Petitioner with Gardner.(RT 137 - 138,152.)

After she saw the three men walk away down the street,the police pulled up to her and told her to move along.Kenya went home,where she found the three men were in her apartment, smoking marijuana.She did not like that they were there,and she went to her room.(RT 138.)Kenya stayed in her room until she heard the front door slam.(RT 139.)

_____

[3]Witnesses also refer to East 14th as International Boulevard.For consistency Petitioner will refer to it as East 14th.

She came out and asked Gardner what they were doing there.She noted that they seemed to be getting along and she had not seen anyone with a gun.(RT 140.)

Kenya told Gardner that Petitioner was a guy who used to talk to her on her corner.She did not tell Gardner that she had been intimate with Petitioner.(RT 153.)When Petitioner and Romeo left, Kenya came out of her room.Gardner had learned that Kenya had had sex with Petitioner,and she found Gardner was agitated and pacing back and forth.He went to light a cigar,and could not locate his lighter.He said Petitioner or Romeo had his lighter and he was going out to get it.He gave no indication that he intended to hurt anyone. Kenya said that Gardner had a lot of guns,and he was known to carry guns.(RT 140 - 142,152 - 155.)He almost always had a loaded gun,and she said the gun in exhibit 10 looked like the gun that Gardner had on December 5,2002.(RT 151,161.)Kenya said Gardner took a jacket and a beanie and started to leave.Kenya told him the lighter was not important,but he gave her a mean look.He grabbed his cell phone, and he left.(RT 159 - 160.)

A while later she saw lights go by and she went outside.She heard that someone had been shot down the street.Kenya walked over there,and saw that it was Gardner.(RT 143.)Sometime later Petitioner came to her apartment and asked what she had said to the police.( RT 145.)

Kenya agreed that she told Sgt.Longmire someone had informed her that Gardner shot a person named Leo over on 51st Avenue.She also told Longmire the person told her that in September Gardner shot someone at 96th and Bancroft.

Juan Rodriguez testified that in December 2002,he was doing some remodeling work on a house at 1528 52nd Avenue.One day he saw

- 4 -

two men near his truck,which was parked outside on the street.Because
Rodriguez had tools in the truck,he went out to keep an eye on it.
The taller man had a darker complexion,while the shorter man had
lighter skin.The taller of the two men asked him for a cigarette.
Next,Rodriguez moved the truck into the driveway where he was working.
(RT 169 - 171.) A couple days later,in the evening,he was working
at the same house .He had his wife and kids with him.Rodriguez said
he heard two shots and looked outside,but did not see anything.He
went to the living room and heard two more shots fired.(RT 171 - 172.)
Rodriguez looked out the window and said he saw a "flame" come out
of a gun.(RT 173.)

Rodriguez said he saw two people near the front tire of a car
and he saw the taller of the two men fire a shot toward the tire.
The man stretched out his arm,leaned over,and then Rodriguez saw
the flash.He said the two men appeared to be the same men he had
seen on the streets a couple of days before,but he was unable to
identify Petitioner in court.(RT 173 - 174,180,182.) Next,Rodriguez
saw the two men walk toward East 14th street and enter a house that
was a few buildings down the street.[4] Rodriguez went outside,and
found a person laying on the curb,next to the tire of a car.(RT 175, -
179.)

Rodriguez agreed he had previously testified that photo number 1,
in a photo lineup,was the man near his truck,who asked him for a
cigarette,and who was the shooter on December 5.(RT 201 - 202.)
However,Rodriguez said he was not certain of the identification,and
he said the man in the photo only "resembled" the shooter.(RT 202.)

---

[4]Petitioner's family's house,which was at 1599 52nd Ave.,was in
the opposite direction,away from East 14th Street.(See RT 211.)

In addition,although he testified the shooter was taller and darker the parties stipulated that at the preliminary hearing,where Rodriguez did not have an interpreter to assist him,he said the light skinned man was the shooter.(RT 204 - 205.) Rodriguez agreed that on December 5,2002,it was dark outside and the light was on inside the house where he was working,which made it difficult to see clearly outside. (RT 207.)

Rodriguez said he spoke to the police,who gave him a statement to sign.He agreed that the statement said nothing about seeing a person fire a gun.(RT 190 - 191.) He agreed that he could not be certain if the man "racked" the gun he was holding,or if the two men he saw on December 5 were the same men he had seen near his truck a couple days earlier.(RT 195.)

Rodriguez testified that,before the two men walked away,the shooter stepped forward,then back,then turned toward East 14th Street. He said the shooter turned around and walked back,back toward the parked car.He leaned down and fired one shot near the front tire. (RT 196 - 197.) The shooter then brought his arm back up and walked away.(RT 199.)

Lakeisha Jackson testified that she was Petitioner's cousin. She lived in the bottom rear unit at 1599 52nd Avenue,which was a fourplex.Her grandparents lived in the bottom front,while other family members,including her aunt,cousin,and Petitioner's brother, lived in the upper units.(RT 211.) Lakeisha saw Petitioner there a couple of tijmes a month.He was sometimes with Romeo Yarborough, who was like a member of the family.(RT 212 - 213.)

On December 5,2002,at around 9 p.m.,Lakiesha was in the front unit with her grandmother when she heard three shots fired outside. Then,a flash caught her eye and she went to the window.(RT 214 - 215,244.) She said the house had no outside lights.(RT 252.)

- 6 -

She saw two men near the curb involved in some kind of struggle,and a third man standing near the tree.The two men were wrestling over something,in a kind of "tugging match," and they were moving all over the place.The man by the tree "aimed the gun at the other two people" and fired three shots,Lakeisha ducked down and heard another couple shots.(RT 216 - 217,246 - 248.) Next,Lakiesha's aunt Liz came in and looked out the peephole.Lakeisha saw people out,"Being nosy." She said the man by the tree fired another shot,and she then moved away from the window.(RT 217 - 218,222.)

Lakiesha at first denied she told the police it was Petitioner and Romeo outside the house on December 5.She then conceded that she told Sgt. Longmire it was them.(RT 223 - 224,226,237.) Lakiesha testified she told Sgt. Longmire she saw two men wrestling,and one man she saw shooting.She said Longmire told her he knew Petitioner was not the shooter,and he also said he knew the shots were fired in self defense.(RT 242.) Lakiesha said there were many people on the street at the time of the shooting,which led her to believe it must have been self defense,because no one would commit murder with so many witnesses.(RT 244.)

The prosecutor played for the jury a tape of Lakiesha's interview with the police on December 10 th,2002.(RT 227.)[5] On the tape,Lakeisha said she looked out the window around 9 p.m. on December 5 and saw "somebody tusslin'."(Exh. 22B at p. 2.) She identified Petitioner and Romeo Yarborough as people who were involved in an altercation with a third person who she did not know.(Exh. 22B at pp. 3 - 4.)

_____

[5] The transcript of the tape,which is Exhibit 22B in this case,has been made a part of the appellate record pursuant to a motion under California Rules of Court,rule 32.1(b).

They were"wrestling" near her aunt's car,which was parked in front
of the house.(Exh. 22B at p.4.) Neither Petitioner nor the third
man was on the gound.At some point Romeo shot **at the third** man.He
fired twice that she saw,but she heard about seven shots altogether.
(Exh. 22B at p.5.) She never saw Petitio**ner** or the third man with
any weapons.**(Exh.22B at p.6.)**Eventually,Petitioner and Romeo ran
off,toward East 14th Street,leaving the third man injured on the
ground.(Exh. 22B at pp. 7,**10**) Lakiesha said Romeo was wearing a
white top and a black knit cap,while Petitioner was wearing black
pants and a dark colored leather jacket.(Exh. 22B at pp. 7,9.)

    Elizabeth Forrest testified she was Petitioner's cousin.She
lived in the bottom rear unit at 1599 52nd Avenue.Around 9p.m. on
December 5,2002,Ms. Forrest heard five to seven shots fired.(RT 254 -
257,267.) When the shooting stopped,she went to her grandmother's
unit,where she found Lakeisha Jackson.(RT 257.) Lakeisha said she
saw Romeo shoot someone.(RT 262.)

    Ms. Forrest looked outside through the peephole in the door.
She saw two people who could have been Petitioner and Romeo Yarborough.
They were about 25 feet away.The two-men were standing outside,and
then walked toward East 14th Street.(RT 259 - 261,269.)

    Ms. Forrest said that when she later spoke to the police,they
encouraged her to talk in order to help her cousin,and they told
her "we know he didn't do that."(RT 270.) She said her statement
to the police was based on her own observations,and on what Lakeisha
told her.(RT 270 - 271.)

    Evid. Technician Christensen said he was called to the scene
at 1599 52nd Avenue,where he prepared a diagram.He saw a man in the
gutter,who had been shot.(RT 87 - 88.) Christensen noted that a car
was parked in front of the house at 1599.(RT 91.) Among the items

he found and noted at the crime scene were a knit cap with a gun tucked inside,a cell phone,a .25 caliber shell casing which was under the victims body,some spent slugs,and a set of gold tooth caps.(RT 92,95,97 - 98.)

Evid. technician Viglienzone also processed the crime scene. He also noted the presence of a .25 caliber shell casing and two slugs,which were under the body.(RT 105.) He noted a set of gold teeth that appeared to have fallen out of the victims mouth.(RT 106.) Viglienzone found and collected seven .9 mm shell casings.(RT 107.) He said that a .9mm pistol that was found at the scene was fully loaded,with a 15 round clip and one round in the chamber.He also said the saftey was off,and the gun was ready to fire.(RT 110,125.) He said the body was found on the curb,next to a parked car.(RT 114.)

Evid. Technician Oare said that he checked the area near 1531 52nd Avenue.In the rear of the house,he found an area of trampled - down grass,and a white sweatshirt,which was inside out.(RT 276 - 277.) However,he found no actual footprints.(RT 282.) In the area of 1599 52nd Avenue,Oare saw a trail of blood spots leading from the front steps toward the car parked at the curb.(RT 281.)

Criminalist Bennett testified about various aspects of .25 caliber and.9 mm firearms,which were the type of guns used in this case. However,Bennet noted that the guns actually used here were not recovered. (RT 282,284.) He described how semiautomatic guns operate,and talked about the ejection of shell casings.(RT 285 - 288.) He examined the nine shell casings and spent bullets taken from the crime scene and collected at the autopsy.(RT 289 -292,313.) Bennett said all the .9 mm shell casings found in this case appeared to have been fired from one weapon,but he could not be certain.The same was true of the .25 caliber shell casing.(RT 295 - 297.)The .9 mm semiautomatic

- 9 -

pistol found at the scene did not fire any of the casings collected in evidence.(RT 297.) Bennett said that two contact wounds to the head of the victim did not appear to have been made by a .25 caliber pistol. (RT 321.)

Sgt. Dunakin testified he was an investigator in this case.(RT 327.) He found the victim face down at the edge of the sidewalk,near a parked car.He saw contact wounds to the back of the head,and some shell casings nearby.(RT 329,333.) On December 5,Dunakin spoke to Lakeisha Jackson,who was nervous and concerned and did not want to be seen speaking with the police.(RT 334 - 336.) He and Sgt.Longmire interviewed Lakeisha again on December 10.She was still reluctant to speak with them,but Longmire told her it was important to determine what happened,and he pointed out it could have been self defense. (RT 338 - 339,353.) Lakeisha told Sgt. Dunakin that she saw Petitioner struggling with the victim.She said that Romeo,who was wearing a white sweater,was shooting.(RT 341.) She also said she saw two men struggling,and that one of them was wearing a white sweatshirt.(RT 352.) Lakeisha told Dunakin that Petitioner called the house a little after 10 p.m. on December 5,to see if everyone was okay,but he did not say anything about the shooting incident.(RT 343 - 344,353.)

Sgt. Dunakin spoke to Elizabeth Forrest on December 16.She was not hesitant to speak,and she told him that she saw Petitioner and Romeo run from the scene of the shooting.(RT 344 - 345.) On December 19,Dunakin spoke to Juan Rodriguez,who told him he saw a man who was about 6'1" and wearing a white sweatshirt,standing over the victim. He thought the man was firing a gun toward the victim's head. A second man was present,and he said he had previously seen the two men in the neighborhood.(RT 345 - 346,356 - 357.) Sgt. Dunakin showed photo lineups to Rodriguez,who pointed out some people shown there,but who could not make a positive identification of anyone.(RT 347 - 348.)

Dunakin noted that Romeo Yarborough was arrested in this case on
December 16,2002.(RT 350.)

Dr, Rogers testified that he performed an autopsy on Noble
Gardiner on December 6,2002.He said he found a total of 15 wounds
to the body,some of which were entrance wounds and some were exit
wounds.(RT 59 - 61.) Rogers said he found wounds to the back of the
head,the side of the nose,the left forearm,the torso,buttock,shoulder,
groin area,and chest.There were also some scrapes and abrasions which
could have been caused by punching or kicking,and which were consistent
with participation in a fight.However, the internal injuries were
largely caused by the bullet wounds,and the cause of death was mutiple
gunshot wounds.(RT 61 - 63,72,75.) The bullet wounds were caused
by two diffrent size guns.(RT 66)Gardiner was still alive,and his
heart still pumping,when all the bullet wounds were inflicted.(RT 72.)
The wounds to the back of the head and to the cheek were close contact
wounds,evidenced by the presence of powder burns.(RT 71.) Dr. Rogers
said that the wound to his backbone would cause Gardiner to lose
controll of his legs,but he would still have had control of his arms.
(RT 79,81.) The toxicology report showed that Gardiner was under
the influence of marijuana at the time of his death,and also that
there were metabolites of cocaine in his bloodstream.(RT 72 - 73.)

## Defense Case

Dr.David Smith testified as an expert in toxicology,and on the
effect of cocaine use.(RT 363 - 364,372 -373.) Smith disagreed with
Dr.Rogers,who had testified he did not believe Gardiner was under
the influence of cocaine at the time of his death.(RT 73,367.) Smith
was given a hypothetical which provided the essential facts of the
interaction between Petitioner and Gardiner on December 5,including

the presence of a metabolite of cocaine in Gardiner's system.On the question of what effect cocaine had at the time of Gardiner's death, Smith said the toxicology report was consistant with a state of dysphoric agitation - a state of mind which is characterized by agitation,paranoia,and impulsivity.This would be consitent with an aggressive personality at the time of death.(RT 375 - 377.) Smith said the effect of cocain on Mr. Gardiner would depend on whether or not he was a chronic user,and he also said that more tests would be necessary to determine if he was under the influence at the time of the shooting.(RT 378,383.) For example,to determine if Gardiner was paranoid,it would be useful to determine if his lighter was really missing.(RT 385.) In addition,if Gardiner was found to have some rocks of cocaine in his possession,it would support a conclusion that he was a chronic user.(RT 387.) Moreover,Dr. SMith said that as with PCP,chronic cocaine use can makè it difficult to control a person who is uder the influence.(RT 391.)

Petitioner testified in his own behalf.His testimony regarding the events of December 5,2002,began with a description of an incident that took place at a gas station,located at High Street and Foothill Boulevard,in an early morning hour of December 5.Petitioner was driving a van that he had just purchased.He did not yet have the ownership papers for the van.He and Romeo Yarborough stopped at a gas station to fill up.(RT 397 -398,463.) When he got out to pay for the gas, two men carjacked the van and drove away with it.Petitioner said he recognized one of the carjackers.The contents of the van included keys,Petitioner's wallet,Romeo's cell phone and some papers. When the van was stolen,Romeo walked away from the gas station.(RT 398-399,469 - 471,474.) Petitioner began walking toward his gradmother's house. He met up with Romeo on the way.(RT 399.)

- 12 -

At around 9 a.m.,Petitioner and Romeo were at his grandmother's house.Because Romeo's cell phone was in the van,they called the number, trying to contact the robbers.Petitioner also called the family of the robber that he had recognized,and tried to arrange the return of his vehicle.Eventually,Petitioner got hold of the man who had taken the van.The man said he had Petitioner's ID,and knew where he lived.He also made threats against Petitioner's family.(RT 399- 401,476 - 478.) because he was concerned about the safety of his family,Petitioner armed himself with a .25 caliber semiautomatic handgun.Romeo had a .9 mm pistol.They sat in the front yard all day,and waited for the carjacker to come by.(RT 401 - 402,480 - 481.)

Around 9 p.m.,Petitioner and Romeo walked to the corner,looking around to see if anyone was lurking,who might sneak up on them.(RT 402.) When they got to East 14th Street,they saw Kenya Smith getting out of a van.Romeo spoke to Kenya.Then they noticed a man standing outside,in the area of Kenya's apartment.(RT 403 - 404.) They walked toward the man,who turned out to be Noble Gardiner,and saw that he was holding a pistol,which was pointed backward.Petitioner had not met Gardiner before December 5,2002.Romeo then recognized the man and greeted him,telling Petitioner it was the person he had talked about before.(RT 406 - 407,455.) Romeo had previously told Petitioner that Gardiner was known to carry a gun,and had bragged about shootings he had done and a murder he had committed.(RT 431 - 432.) Petitioner knew Gardiner had shot someone named Leo.(RT 433,456.)

Romeo and Gardiner both kept their guns out.Romeo talked to the man "about him shooting Leo" (RT 408 - 409.) Romeo told Gardiner that Leo had been a friend of Petitioner.Petitioner,wanting to defuse the situation,told Gardiner "your hard" - meaning tough - and also noted that Kenya was making money for Gardiner.(RT 409.)

- 13 -

Next,Romeo and Petitioner went to Gardiner's apartment to buy some marijuana.(RT 409,411.) While they were in the apartment,Gardiner boasted about the time he had spent in jail.He kept getting up and moving around,each time picking up and carrying his gun.(RT 412.) Gardiner then talked about the neighborhood,naming people who lived in the area,noting when they left for work,and describing the location of their yards.(RT 412 - 413.) While the three of them were smoking marijuana,Gardiner asked Petitioner and Romeo where they got their drugs.He put baggies of marijuana and crack cocaine on the table. (RT 413.) In addition,while they were in the apartment,Petitioner told Gardiner that in the past he had had sex with Kenya.Petitioner did not want Gardiner to hear it from someone else.(RT 434.)

At some point,Kenya walked in.She asked what Petitioner was doing in her house,and she went into the back with Gardiner.(RT 413 - 414.) While they were gone,Petitioner told Romeo he was not comfortable with the situation and wanted to leave.When Gardiner came back,Petitioner and Romeo left and went back to Petitioner's grandmother's house. They stood by the gate and smoked some more marijuana.(RT 414.)

A while later,Gardiner came along.He said "I see you're behind the  gate tonight." Petitioner and Romeo said nothing,but just waited. Gardiner did the same.Finally ,Petitioner let Gardiner into the yard. Gardiner then told Petitioner he had set himself up as the person in charge of the neighborhood.He told Petitioner to get "on board" or leave.Gardiner's statements scared Petitioner's and made him watchful of Gardiner's movements.Gardiner never said anything about a cigarette lighter.(RT 415 - 417,485.) Petitioner testified that on December 5,he was fearful of Gardiner because Gardiner was holding a .9 mm handgun.(RT 459,461.) Petitioner thought Gardiner was "up to no good" and noted that Gardiner kept moving around.Petitioner

- 14 -

could not see if Gardiner had a gun drawn,but Petitioner believed
Gardiner had shot Leo Logwood and other people as well,and that he
was carrying a .9mm pistol and he did not want to take any chances.
Gardiner kept "bragging" about his exploits and Petitioner thought
he was trying to scare them. (RT 417 -418,459,461.) Petitioner said
they were just trying to live their lives.However,Gardiner kept talking
about taking over the nieghborhood and about selling drugs.(RT 419.)

   The situation was getting "tense" and Petitioner did not want
to give Gardiner any excuse to act out.When Gardiner told Petitioner
to hook up or book up" Petitioner turned and started to walk away.
He walked toward the back of the house,but felt uncomfortable leaving
Romeo there with Gardiner.(RT 420 - 422.) Petitioner took out his
gun,and returned to the front yard,where he saw Gardiner leaning
toward Romeo in a threatening manner,and speaking into his ear.
Gardiner appeared to have something in his hand.(RT 422,491.)

   Petitioner testified he grabbed Gardiner and spun him around.
Gardiner began to swing his gun hand toward petitioner,but,Yarborough
grabbed Gardiner's hand(RT 423 - 424.),Petitioner then hit Gardiner
with his gun and fired.(RT 424.) As Petitoner and Gardiner struggled,
and Gardiner raised the hand with his gun,Petitoner was able to grab
his wrist.He fired again,and hit Gardiner near the shoulder.They
continued to struggle,but Petitioner's gun would not fire again.(RT 425.)
The two men stuggled and wrestled together,moving around the yard,
as Gardiner kept trying to shoot Petitoner.Gardiner had his gun concealed
inside a beanie hat.Then Romeo stepped back and fired at Gardiner.
(RT 426 - 427.) Petitioner said he shot Gardiner twice and could
not say how many times Romeo shot Gardiner.(RT 427.)

   Still struggling with Petitioner,Gardiner moved outside the
gate and fell near the car parked by the curb.He pulled Petitioner
down as he fell toward the ground.Petitioner stopped himself from

- 15 -

falling by bracing against the parked car.He grabbed for Romeo's
gun and fired two more shots at Gardiner.He only learned later that
he had hit Gardiner in the head.(RT 427 - 428.) Petitioner said that
Romeo was standing near him and he only had to reach over to take
Romeo's gun and fire it at Gardiner.(RT 509,512.) Petitioner said
he believed Gardiner still had a gun at the time Petitioner shot
him,and Petitioner did not think at all but only reacted,in order
to survive an anticipated attack by Gardiner.(RT 500,508,510 - 512.)
In addition,even though he had been shot several times,Gardiner kept
coming at Petitioner.Petitioner said "I felt that I had to shoot
him.He was still moving." When he fell near the car,Gardiner was
still trying to get up and Petitioner believed that,if Gardiner could
get up,he could still shoot Petitioner.Petitioner was shown one of
the crime scene photos,but could not explain how Gardiner's gun ended
up near the gate.(RT 436 - 437.) He said he believed he had acted
in self defense.(RT 515.)

Officer Saunders testified that in his interview of Juan Rodriguez,
Rodriguez never said he saw anyone shooting on December 5.(RT 535.)

Defense investigator Notty Bumbo testified that he made some
measurements around the scene of the shooting.He said the distance
from the house where Juan Rodriguez was located to the spot where
Gardiner was shot amounted to 160 feet.(RT 541 - 542.)

Terry Wingert testified as an expert in the use of firearms
and prper use of deadly force.(RT 552.) Wingert said it was not unusual
for a person to be shot several times and still have the ability
to struggle and act aggressively.He said adrenaline can play a part
in such encounters.(RT 555 - 556.) Given a hypothetical based upon
the evidence presented in this case,Wingert said he believed Gardiner
was affected by adrenaline and drugs,and that he could continue to

struggle even after having been shot. He said the evidence showed
there was a life and death struggle between the participants,and
he pointed out that the gun shots were scattered over Gardiner's
body.He also noted there was no evidence that the shooter simply
walked up and shot Gardiner.He said that in his opinion Petitioner's
actions were reasonable under the circumstances.(RT 560,590.)

Wingert said that if he was faced with a person who he reasoably
thought planned to use a gun on him,he would use lethal force and
would continue to fire a gun at the person until he no longer posed
a threat.Wingert said a police officer would do the same thing.(RT 573 -
574.)

James Dale testified that on December 1,2002,at around 2 a.m.,
he and Leo Logwood were on the cornor of 51st Avenue and East 14th
Street.(RT 615.) A man,brandishing a gun,approached Dale and Logwood.
He said he was going to "shut down shop" and eliminate all competition
pertaining to drug sales and prostitution in the area.(RT 616 - 617.)
Dale said the man smiled at him and Logwood,revealing gold teeth.
(RT 618.) The man with gun told Leo to walk with him over to the
dumpsters.The man grabbed Logwood by the arm,and Logwood told Dale
to run and get help.(RT 618 - 619.) Leo logwood was not armed.(RT 622.)

As Dale ran down 51st Avenue,he heard about six shots.He turned
and ran back,where he found the man standing over Leo logwood,holding
a gun in his hand.The man looked at Dale and ran toward 52nd Avenue.
Dale identified a photograph of the man who shot Leo logwood.(RT -
619,623.) Leo did not die on December 1 and,when Dale visited him
in the hospital,Leo told Dale the man who shot him was known as Chuck.
(RT 620.)[6]

The parties stipulated that the Oakland Police Department investigated
the shooting of Leo Logwood at the corner of 51st Avenue and East

- 17 -

14th Street.The police recovered several .9 mm shell casings from
the scene of the shooting.The casings were analysed and were found
to have been fired from the gun that was offered into evidence in
this case as Exhibit 10.[7] (RT 623 - 624.)

During the trial,the parties also entered into the following
stipulations:

The parties agreed that at the preliminary hearing,Juan rodriguez
testified that the shooter he saw on December 5 was the lighter -
skinned of the two men.(RT 204.)[8]

The parties agreed that on December 13,2002,Sgt.Longmire spoke
to Kenya Smith.She said she heard Gardiner state on the telephone
that he shot a person named Leo,on 51st Avenue.In addition,Gardiner
told Kenya that at the end of September he shot a person who was
located at 96th and Bancroft.Kenya told Sgt. Longmire that she heard
on the news about a man and two girls who were shot while they were
in the back of a car,and she said the man was now confined to a wheelchair.
Kenya told Sgt. Longmire that the two girls had been seated in the
back of Gardiner's car,and that they were hit because someone was
shooting at Gardiner.Finally,Kenya said Gardiner had a black handled
.9 mm gun with some rust on the top.(RT 540.)

The trial court took judicial notice of the fact that on December
5,2002,the moon set at 6:14 p.m. (RT 539.)

---

[6] As noted above,Gardiner was referred to by several names,including "Chuck."

[7] This was the gun that apparently belonged to Gardiner,and which was found
in the knit cap.

[8] In Lakeisha Jackson's statement to the police,she described Romeo Yarboroug
as being mixed - race with a complexion that was "yellow- Ish."(Exh.22B at
p.8.)

- 18 -

**GROUND ONE- PETITIONER'S CONSTITUTIONAL RIGHT TO EFFECTIVE COUNSEL
WAS VIOLATED.**

An attorney is ineffective if his performance falls below an
objective standard of reasonableness and there is a reasonable probability
the jury would otherwise have acquitted (Strickland v. Washington
466 U.S. 668,688,694-1984). In this case,counsel failed to call
Romeo Yarborough to corroborate Petitioner's self defense and unreasonable
self defense defenses. It is beyond question this was ineffective.
"A lawyer who fails adequately to investigate and introduce into
evidence information that demonstrates his client's factual
innocence,or that raises sufficient doubt as to that question to
undermine confidence in the verdict,renders deficient performance'
[Citation]" (Lord v. Wood 184 F.3d 1083,1093-9th Cir. 1999).

Analogously,in "Riley v. Payne" (352 F.3d 1313-9th Cir. 2003),
the defendant testified he shot one Jaramillo when Jaramillo threatened
to kill him and reached for a gun. Jaramillo and his friend
testified riley and Edward Pettis had robbed them and shot Jaramillo.
The Ninth Circuit deemed Riley's attorney ineffective for not interviewing
Pettis,who would have testified Jaramillo had indeed threatened
Riley before Pettis ran away: "Having never interviewed Pettis [Counsel]
could not have determined what Pettis would have said about the shooting
[Or] whether Pettis should have been  called to testify to aid the
defense" (Riley AT 1319):

In this case,the record is not clear the extent to which counsel

interviewed Yarborough.  If he did not or did not do so fully,he
was deficient (Riley AT 1318-19;Avila v. Galaza 297 F.3d 911,920-
9th Cir. 2002 [" A lawyer has a duty to investigate what information....
potential eyewitnesses possess,even if he later decides not to put
them on the stand"];Bryant v. Scott 28 F.3d 1411,1419-5th Cir.1994
[Failure to interview codefendant who exculpated Bryant deficient
despite fact he might not be called]).

     At a post trial hearing,petitioner complained about counsel failure
to call Yarborough,noting he would have bolstered the defense and
contradicted prosecution witness Rodriguez (RT-739-740).   The trial
Judge assumed counsel's failure was a "tactical" decision (id).
The court did not ask counsel if this were true or attempt to determine
the nature or reasonableness of such a tactic or if counsel had
fully interviewed Yarborough.

     Counsel remained strangely silent.  He did not confirm on the
record he'd spoken to Yarborough,discuss the content of any discussion
or explain why Yarborough was not called.  The prosecutor was not
present at the hearing (RT-709) counsel's investigator "Believed"
counsel determined Yarborough would not help the defense (RT-740).

     Yarborough's declaration indicates his interview with counsel
was less than thorough (Attached Exhibit Q).  Petitioner told the
court counsel had indicated Yarborough's statement did not
"completely match" Petitioner's and that Yarborough did not want
to testify (RT 740).  However, when pressed,counsel claimed not to
remember what the alleged inconsistencies were.

     As Petitioner related to the court (id),counsel's investigator
Kohler,contradicted counsel by telling Petitioner Yarborough corroborated

self defense.  Kohler,confirmed to the court that "Mr. Yarborough probably would have testified" (id).  Her statement Yarborough might "Take the Fifth" (id) referred merely to Yarborough's initial reluctance to  testify Petitioner had also shot Gardiner (A fact not known to the prosecutor at that time).  After Petitioner assured Yarborough he wanted Yarborough to testify and tell the whole truth,Yarborouh was willing and prepared to testify as of the date he spoke with counsel (See attached exhibit Q).  Petitioner confirmed to counsel that Yarborough wanted to testify.

The record at present does not reflect the extent or content of counsel's conversation with Yarborough or if counsel learned enough to support a reasonable decision not to call Yarborough. Indeed,counsel was not aware,or had forgotten,his investigator spoke to Yarborough several times (RT-740-41).  As such,there is no reason to defer to his decision (Lord v. Wood 184 F.3d AT 1095. fn. 8 [Declining to defer to counsel's failure to call witnesses when attorney had not interviewed them]; Avila v. Galaza 297 F.3d AT 920 [Counsel deficient for conducting only incomplete interview of witness);See Petitioner's motion for evidentiary hearing with counsel,Kohler, and Yarborough]).


Moreover,even if counsel fully interviewed Yarborough,his decision not to call him was unreasonable.  "Strickland" requires counsel to have  "made all significant decisions in the exercise of professional judgement" (AT 690;Lord v. Wood AT 1095 [Independently examining witnesses' statements and concluding "A competent attorney would not have failed to put them on the stand"]; Sanders v. Ratelle 21 F.3d 1146,1457-9th Cir. 1994 [Attorney ineffective for failure to

- 21 -

introduce exculpatory statement in his possession]; Pavel v. Hollins
261 F.3d 210,217-18-2nd Cir. 2000 [Same with failure to call
witnesses "With whose putative testimony [Counsel] was familiar"];
Luna v. Cambra 306 F.3d 954,961-67-9th Cir. 2002 [Same for failure
to interview and call corroborative witnesses]; Brown v. Myers 137
F.3d 1154,1156-58-9th Cir.1997 [Same];Rios v. Rocha 299 F.3d 796,
805-12-9th Cir. 2002 [Same]).

      Yarborough told counsel,in essence,that: Gardiner approched
Petitioner and Yarborough at the Stone home,boasted of how he would
take over the local drug trade and implied he would kill Petitioner
and Yarborough if they did not join him.  Gardiner then pulled his
gun and tried to shoot Petitioner.  Petitioner and Gardiner struggled
during which the men shot Gardiner to protect themselves.  Petitioner
eventually was forced to shoot and kill an apparently still dangerous
gardiner with Yarborough's gun (ATT. EX. Q).  This account near
perfectly corroborated Petitioner's testimony (RT-414-28) and
contradicted contrary prosecution testimony (Lord v. Wood AT 1093,
1094 [Counsel ineffective for failing to call witnesses with
"consistent" and "mutually reinforcing" statements] and at [Failure
to call witnesses not justified by thier "Slightly inconsistent
recollections" when "Discrepancies were minor and turned on the kind
of highly specific details that eyewitnesses often remember diffrently"
]).

      Yarborough could also have corroborated Petitioner about Gardiner's
admissions of prior violent conduct (ATT. EX. Q; RT-417-19,432-33).

PREJUDICE

Had counsel called Yarborough,there was a reasonable probability of acquittal (Strickland AT 694). "Riley" found prejudice from the failure to call a corroborative witness: "Pettis was a critical witness to lend credibility to Riley's story of threat by Jaramillo and response by Riley. Pettis's testimony would have been 'consistent with riley's account' and would have created more equalibrium in the evidence presented to the jury; Luna v. Cambra AT 961. Here, as in 'Brown [ v. Myers],'without any corroborating witnesses,riley's bare testimony left him without any effective defense'" (Riley AT 1320 quoting Brown AT 1158).

So it is herein. Yarborough would have lent critical credibility to Petitioner's defense.While prosecution witness Jackson confirmed there was a struggle during the shooting (RT-216,221,226,247-48), it was Yarborough who could corroborate Petitioner as to the circumstances of that struggle: that Gardiner triggered the incident by trying to shoot Petitoner and Petitioner and Yarborough fought with and shot Gardiner while defending themselves. Yarborough's absence,which the jury surely noticed,left Petitioner as the sole direct support for his defense.

Moreover,"[E]valuation of 'Strickland' prejudice must be considered in light of the strength of the Government's case" (Riley AT 1321). "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support" (Strickland AT 696).

The instant murder verdict was truly "weakly supported." Petitioner need only have raised a reasonable doubt the killing was unlawful,I.E.,

- 23 -

a "reasonable possibility" of self defense (People v. Rios 23 C.4th
462,525 fn. 9).  His testimony alone,plausible and unimpeached,
did so (See CALJIC No. 2.27 [The testimony of a single witness is
sufficient to establish any fact]).  Moreover,most of the evidence,
including that from the prosecution,corroborated rather than contradicted
Petitioner.

Gardiner was indeed a volatile,violent man who had abused smith
(RT-162) and attempted to kill someone just four days before the
incident in this case (RT- 616-22).  That shooting,like his actions
in this case,was motivated by his desire to controll the local drug
and prostitution trade (RT 616,417-19).  Two days before that,Gardiner
bradished a gun and declared an intent to violently eliminate the
criminal competition (RT-616).  In this case,Gardiner was armed with
a fully loaded 9 millimeter firearm (RT-110-11,119-20) Ballistics
evidence and Smith established Gardiner had used in the prior shooting
(RT-539,157,618-19,624).  Petitioner and Yarborough were aware of
Gardiner's commission of that and other shootings (RT-417-19,432-33).

Gardiner confronted Petitioner and Yarborough while angry and
upset due to Petitioner's prior relationship with Gardiner's girlfriend,
Smith,and/or his belief the men had stolen his lighter (RT-141,155,
158-60).  Gardiner had cocaine (RT-412) and exhibited symptons of
cocaine intoxication (Agitation,Paranoia,Restlessness,Impulsivity
RT-376-77,382-84) which rendered a violent outburst more likely
(RT-377,370,386).  Cocaine metabolites in his blood stream indicate
he was,in fact,under the influence during the incident (RT-392-94).
Consistent with Petitioner's testimony,an expert testified cocaine
intoxication would have made it difficult to physically subdue Gadiner
(RT-391).

- 24 -

Jackson testified Petitioner and Gardiner appeared to be fighting
for possession of something (RT-248,252,341). This corroborated
Petitioner's testimony he was attempting to disarm Gardiner. Jackson
also saw a third man fire about three shots which did not stop the
fight (RT-216-17,221,246,248). This corroborated Petitioner's
testimony Yarborough shot Gardiner who nevertheless continued to
try to shoot Petitioner (RT-426-30). The bullets in Gardiner,of
two diffrent calibers,came from "all diffrent directions" (RT-76),
a fact supporting an expert's common sense conclusion Gardiner was
shot durring a struggle (RT-560). Gardiner's multiple blunt injuries
were further corroboration (RT-75).

Powder burns on Gardiner's head wounds were consistent with
petitioner's testimony he inflicted them up close while fighting
with Gardiner (RT-424,428,436;ATT EX. A AT 19-20 [Coroner Rpt])
the absence of powder burns on Gardiner's torso,arm,or back wounds
were consistent with them being inflicted from a distance by
Yarborough (RT-80,70-72). An expert testified it was not unusual
for one like Gardiner to continue to struggle after suffering
multiple gunshot wounds (RT-555,575,556).

Petitioner testified Gardiner eventually fell,pulling Petitioner down
as well and apparently still intent on killing Petitioner (RT-427-28,
508-11). Experts testified the bullet wound to Gardiner's spine
would have caused him to fall but not prevented him from fighting
or firing his gun (RT-79-81).

Sargeant Dunakin initially testfied Gardiner gun was found in
"very close proximity" to his body (RT-330), indicating Gardiner
was still armed when the final shots were fired. Even if he wasn't,

- 25 -

it was arguably reasonable for Petitioner to believe Gardiner was still armed at that moment (See CALJIC No. 5.51 [Right to self defense arises upon appearance of imminent danger. Actual danger not required]). Expert testimony demonstrated Gardiner's inability to fire was likely caused by the poor condition of and/or a design flaw in his gun (RT-129,612). Evidence Gardiner had the gun concealed in a cap (RT-97,104) suggests an intended suprise attack.

Rodriguez, the only witness to contradict Petitioner,testified Petitioner walked away,came back,and fired a gun near Gardiner (RT-173,180,196-97). The prosecutor cited this as evidence of premeditation (RT-655). In this sense,the case came down to credibility (See Riley AT 1321 fn.8 [Failure to call corroborative witness prejudicial when trial a "credibility contest"]).

Substantial evidence indicated Rodriguez did not see the incident or Petitioner and Yarborough. Rodriguez admitted as much in his first statement to police (RT-189; See CT-647 [Magistrate finding Rodriguez not worthy of belief]). Accordingly,Rodriguez was unable to identify either man in photo line-ups (RT-355,347-48,357). AT the preliminary hearing,Rodriguez was suddenly able to identify the lighter-skinned of the men (apparently Yarborough) as the shooter (RT-204). At trial,where Petitioner was the only defendant,Rodriguez fingered the darker,taller man (apparently Petitioner) (RT-205,180). Rodriguez was nevertheless unable to identify Petitioner (RT-182). Rodriguez' unexplained switch smacks of prosecutorial coaching.

Rodriguez previously testified he saw only the gun being fired and omitted mention of anyone walking away and coming back (RT-196-99).

Physical evidence impeached Rodriguez. He testified the gun

was about a foot above the ground when fired once (RT-196-97).
However,autopsy evidence shows the two head wounds,which finally
stilled Gardiner (RT-428,508-11,77-78),were inflicted with a gun
pressed against Gardiner's head.  An expert confirmed this was fatally
inconsistent with Rodriguez' testimony (RT-315,70-72).  The prosecutor
attempted damage control by alleging that what Rodriguez saw inflicted
was the single,non-"Press-contact" wound to Gardiner's chest.  The
prosecutor also alleged the shot occured after the two undoubtedly
fatal (RT-77-78) head wounds and after Gardiner was down (RT-655).
This last contrivance was necessitated by Rodriguez' testimony the
shot he allegedly saw was the final one (RT-172-79).

        However,a prosecution ballistics expert testified the chest
wound could not have been inflicted in the way Rodriguez said (RT-
316-17,322).

        In light of the substantial evidence of self defense and the
rocky prosecution case,corroborative testimony would likely have
led  to acquittal (Brown v Myers 137 F.3d AT 1157 [Counsel's failure
to call exculpatory witnesses prejudicial when "[Defendant's] own
testimony would have appeared more credible because it coincided
in important respects with that of the [omitted] witnesses" and
there were "sufficient inconsistencies in the prosecution evidence"];
Luna v. Cambra 306 F.3d AT 967 [Same when probative value of identificatio
evidence "limited",physical evidence did not implicate Luna,and
Luna's testimony "constituted the whole of his defense"];Rios v.
Rocha 299 F.3d AT 809-10 [Same when prosecution testimony "both
inconsistent and severely impeached" and prosecution case "was at
best a close one"]; Avila v. Galaza 297 F.3d AT 924 [Same when prosecution

testimony "not rock solid"]; Sanders v. Ratelle 21 F.3d AT 1461

[Same when prosecution witnesses,in part,supported defense theory

and Sanders deprived "of the most critical evidence supporting his

best defense"]; Hart v. Gomez 174 F.3d 1067,1073-9th Cir. 1999

[Hart prejudiced when evidence omitted by counsel "Provided remarkably

strong corroboration for [defense witness'es] uncorroborated testimony"]).


    The error was even more prejudicial as to unreasonable self

defense (usd).  As to usd,Petitioner needed only to raise a reasonable

possibility he believed shooting Gardiner was neccessary,not that

it was also reasonable (People v. Randle 35 C. 4th 987,995-2005 ).

"BRADY v MARYLAND" WERE VIOLATED.

### A. BACKGROUND.

Kenya Smith informed Sargeant Longmire on December 13,2002 that Gardner had admitted his involvement in a shooting at 96th and Bancroft.Smith said the shooting involved two wemen (in a car) and a man being shot at "the end of September". Smith also stated Gardner admitted to shooting a "Leo" (CT - 594 - 95,PTRT[prior trial transcript] - 152),The Prosecutor knew of the statement as of the preliminary hearing (id).

Prior to Petitioner's first trial,his attorney made several requests for disclosure of any information relating to the shootings mentioned by Smith (PTRT - 104,109 -11,34,150 -52). Information was discovered about the Leo Logwood shooting which occured just before the instant incident by four days (PTRT - 103 - 06,135 - 37).However,the Prosecutor either did not turn over this information or only did so on the eve of the first trial (see PTRT - 103 - 06; CT - 957).The prosecutor also had information on a shooting at 96th and Bancroft but claimed Gardner could not be connected thereto (PTRT -109,151 -52).

Prior to the instant trial,petitioner's second attorney renewed requests for information on a 96th and Bancroft shooting (RT - 1 - 4).A memo indicated Longmire and an Oakland Police Department Detective had "no specific information regarding Noble Gardner being a suspect in any shootings"(RT - 1).Defense counsel pointed out the memo suggested the search was unreasonably focused on Gardner,rather than shootings at Bancroft (RT - 2).

The Prosecutor later claimed a computer search failed to turn up a shooting near 96th and Bancroft in September of 2002 (RT - 10 - 11).

After petitioner's conviction,counsel's investigators
(CT - 957 )located newspaper accounts of shootings potentially
matching Smith's description.One occured a block or two East of
Bancroft (the Easterling shooting ).The other in the 2200 block
of 96th,near Bancroft.After being confronted with the news reports,
the prosecutor finally turned over the related Police reports
(RT - 750,754 - 55).The Easterling incident did not invole Gardner
but was investigated by Longmire and Sargeant Dunakin(Attatched EX -
I at 1 - 7;RT - 753 -54).

The Bancroft shooting,which occured just two months before the
instant incident,matched Smith's description.Moreover,evidence
suggested Gardner was the unidentified shooter.A witness identified
the shooter as "C"(att.Ex.B - 3).Gardner's nickname was "Chuck"
(CT - 594),a fact known to Longmire and Dunakin (id).Witnesses
Daniell Jeter,Michael Hall,and Ava Casey told Police,"C" had opened
fire from a car on Hall and another man(Att.Ex. B - 1 - 3;G - 7 - 8).
Hall,who was hit,apparently fired back,hitting Jeter and another
woman in the car(id),most critically,Police found Gardner's resume
in the car(Att.Ex. C - 1 - 2).Two of the officers involved in
finding the resume,Viglienzone and oare,worked on this case(Att. -
Ex. C - 1 - 2;RT - 100,273).

Defense counsel filed a post-trial motion seeking (1) inquiry
into prosecutorial efforts to discover and disclose potentially
exculpatory information,(2) Disclosure of the results of any investigation
of the Bancroft shooting,and (3) inquiry into why the Bancroft,
Logwood,and Easterling shooting information was not disclosed earlier
(CT - 970 - 72;RT - 754 - 56,758,759 - 60)counsel also sought to
examine Gardner's resume(CT - 981),which the prosecutor subsequently
stated was discarded(RT - 757).Counsel filed a New Trial motion
based on the foregoing(RT - 985 - 94).The Trial Court denied
discovery regarding the Easterling incident and the destruction of

-30-

A defense investigator found the Bancroft shooting case had been "cleared" just two days after the shooting.The prosecutor claimed there was no "follow up " investigation,"C" was never identified and that no case - related evidence could be found (RT - 756 - 57).Nevertheless,it remains unclear if Gardner was investigated or implicated.

The prosecutor claimed ignorance of the Bancroft shooting and speculated the information was not located because Gardner was not "named" in the investigation (RT - 759,763 -64).

Despite the prosecutor's suspect justification,The Trial Court precluded testimony to determine why the information was missed or not disclosed.The Court concluded the suppressed evidence would not have changed the verdict (RT - 760,767).

### B. THE "BRADY" RULE

" [A] Defendant's due process rights are violated when the state fails to disclose to the defendant prior to trial 'evidence favorable to the accused... where the evidence is material either to gult or punishment,irrespective of the good or bad faith of the prosecution' "(Bailey v. Rae 339 F.3d 1107,1113 - 9th cir. 2003 quoting Brady v. Maryland 373 U.S. 83,87 - 1963). "The prosecutions duty to disclose favorable evidence is not dependent upon a request from the accused,and even an inadvertent failure to disclose may constitute a violation"(id).

Suppressed evidence is "material" if "there is a reasonable probability that,had the evidence been disclosed to the defense, the result of the proceeding would have been diffrent"(Kyles v. Whitley 514 U.S. 419,434 - 1995).A reasonable probability is one sufficient to undermine confidence in the verdict(id).A'Brady' claim is not defeated merely because there is sufficient evidence to convict(id at 435 - 36).

- 31 -

## 1. SUPPRESSION OF EVIDENCE.

The record clearly demonstrates a negligent (and maybe even bad faith) failure to discover and/or disclose the Bancroft information. The prosecution team either did not search diligently or at all or found evidence but did not disclose it.The prosecutor had discoverd a shooting at 96th and Bancroft before the first trial but claimed there was no connection to Gardner(PTRT - 109,151 -52).This was very likely the Hall shooting.If so,the prosecutor nevertheless failed to disclose it despite the obvious match to Smith's description.

After another alleged search (RT - 2),the prosecutor confusingly stated NO information about a shooting around 96th and Bancroft had been found(RT - 10 - 11).

The prosecutor claimed to be ignorant of the information during trial(RT - 759,763 - 64).Even if this were true,"Brady" extends to evidence of which the prosecutor is ignorant,imposing "A duty to search possible sources of [Exculpatory] information"(U.S. v. Brooks 966 F.2d 1500,1502 - D.C. cir. 1992).The "prosecution has a duty to learn of any favorable evidence known to others acting in the Government's behalf in the case,including the Police" (Kyles  v. Whitley 514 U.S. at 432,437 - 38;Carriger v. Stewart 132 F.3d 463,479 - 80 9th cir. 1997[finding Brady violation despite doubt prosecution was in possession of information]).

The details given by Smith about the incident(two women shot in a car,another man shot at 96th and Bancroft - CT - 594 - 95) were clearly reflected in the late disclosed report(Att. Ex.B - 1 - 3).A proper computer search would undoubtedly have turned up the case(see Crivens v. Roth 172 F.3d 991,997 - 7th cir.1999[Brady violation found when it was "difficult to accept" Police could not have found police record]).

Police officers,too,may violate "Brady":"Brady....neccessarily requires the cooperation of other Government agents who might possess Brady material"(U.S. v. Blanco 392 F.3d 382,388 - 93 - 9th cir. 2004 ["Brady"violated by investigating agency's failure to reveal information to Prosecutor];U.S. v. Wood 57 F.3d 733,737 - 9th cir. 1995[same]).Sargeants Longmire and Dunakin knew this might be a self - defense case when they spoke to smith(RT - 339)and this knew[even before the defense made its request]the significance of Smith's statement that Gardner had admitted to two shootings(PTRT- 109 - 11,34,150 - 52,RT - 1).Once Smith's information about the Logwood shooting proved true,It bolstered the likelyhood Smith was right about Bancroft as well.

The information search was negligent or in bad faith.If that fact prevented discovery of the information,"Brady" was violated: "[E]ven an inadvertent failure to disclose may constitute a 'Brady' violation "(Bailey v. Rae 339 F.3d at 1114 fn.5).A memo indicated the prosecution team was looking for shootings in which Gardner had specifically been implicated (RT -1).The prosecutor suggested that this is why the Bancroft information was not found(RT - 758 - 60). However, the defense requested for shootings at 96th and Bancroft, Period(RT - 1 - 2).It appears the search was also unnecessarily limited to homicides(RT - 1 - 2).No one was killed in the Bancroft shooting."Brady" requires the "Government [to have]diligently searched the pertinent criminal records for information"(Crivens v. Roth at 977;U.S. v. Brooks at 1501 - 02 ["Brady"violation found when non-disclosure resulted from prosecution confusion over scope of defense request]).

Moreover,Gardner's name did come up in the investigation, although not necessarily as a suspect.His resume was found in the crime scene(i.e,the car)(Att.Ex.C - 1 - 2).No reasonable prosecutor or Police officer could believe this a coincidence.

Longmire was involved in the search(RT - 1).His negligence or
bad faith as to the Bancroft shooting is evidenced by the failure
to disclose,or late disclosure of, the logwood and Easterling
shooting information(PTRT - 103 - 06;CT - 957;RT - 753 - 54).
Longmire should have(and likely did)remembered the two cases,which
he and Dunakin had worked - only four days and two months -
respectively,before the instant shooting(Att.Ex.J at 6[Logwood
Police report]Att.Ex.I at 1 - 7[Easterling Police report])this
is particularly true when Smith named Logwood as a victim(CT - 594 -
95).

    Finally,the Prosecutor's speedy disclosure of the Bancroft
report after being confronted with a news article about it(RT - 750,
754 - 55)further denotes and demonstrates the report should have
been (and maybe was)found earlier.The article contained no information,
such as the identities of witnesses or officers,that was not in Smith's
description(CT - 959,594 - 95).


## 2. MATERIALITY.

    whether evidence is"favorable" is determined "in light of the
facts of the case and that statutory elements of the crimes at issue"
(Bailey v. Rae 339 F.3d At 1115 [suppressed evidence favorable when
it impacted central element of charged crime]).In this case,the
murder charge required disproving self - defense.The suppressed  evidence
was thus favorable and material.It would have bolstered the inference
that,Gardner had,in fact,attempted to shoot petitioner and Yarborough,
as petitioner testified:"[Where] self - defense is raised in a
homicide case,evidence of the aggressive and violent character of
the [decedent] is admissible... such character traits can be shown
by evidence of specific acts of the [Decedent] on third persons as
well as by general reputation evidence" (people v. Wright 39 C.3d
576, 587 - 1987 citing evidence code section 1103 (a)(1)[evidence

-34-

The admitted evidence of self - defense included (1) eyewitness
and ballistics evidence,Gardner had unjustifiably shot Leo Logwood
(RT - 616 -20,624)and admited doing so(RT - 539)and (2) Hearsay
evidence of Gardner's commission of,and admission to,other shootings
in the area (RT - 417 - 18,432 -34).The suppressed evidence,rather
than being cumulative,would have complimented and strengthened the
admitted evidence. The Bancroft evidence included three eyewitnesses
to Gardner's commission of yet another unprovoked shooting within
months of the Logwood and instant incidents.This evidence,combined
with the Logwood and reputation evidence,would have provided the
key inference,Gardner had a pattern of firearm violence and was
dangerous indeed.The Jury could otherwise have concluded the Logwood
shooting was an isolated incident and the reputation evidence mere
hearsay.Evidence is "material" if it could "put the whole case in...
a diffrent light "(Kyles At 435 and At 442 fn.13["Brady" violated,
in part,by suppression of witness'es criminal history];Carriger v.
Stewart At 481[same when suppressed evidence of witness'es history
of violence more probative than single instance of violence admitted]).

The Bancroft evidence,although circumstancial as to Gardner's
identity,was valuable and would have renderd admissable,Smith's
statement that Gardner had admitted his involvement(CT - 594 - 95).
The trial Court admitted Gardner's confession to the Logwood shooting
in conjunction with the Logwood evidence(Kyles v. Whitley At 441
- 42,447["Brady" violated ,in part,due to suppression of evidence
suggesting witness' identity as perpetrator];Carriger v. Stewart At
479 - 81 [same]).Conversely,the Logwood evidence would have bolstered
the inference that Gardner,not Hall,fired first on Bancroft.

The evidence would also have lent credibility to petitioner's

- 35 -

testimony he had heard about Gardiner's other shootings and actually feared Gardiner might shoot him.Moreover,Hall,Casey,and Jeter were, unlike Petitioner,nonbiased witnesses,a factor adding to materiality (Bailey v. Rae At 1116).

Finally,as shown (above At 23-28      ),the remaining evidence was far from overwhelming (Kyles At 450 [Suppressed evidence material when other evidence consistent with defense testimony];Gantt v. Roe 389 F.3d 908,913-14-9th Cir. 2004 [Same when eyewitness testimony "heavily impeached" and another witness testimony implausible and contrary to other prosecution evidence]).

Footnote One- Although Petitioner also alleges counsel was ineffective regarding the Bancroft evidence (See Ground 5),this did not absolve the prosecution of its "Brady" duty (Gantt v. Roe 389 F.3d 908,912-13-9th Cir. 2004 [Attorney's possible ineffectiveness in failing to discover supressed evidence "does not absolve the prosecution of its Brady responsibilities" and did not defeat "Brady" claim];Accord Banks v. Dretke 540 U.S. 688,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).

**GROUND THREE - PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS AND EFFECTIVE COUNSEL WAS VIOLATED.**

The suppression of the Leo LOgwood and Bancroft evidence violated "Brady" at the preliminary hearing.Neither incident was turned over to the defense until after petitioner was held to answer(PTRT - 103 - 06;135 -36).As noted above, Kenya Smith told detectives of Gardner's admission to a shooting around 96th and Bancroft and of someone named "Leo" at "51st Avenue"(CT - 594 - 95). The Logwood shooting occured at 5040 International Boulevard (Att.Ex. J - 1).The concurrence between the details given by Smith and those of the Bancroft shooting should have led the prosecution directly to it,paticularly given Gardner's resume at the crime scene(above at 30,32        ).Similarly,Smith's use of the name "Leo" should have triggered Longmire and Dunakin's memories of the Logwood shooting they had worked just day's before(CT - 594;Att.Ex. J AT 416).Even if not,a cursory computer check of area shootings would have revealed the shootings.

The gun found at the scene in this case and Jackson's statement that there was a struggle before the shooting(RT - 341 - 42)noticed the detectives that the case might involve self - defense(see RT - 339[regarding detectives' suggestion that the killing was self - defense]).In sum,the prosecution knew,prior to the preliminary hearing,of the importance of locating and turning over evidence indicating Gardner had shot people.

Had the information been used at the preliminary hearing (along with petitioner's testimony),there is a reasonable probability he would not have been held to answer for murder(see Merrill v. Superior Court 27 C.A. 4th 1586,1594 - 1994["Brady" violation when prosecution failed to disclose exculpatory evidence for use at

preliminary hearing];Stanton v. Superior Court 193 C.A.3d 265,269 -
72 - 1987[same with state law equivalent of "Brady" rule];Currie v.
Superior Court 230 C.A.3d 83,96 - 1991[Applying state Law Equivalent
of "Brady" rule to preliminary hearing]).

Indeed,materiality in this context is greater than in the trial
context.The Jury was deprived of the Bancroft evidence but heard
the Logwood evidence.In contrast,the preliminary hearing magistrate
was ignorant of both incidents,including that Gardner used the same
gun found in this case to shoot Logwood(RT - 616 - 20,624).This
evidence clearly would have "put the whole case in....A diffrent
light"(Kyles v. Whitley At 435,442 fn.13).As "Brady" requires only
a reasonable probability of a diffrent result,the claim is not defeated
by a conclusion.Probable cause would have existed not-withstanding
the Gardner evidence.It is certainly probable such conclusive proof
of Gardner's violent conduct,including that,within four days of the
instant incident,would have swayed the Magistrate(Kyles At 435 -
36["Brady" claim not defeated by sufficient evidence to convict]).

The Habeas remedy must be "tailored to the injury suffered
from the constitutional violation..."(U.S. v. Morrison 449 U.S. 361,
364 - 1981;Accord Riggs v. Fairman 399 F.3d 1179,1184 - 9th cir.
2005).As such,Petitioner is entitled to,not just a new trial.But
dismissal of the information and a new preliminary hearing.

Footnote one - The suppression of the information also hampered
counsel's ability to investigate and discover information which
could defeat probable cause.

Footnote Two - The Logwood police report was not turned over until
september,2003,just before Petitioner's first trial (PTRT-103-04,135-
37.).However,it turns out police considered Gardiner a suspect in the

Logwood shooting as early as December 2002 (ATT. EX. U [12-6-02 report stating that Gardiner a suspect in a firearm assualt and noting case number for Logwood shooting];ATT. EX. J-1 [Logwood report reflecting same case number]).The delay in revealing the Logwood connection shows bad faith directly as to the Logwood evidence and inferentially as to the Bancroft evidence.

**GROUND FOUR - PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS WAS VIOLATED.**

Petitioner alleges (1) that more evidence than the resume was uncovered implicating Gardner in the Bancroft shooting and(2) that said investigation and evidence was destroyed or concealed from the defense in this case.Suppression of evidence implicating Gardner violated "Brady v. Maryland"(373 U.S. 83,87 - 1963).Destruction of the evidence violated "California v. Trombetta"(476 U.S. 479 - 1984) and "Arizona v. Youngblood"(488 U.S. 51,56 -58 - 1988). Petitioner alleges that,after he was charged,police failed to investigate,locate,and preserve evidence Gardner committed the Bancroft and other shootings.They did so to avoid discovering evidence to support petitioner's self - defense claim(Miller v. Vasques 888 F.2d 1116,1121 - 9th cir. 1989).

Circumstances suggest there was more investigation in the Bancroft case.As counsel pointed out,it seems unlikely the case was"cleared" so quickly when a person who almost killed hall may have precipitated the shooting of Jeter and Williams remained unidentified(RT - 756 - 58).

Given the presence of his resume,it is likely Gardner was investigated.It is unclear whether Police (1) located and questioned Jasmine Robbins,who was with "C"(the shooter)and driving the car that day(Attached Exhibit G - 5 - 6;Att.Ex. B - 1).Williams told Police "C" was Jasmine's boyfriend (id);(2) identified the owner of the car (perhaps Robbins or "C") through its license number (ATT. Exs.

C - 1 and H - 1); (3) showed Gardner's photo to witnesses.It is likely the Police took these rudimentary steps to identify the shooter.

Shell casings were collected from the scene (Att Exs F - 1 - 2 & G - 5).

Att. Ex. G - 8).It's unclear if bullets were collected from the
victims and car and,if so,what happened to them and the shell
casings(see Att.Ex. - B At 2 - 3).Test could have shown Gardner's
gun fired the bullets or ejected the casings (RT - 295 - 99,290 -
91).This is precisely how the defense proved Gardner shot Leo Logwood
(RT - 624).

    Fact developement is clearly justified to determine what
exculpatory information was discovered and then destroyed or suppressed.


    In the alternative,the prosecution failed in bad faith to
investigate Gardner's likely involvement in the Bancroft shooting.

    Given (1) Gardner's resume at the crime scene,(2) that the shooter
was known as "C" (Att.Ex. B At 3[Gardner's nick name was "Chuck"]-
CT - 594),and most importantly,(3) information Gardner had admitted
the shooting,the prosecutor should have taken the basic steps outlined
above to determine if Gardner was indeed involved in the Bancroft
shooting.Due process demanded this.Gardner's involvement would have
been exculpatory to petitioner by supporting his self - defense
claim.

    The prosecutor's duty to seek truth trumps the duty to convict.
determining if Gardner committed the Bancroft shooting bore directly
on whether the killing in this case was murder,manslaughter,or
self - defense.The investigative steps were so basic and obvious,
and the importance to the case so clear,that bad faith is manifest.
Indeed,at the least,the prosecutor could have solved another crime.

    "[A] bad faith failure to collect potentially exculpatory evidence
would violate the due process clause "(Miller v. Vasques 868 F.2d
At 1120 relying on Arizona v. Youngblood 488 U.S. 51 - 1984).
A prosecutor cannot avoid this obligation "By refusing to search
for the truth and remaining willfully ignorant of the facts"

(Commonwealth of Northern Mariana Islands v. Bowie 243 F.3d 1109, 1118 - 9th cir. 2001).

In "Miller", a police officer failed to collect evidence with the obvious potential for exculpating Miller,lied about the reason for his failure,spoke of Miller in a derogatory manner,and tried to dissuade witnesses from testifing for Miller.The ninth circuit found a "colorable bad faith claim" (At 1121).

In "Commonwealth v. Bowie",the prosecutor came into possession of a letter evidencing the "strong possibility" the prosecutor's immunized witnesses were planning to commit perjury to incriminate Bowie.The prosecutor nevertheless decided against investigating the letter and did not question his witnesses or take any steps (such as handwriting analysis or polygraph tests) to identify the letter's author(At 1117 citing Miller At 1121['Bowie' noting duty to "gather and collect...evidence [that] could form a basis for exonerating the defendent"]; id quoting Kyles v. Whitley At 437 [ noting prosecutor's duty to learn of favorable evidence known to it's agents]).

"Bowie" found due process violated by the prosecutor's failure "promptly to investigate the letter and to interrogate thier witnesses about it" (At 1117[prosecutor's duty "was not discharged... simply by ignoring the content of the letter and by turning it over to the defense"]).The Court found"bad faith as a matter of Law" from the clear record evidence of a willful refusal "to develope any evidence or information that would either hurt their case or damage the credibility of their conniving witnesses" (At 1118).

The prosecutor's actions in this case are analogous to those in "Bowie" and "Miller" as such,due process was violated.

- 42 -

**GROUND FIVE - PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO EFFECTIVE COUNSEL WAS VIOLATED.**

counsel was deficient regarding the Bancroft witnesses (See above At 29-31     ). He failed to investigate suffiently despite substantial evidence Witnesses to Gardner's violence existed.

Counsel was appointed five months before petitioner's trial, on October 20,2003(CT - 722).Counsel's request of the prosecutor (RT - 1 - 2) shows he was aware,through Smith's statement,of the Bancroft incident,that it was covered by the media,and that Gardner had confessed (CT - 594 -95).Although counsel had this information some months before trial,he did little,aside from relying on prosecution disclosure,to locate information and witnesses related to the shooting.

The defense did not locate any significant information on the shooting until <u>after</u> petitioner was convicted and moved to replace counsel.At the hearing,petitioner complained of the failure to investigate Bancroft(RT 711 - 12,718,742 - 43).Shortly thereafter, defense investigators searched the internet and found an oakland Tribune article about the shooting (RT - 750;CT - 959).Revelation of the article forced the prosecution to disclose the police report about the shooting (RT - 750,754 - 55).By then,of course,it was to late to locate the witnesses to testify.

Obviously,counsel should have suffiecently investigated <u>before</u> trial.It is equally obvious,based on subsequent events,that earlier investigation would have borne fruit,I.E.,the news article and thus pre - trial or pre - conviction disclosure of the police report. Counsel could then have followed leads in the report,which identified those involved,including Mike Hall,Danielle Jeter and Casey (Att. Ex. B-1     ) counsel's failure to act before trial was clearly deficient

- 43 -

In the alternative,counsel could have himself utilized the article, which confirmed the existance and location of the incident.Counsel should have gone to nearby Hospitals to identify shooting victims brought in from the Bancroft incident(which turned out to be Hall, Jeter,and Melinda Williams)(Att.Ex. B-1    ).Counsel could have subpeonaed their Hospital records to obtain their addresses(the police report names the Hospitals to which the witnesses were taken(Att. Ex.B-2-3    ).

Counsel could also have visited the area of the shooting to locate and interview witnesses to the street shooting and those in the area.Such witnesses may have seen Gardner fire or been able to identify and/or direct counsel to those involved.As Smith's state - ment demonstrates(CT - 594 - 95),a lot of people were aware of the shooting.

Counsel indicated that he and his investigator had visited 96th and Bancroft to locate witnesses,"But uncovered no useful information" (RT - 717 - 18).However,the extent or timing of that search (if it indeed occured) is unclear.If counsel,say,only interviewed a couple of people before abandoning the endeavor,he did not discharge his duty of investigation.The lack of "useful information" suggest that is the case.Further factual developement on this point is needed (Avila v. Galaza 297 F.3d 911,920 - 9th cir.2002[counsel ineffective for failing to interview potential witnesses]).In any event,even if this segment of counsel's investigation was sufficient, it did not relieve him of exploring other avenues of investigation.

Smith mentioned there was media coverage of the shooting(CT - 594).Counsel should have contacted more than one media outlet(RT - 742 - 43)to see if any witnesses or involved parties had been interviewed or identified.Counsel stated that reading newspapers

- 44 -

had failed to turn up the **Bancroft** incident(RT - 719).Counsel apparently
did not read the Oakland Tribune,which reported the incident.

    There were other leads counsel should have followed aside from
Smith's information.Petitioner discovered information,mid - trial,
that a Bancroft shooting victim was named "Mike",that Mike was on
crutches as a result,and that Mike was from Oakland and his 'Turf'
was Seminary avenue and that he drove a turqouise Delta 88,traveled
back and forth to Oregon.And,most importantly,was on probation.
Petitioner imediately told counsel of this information and in "plenty of
time to locate Hall before the defense case began(RT - 718,743)

    Cousel should also have followed on these leads to present
the witnesses in a new trial motion.Eight months passed between
petitioner's conviction and denial of his new trial motion (RT -
704 - 05;767).

    Counsel's failure to listen to and follow these leads was,
again,clearly deficient.Indeed, a computer check at the local
probation office for a'Mike' who'd recently been shot would very
likely have turned up Hall,whose probation had been revoked because
of the Bancroft incident (RT - 756 - 57).Hall,once located,could
have led to other witnesses.


    Caselaw is in accord.In "Wiggins v. Smth" (539 U.S. 510 - 2003),
The Supreme Court addressed "whether the investigation supporting
counsel's decision not to introduce [defense] evidence... was itself
reasonable" (At 522[court's emphasis]).The court concluded the
Attorneys' decision not to expand their investigation beyond that
already conducted was unreasonable,particularly when the results
suggested additional favorable evidence existed (At 524 - 25,527).

    In this case,counsel ceased investigation,such as it was,at
an "unreasonable juncture" (Wiggins At 527).And relied for the
most part on the prosecutor to locate and turn over any exculpatory

- 45 -

Indeed,it appears the prosecution suppressed the evidence(above At 29 - 31 ).Cousel was thus deficient for not conducting his own sufficient investigation(Rios v Rocha 299 F.3d 796,808 - 9th cir. 2002[finding Attorney's reliance on co - defendant's investigation unreasonable "Because the co - defendant's interest in the case might well conflict with Rios' own"]).

Neither did discovery of the Logwood information relieve counsel of further investigation(see footnote one below At page 47 ). Discovery of additional incidents (which the Logwood information suggested would exist) was needed to establish Gardiner's pattern of violent behavior.Had counsel taken the above or other reasonable investigative steps,he likely would have located one or more of the witnesses (Wiggins At 525 [noting Wiggins' counsel "may well have discovered" evidence revealed in subsequent proceedings]).

Instead,counsel "failed to take advantage of several opportunities to identify and interview potential witnesses" (Avila v Galaza 297 F.3d At 919). "Avila " found an attorney ineffective for not attempting to identify potential witnesses shown in a photograph taken at a crime scene.The court noted that counsel might have located favorable witnesses (At 920).

Counsel in"U.S. v Gray"(878 F.2d 702 - 8th cir. 1989)was deemed deficient for failing to "go to the scene of the incident to interview potential witnesses" who could have supported Gray's self - defense claim (At 712;Rios v Rocha At 808[deeming Attorney deficient for not reading reports which may have led to exculpatory witnesses]; Johnson v. Baldwin 114 F.3d 835,839-40-9th Cir. 1997 [Faulting counsel for not "inquir[ing] about any other possible sources of corroboration for [Johnson's] story"]).

Counsel's failure to take adequate steps to locate woitnesses,like the the attorneys in the above cited cases,was deficient.

there is a reasonable probability counsel would have introduced
the Bancroft evidence once located (Wiggins At 535).His theory painted
Gardner as a violent man who'd attaked petitioner and precipitated
the shooting.The Bancroft evidence dovetailed with this theory.As
shown (Above At 34-36       ),it is reasonably probable introduction
of the evidence would have altered the verdict.


Footnote one - Notably.Counsel did not locate James Dale,who
testified Gardner shot Logwood (RT -615 - 22),untill petitioner's
family provided the phone numbers and addresses of Dale and Logwood.
Despite having information Logwood was in santa rita Jail,Counsel
never  contacted him.

Footnote two - Counsel's investigation and preparation were
generally less than stellar.He did not interview petitioner in person
untill three months after his appointment and within two months of
trial.It was apparent to petitioner that counsel had payed little
attention to the case and knew none of the facts.The defense
investigator did not recieve written authorization to investigate
from counsel untill a month or two later and after trial had
commenced in March,2003 (See RT - 717).There was by then little
time for investigation of several critical matters(See RT - 711 -
16,719 - 31,737 - 40,744 - 45[petitioner listing for trial court
counsel's many deficiencies]).


Footnote three - Counsel's investigator told petitioner they
had information Hall was in New Orleans.If true,counsel should have
subpeonaed Hall through the uniform act for securing the attendance
of out of State witnesses (PEN. Code 1334.3,1334).Counsel could also
have obtained an out of state deposition of the witnesses which
would have been admissible upon a showing they were unavailable to
testify(PEN. Code 1349 - 1362).

- 47 -

COMPULSORY PROCESS, AND EFFECTIVE COUNSEL WERE VIOLATED.

Prior to petitioner's first trial,The Court recieved Gardner's
·Prison records(PTRT - 114).Contained therein was a report of a January
13,2002 incident "where MR.Gardner and another inmate were involved
in a physical altercation"(PTRT - 115).The trial Court concluded
the incident did not qualify as an"act of aggression" because Gardner
indicated to a prison gaurd he and the other prisoner were "Just
playing around" and were actually friends(id,PTRT - 118).
Notwithstanding Gardner's self-serving statement,Petitioner and Yarborough's
attorneys sought a copy of the report and the name and contact
information of the other prisoner(PTRT - 115,117).Counsel pointed
out the possibility Gardner was,in fact,the agressor in the incident,
a fact the unnamed prisoner could confirm and testify to.Counsel
noted such would be relevent to proving self-defense in this case
(PTRT - 116).Petitioner's attorney noted the likelihood Gardner
said what he said,not because it was true,but to avoid a disciplinary
write up(PTRT - 117).

The trial Court refused,citing privacy issues and an alleged
confidentiality of department. of correction records.The Court also
suggested the incident,which preceeded the instant shooting by eleven
months,was too remote to be probative(PTRT - 116),The Court also
cited "all of the other incidents that [The Prosecutor]is in possession
of" (id).

Counsel disagreed that the incident was too remote and noted
there was no indication that the prisoner would assert confidentiality
(PTRT - 117 - 18[Counsel citing due process right to present witnesses]).

The Court erred.It (1) violated "Brady v. Maryland" by suppressing
favorable evidence(the testimony of the prisoner);(2) violated compulsory
process under "Crane v. Kentucky"(476 U.S. 683,689 - 92 - 1986) and

- 48 -

"Strickland v. Washington"(466 U.S. 668 - 1984)by hampering counsel's
ability to interview the prisoner and related witnesses to prepare
a defense.

Evidence Gardner was the aggressor in the prison incident would
support the conclusion Gardner had a pattern of violent behavior.
As explained more fully above(At 34-36        ),this was a key component
to Petitioner's defense (People v. Wright 39 C.3d 576,581 - 1987
citing  evidence code 1103[evidence of prior violent acts of decedent
"properly admitted" in self - defense case];Carriger v. Stewart 132
F.3d 463,479 - 80 - 9th cir. 1997[due process violated by suppression
of witness'es prison file]).

As the evidence was"material,"so too was its absense prejudicial
under "Strickland" and"Crane"(see Kyles v. Whitley 514 - U.S. At
435 - 36 [equating "Brady" materiality with a "reasonable probability
of a diffrent result" absent suppression]and id[holding "materiality"
sufficient "prejudice" for constitutional error to warrant reversal];
Strickland v. Washington At 694[showing of prejudice from ineffective
counsel equivalent to "Brady" materiality]).

**PROCESS WAS VIOLATED.**

Petitioner's "Brady" rights were violated by suppression of a diagram indicating Gardner's gun was found near his body.

The prosecutor presented testimony,photographs,and a diagram (Att.Ex. O) to prove the gun was found serveral feet away from Gardner,behind a fence (RT - 89 - 98,104,114 - 17). However,there was evidence the gun was actually near Gardner's body.This included Seargent Dunakin's testimony that evidence technician Viglienzone told him the gun was found in "very close proximity" to Gardner's body (RT - 330).The prosecutor caused Dunakin to recant by "Refreshing his memory" with the afore mentioned photographs (RT - 331 - 32). Moreover,in a report,Seargent Longmire also indicated the firearm "was recovered near the body"(Att.Ex. P At 1).Futher still,the gun's position in the photo,neatly tucked into a knit cap(RT - 97,104) suggests it was carefully placed where it was photographed.

The aforementioned diagram,peoples exhibit 5 and 6 (RT - 89 - 90),was not the only crime sceane diagram.Officer Christenson first made an initial,"rough" crime scene diagram (RT - 88 - 89,95) which he failed,despite Court order,to bring the diagram to Court (RT - 95).

Based on the foregoing,and notwithstanding prosecution testimony Petitioner alleges (1) The initial diagram shows the firearm was **close** to Gardner,and(2) The gun was moved,perhaps inadvertently, further away before being photographed and before the second diagram.

As the first diagram was thus "favorable",and "material", it's suppression by the prosecution violated "Brady"(Cooper v. Woodford 358 F.3d 1117,1122 - 9th cir 2004).The gun's actual position was