was important to the self defense claim.The prosecutor suggested through cross-examination (RT-599-600) and argued (RT-653,657,693, 697-98) the alleged distance between Gardiner and the gun proved he was not armed at the time he was killed.The exculpatory diagram would have corroborated dunakin's initial testimony and Longmire's report,showing that Gardiner was still armed and a threat when he died (See RT-719-26 [discussion regarding failure to produce diagram]).

As such,due process was violated.

## GROUND EIGHT TRIAL COUNSEL WAS INEFFECTIVE FOR NOT ADEQUATELEY CROSS - EXAMINING AND IMPEACHING A PROSECUTION WITNESS.

Rodriguez's was the only testimony to contradict petitioner's self - defense testimony.Rodriguez testified that,after hearing four gunshots,he saw a man walk away and come back to fire one last shot near where Gardner lay(RT - 180,196 - 97).The prosecutor relied on this to argue petitioner premeditatedly shot an already incapacitated Gardner(RT - 655).Petitioner testified he shot Gardner during a struggle(RT - 423 - 30).Rodriguez's credibility was zero and he likely did not even see the incident.However,counsel failed to demonstrate this through cross - examination and impeachment.

Counsel impeached Rodriguez to some extent.He brought out (1) that Rodriguez initially told police he didn't see (as opposed to hear)any part of the incident (RT - 189 ); (2) that,at the preliminary hearing,he fingered Yarborough as the shooter(RT - 204 ).;(3) That Rodriguez claimed 100% certainty when he picked yet another man as the shooter(RT - 201 - 02);and (4) That he did not mention,at the preliminary hearing,the shooter had allegedly walked away and come back before shooting(RT - 196 - 99).

However,counsel unreasonably failed to follow - up by demonstrating through questioning the inconsistencies were not innocent,I.E., that Rodriguez was lying,either to aid the prosecution and/or protect his family.Counsel also failed to bring out additional inconsistencies.

### A FOLLOW-UP IMPEACHMENT

Critically,counsel failed to ask Rodriguez to explain the above  cited inconsistencies(Compare CALJIC No. 2.62[with which jury instructed -CT - 854][Jury may draw adverse inference from failure to explain]).

For example,in Rodriguez's first statement to police,he stated
his <u>wife</u> first saw the two men(RT - 533).Curiously,his wife did not
testify.Moreover,Rodriguez appeared fearful about people knowing
he or his family were speaking to police (RT - 535).He tried to
prevent police from speaking to his daughter(PTRT -[Transcript of
prior trial] - 511;RT - 187,172 - 73),and was concerned about getting
his family away from the scene(PTRT - 549).Nevertheless,Rodriguez
indicated his wife and children "saw everything"(RT - 550,527).

This was a springboard for counsel to explore whether,despite
his denial(RT - 208    ),Rodriguez was protecting his wife and/or
children by testifying in thier place.Counsel should have confronted
Rodriguez on the matter with the aforementioned evidence.


Counsel should have asked why rodriguez identified Yarborough
(or the "Lighter - skinned"man)as the shooter when Yarborough was
a defendant,but identified the taller,darker man(inferably petitioner)
at trial.There is simply no concievable innocent explination.
Rodriguez failure to explain would have suggested a not so innocent
explination:he was tailoring his testimony to assist the prosecution.
Counsel could then have argued Rodriguez or the prosecutor recognized
that Yarborough as the shooter left an evidentiary void as to
<u>Petitioner</u>.Rodriguez testified the non - shooter merely stood passively
by as the gunman fired(RT - 168 - 82).Jackson indicated Petitioner
only struggled with the decedent(RT - 216,221,248,252;See CT - 654 -
55[information alleging Yarborough,but not petitioner,personally
used firearm]).Petitioner had not yet testified.

It would thus have been arguable Rodriguez identified Yarborough
for the prosecutor before trial(when the evidence pegged Yarborough
only as a shooter - CT - 160 - 69,195 -96,204,222 - 26 and then put
the gun in petitioner's hands to insure his conviction once Yarborough
was no longer a defendant.Notably,Rodriguez also lied,apparently

to assist the prosecutor,by falsely claiming to be 100% sure about a photo identification (RT-200-02,347-48).

In this connection,cousel should have,but failed to,elicit that preliminary hearing evidence indicated Yarborough was the only shooter.

The inference of prsecutor involvement is provided by the convenient timing and utter implausibility of shifts in testimony.

The prosecutor suggested the flip-flop resulted from the lack of an interpreter at the preliminary hearing (RT-204-05).Counsel was ineffective for not eliciting that Rodriguez understood every question asked him at the hearing.The hearing transcript clearly demonstrates this (CT-13-141).

Counsel should have also elicited that Rodriguez identified Yarborough or the "light-skinned" man as the shooter several times, a fact which cannot be explained by mistranslation (CT-20-21,29,34-35, 68-69,79,84-85).

Counsel failed to ask Rodriguez Why he initially failed to mention the shooter allegedly walking away and returning.This switch,too,smacked of witness coaching.In this connection,counsel should have impeached Rodriguez with the sequence of prosecutorial questioning which produced the testimony at the prior trial:

Prosecutor: "Mr. Rodriguez,do you have a memory of whether or not the two men walked away from the car and then came back and did the shooting,or whether or not they shot and then just walked away all together?"

Rodriguez: "They did the shooting and then they left."

saw the men do the shooting and leave (id).However,when the
prosecutor suggest Rodrigez had chosen poorly,he gave the "right"
answer: The men "walked away...and then came back"(id).Impeachment
with this exchange would have strongly suggested Rodriguez so
testified,not because it was true,but because the Prosecutor wanted
to hear it.

At the current trial,Rodriguez testified he did not see the
shooter "rack" the firearm (RT - 192,194 - 95,311 - 12).Rodriguez
had indicated the opposite in his prior testimony (RT - 192 - 95).
This classic switch,also smacked of tailored testimony.The prosecutor's
firearm expert testified that "Racking" a firearm that has been fired
but not emptied would eject a live round from the gun (RT -311 - 12).
The problem:no live round was found at the incident scene(see RT -
292 - 99).Thus arises the inference Rodriguez altered his "racking"
testimony at the Prosecutor's instigation because of contrary physical
evidence.

**B.PRIOR INCONSISTENT STATEMENTS.**

Counsel also failed to bring out several prior inconsistencies
on Rodriguez part.

1. Rodriguez testified at the instant trial that he saw a muzzle
"Flash" from the gun(RT - 180).Counsel failed to impeach him with
his preliminary hearing testimony in which Rodriguez denied seeing
a flash(CT - 113,34 - 36,41 - 42,18 - 26,33 - 36,86 - 91)

2. Rodriguez testified he could not identify petitioner(RT -192).
Counsel failed to impeach Rodriguez with his apparently false preliminary
hearing "identification" of petitioner(CT - 20 - 21).

3. Rodriguez testified he did <u>not</u> see a third person and initially

thought the gunman was shooting at a tire(RT - 174 - 75).Counsel
failed to impeach with Rodriguez's prior claim he'd seen a "shadow"
that he did think a body was falling(PTRT - 527 - 28,491) and that
he did not think the gunman was shooting at a tire (id),testimony
which was in turn contrary to his preliminary hearing testimony
(PTRT - 528 - 29).

Impeachment on these points would have demonstrated Rodriguez's
story changed every time he was sworn in,that he was"making it up
as he went along,"and had lied under oath.


It is clear instant Counsel was ineffective.In "Berryman v.
Morton"(100 F.3d 1089 - 3rd cir. 1996),counsel failed to impeach
uncorroborated eyewitness testimony with prior inconsistent statements
which called into serious question the identification of Berryman.
The Third Circuit found this deficient,petitioner's counsel had in
his hands material for a devastating cross - examination of[the witness]
on the critical issue in the case" (At 1098). It was "Wholly unreasonable"
for counsel not to impeach evidence which "cuts directly to the heart
of the only evidence against Berryman" (At 1099).

In "Nixon v. Newsome" (888 F.2d 112 - 11th cir. 1989),The defendant
was convicted based solely on the identification testimony of the
victim's wife.Nixon's attorney failed to impeach with her prior testimony
that another man was the shooter and that Nixon had no gun.The Eighth
Circuit stated:"We have no difficulty concluding that the attorney's
actions were not within the wide range of professional competence.
Faced with glaring and crucial discrepancies between [The witness'es]
testimony at the two trials,the attorney failed to follow up on his
cross - examination by confronting her with her statements or by
introducing the transcript.The attorney's failure....sacrificed an
opportunity to weaken the star witness's inculpatory testimony"(At -
114 - 16).

In "Moffet v. Kolb" (930 F.2d 1156 - 7th cir. 1991),Moffet's defense theory was that his brother,rather than Moffet,commited the charged attempted Murder.The Seventh Circuit found counsel ineffective for not introducing a prosecution witness's prior statements indicating thebrother had indeed shot the victim(At 1161 - 62 [noting the "Statements were critical evidence for Moffet's counsel's defense theory"]).

Under "Berryman," "Nixon," Rodriguez was an uncorroborated star witness in the case:The sole witness to contradict petitioner's testimony about how Gardner died.This was of great import.The prosecutor was required to <u>disprove</u> beyond a reasonable doubt petitioner's self - defense testimony(CALJIC No 5.15).His testimony raised more than a reasonable doubt the killing was unlawful(Above At 66-67   ). The other evidence,including that from the prosecutor,either corroborated or didn't contradict petitioner.In this context,Rodriguez's brief but critical testimony about returning to shoot Gardner loomed large. Counsel had the means,"Glaring and crucial discrepancies",to devastate Rodriguez's testimony.Had he done so,the Jury would likely have concluded Rodriguez was lying,perhaps to please the prosecutor and prevent the calling of his family.

There is a reasonable probability the Jury would have acquitted the petitioner had Rodriguez been properly impeached,or if Rodriguez would have been properly impeached it is probable that the petitioner would have been found guilty of a lessor crime.Given the paucity of other inculpatory evidence (Above At 23-27   ;Berryman At 1102 [Failure to impeach prejudicial when "Berryman's guilt rested entirely on the accuracy of[The unimpeached]identification"];Nixon At 115[Same when other evidence against Nixon"Far from overwhelming"];Moffett At 1102 - **03** [Same when strongest evidence against Moffett was inconclusive]

**GROUND NINE - PETITIONER'S FEDERAL CONSTITUTIONAL DUE PROCESS RIGHTS WERE VIOLATED.**

"The knowing use of perjured testimony by a prosecutor generally requires that the conviction be set aside"(Killian v. Poole 282 F.3d - 1204,1208 - 9th cir. 2002).The conviction is invalid if there is "any reasonable likelihood" The false testimony affected the verdict (id citing U.S. v. Bagley 427 U.S. 97 - 1976)." 'The same result obtains when the state,although not soliciting false evidence,allows it to go uncorrected when it appears'"(U.S. v. Lapage 231 F.3d 448, 491 - 9th cir. 2000 quoting Napue v. Illinois 360 U.S. 264,269 - 1959).If there is no proof the prosecution knew of the perjury,reversal is required if,without the perjury,there is a"reasonable probability" the result of the proceeding would have been diffrent(Killian At 1208).

"[T]he government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows,and the jury may figure out,that the testimony is false....[Because] the jury... frequently listens to defense counsel with skepticism"(Lapage At 492).

The evidence conclusively demonstrates Rodriguez perjured himself in this case.This evidence includes not only his wildly inconsistent statements,but also the timing of those inconsistencies,the nature of his reversals,and contrary or contradictory physical evidence and expert testimony.The jury heard some,but not all,of this evidence (see Killian v. Poole At 1208[Concluding witness had perjured self based on record of trial and post trial proceedings]).

The Jury heard:

That Rodriguez initially told police he hadn't seen any part of the shooting(RT 189);That Rodriguez initially identified someone not at the scene as the shooter(RT - 201 - 02);That Rodriguez then fingered Yarborough,not petitioner,as the shooter(RT - 204);That

Rodriguez did not say,at the preliminary hearing,the shooter walked away and came back to shoot Gardner(RT - 196 - 99);That Rodriguez gave inconsistent statements about the gun being "Racked" before firing(RT - 192 - 95,311 - 12);That Rodriguez had tried to prevent police from speaking with his family members(RT - 187,172 - 73;PTRT - 511).

The Jury did not hear:

That Yarborough was a defendant during the preliminary hearing; That Rodriguez had little or no difficulty understanding questions at that hearing;That Rodriguez identified Yarborough (or the "light - skinned" individual) several times at that hearing (CT - 20 - 21, 29,34 - 35,68 - 69,79,84 - 85);That Rodriguez had previously testified he'd only seen the shooter fire and leave(PTRT - 497);That the prosecutor led Rodriguez into first giving the "walked away and came back" testimony(id);That Rodriguez had made inconsistent statements about seeing a muzzle flash(RT - 180;CT - 34 - 36,113,41 - 42,18 - 26); That Rodriguez had previously claimed to be able to identify petitioner (CT - 20 - 21)and to know a person had been shot(PTRT - 491,527 -28).

The foregoing evidence,in toto,is undeniable proof Rodriguez did not see the shooting and lied to assist the prosecutor,perhaps to prevent his wife or children from having to testify.

The evidence begins with Rodriguez' words,his own words.He told police he had not seen the shooting.Evidence continued to mount that this was,in fact,the case.Rodriguez was unable to identify either petitioner or Yarborough in a photo line - up although they were the men involved(RT - 204;CT - 131 - 32).Rodriguez instead picked the photo of someone not involved as the shooter and claimed 100% certainty(RT - 201 - 02).This proves **Rodriquez** did not see the

shooting and his willingness to lie to and for law enforcement.After
seeing defendants in jail clothing(CT - 111),Rodriguez unsuprisingly
"identified"them at the preliminary hearing (CT - 20 - 21).The Magistrate
wisely concluded Rodriguez was lying(CT - 647).

    Notably,Rodriguez conveniently identified Yarborough(or the
"light skinned" man)as firing the final shot at the point in the proceedings
when the evidence indicated Yarborough only,had fired a gun(RT - 204;
Ct - 160 - 69,204,195 - 96,222 - 26).Rodriguez himself implicitly
acknowledged this identification was a lie when,at the instant trial,
he fingered the"taller,darker"man(inferably petitioner) instead(RT - 174,
180,205).from this,two inescapable inferences arise:(1) By identifying
Yarborough,Rodriguez was continuing his pattern of tailoring his
statements to corroborate prosecution theory and evidence,and (2) that
Rodriguez knew (perhaps from the prosecutor)Yarborough was the believed
shooter.There is an additional,if weaker,inference the prosecutor
instructed Rodriguez to finger Yarborough.

    These inferences are bolstered to point of undeniable fact by
Rodriguez' unexplained switch to the"darker,taller" man as the shooter,
it should be noted Rodriguez claimed to see only a single shot fired
(RT - 172 - 74,196 - 97).Thus,his switch cannot be excused by claiming
he saw both men fire.Although not explained,the switch was nevertheless
explainable as it neatly tracked the prosecution's shifting proof
needs.At trial,Yarborough was no longer a defendant.Thus,identifying
him as the shooter would not help assure,and would have arguably
have prevented,petitioner's conviction,at that point,the other evidence
indicated that petitioner only struggled with Gardner,not that he
shot him.Thus,implicating petitioner,now the sole defendant,would
assist the prosecutor.Indeed,given the nature and timing of Rodriguez'
switch,the only plausible explination is that he lied on petitioner to
help the prosecutor(see Kyles v. Whitley 514 U.S. 419,443 & fn. 14

[Noting that a "substantial implication" of prosecutorial "coaching" arose when witness'es "testimony at the second trial was much more precise and incriminating than his testimony at the first,which produced a hung Jury"]).Rodriguez' multiple identifications of Yarborough at the prior proceeding cannot not be explained by a supposed language barrier.

That Rodriguez was following prosecutorial cues(perhaps at the prosecutor's direction)is shown by thier exchange at the first trial. Rodriguez initially testified he only saw a man shoot and walk away. However,at the prosecutor's blatant suggestion,Rodriguez recanted and testified he'd seen the man walk away,come back and then fire the shot (PTRT - 497).The prosecutor relied on this kernal to argue premeditation(RT - 655).

The fact Rodriguez saw nothing is further shown by his complete reversals regarding whether he saw a muzzle flash,the gun being racked, or  a body falling(RT - 192 - 95,180,174 - 75;PTRT - 527 - 28,491; CT - 113,34 - 36).This wealth of otherwise unexplainable inconsistencies on such a slew of critical points leads unerringly to the conclusion he simply didn't know what happend.

Physical evidence and expert testimony put the final nail in Rodriguez' coffin.Rodriguez testified he saw the shooter fire once from around a foot off the ground and from the front of the car against which Gardner lay(RT - 88,179,196 -97).Prosecution expert testimony (and common sense) confirm that firing from that distance would not have left the "press contact" powder burns found on Gardner's head wounds (RT - 315,70 - 72).Moreover,the trajectory of the (two,not one)head shots was back toward the gun and shooter (see Att Ex A.1[coroner's diagram showing trajectory of head wounds];ATT. Ex. O,S-2,4,5 [reports showing Gardner's head was pointed towards front of car]).Thus,absent a "Magic Bullet",neither wound could have been

inflicted as Rodriguez testified.

Similiarly,the expert confirmed the shot to Gardner's chest(which the prosecutor claimed was the shot Rodriguez saw)could not,trajectory - wise,have been inflicted from where Rodriguez claimed to see the shooter fire(RT - 316 - 17,322).Given his position on the ground, Gardner's remaining bullet wounds could not have been inflicted after Gardner went down(Att.Ex. A - 1[Coroner's diagram];Tapia v. Tansy 926 F.2d 1554,1562 - 10th cir.1991[Testimony lacks any evidentiary value if witness testified to facts he "physically could not possibly have observed or events that could not have occured under the laws of nature"]).

What finally dooms Rodriguez' testimony is that there is no other reasonable explination for his statements.Why,if Rodriguez saw petitioner walk away,come back and cold - bloodedly shoot Gardner, would Rodriguez not simply say so to police and at the preliminary hearing? Why would he finger two others as the shooter? How could he be so inconsistent regarding "racking",Muzzle flash,and body falling? All were highly important details any reasonable person would be unable to forget.The only rational explination is that Rodriguez lied and lied again.

The evidence of Rodriguez' perjury is equal to,or Greater than, that in "Killian v. Poole" (282 F.3d 1204) and "U.S. v. Lapage"(231 F.3d 488).

Killian's conviction was based solely on the testimony of one Masse.Based on the evidence,the ninth circuit concluded that "one cannot reasonably deny that Gary Masse gave perjured testimony at Killian's trial"(At 1208).Initially,Masse had conceded to lying at the trial about not having an agreement with the prosecutor and about Killian's alleged role in the charged crimes (At 1208 - 09).The Court

- 62 -

noted that other evidence confirmed Masse had lied(id).

In "U.S. v. Lapage",the prosecutor's star witness,Manes,did not recognize and failed to identify a woman in the courtroom.This hurt the credibility of his claim to have conspired with Lapage and the Woman (at 490). At a subsequent trial,Manes testified he <u>had</u> recognized and identified the woman(id)."Lapage" (At 491 – 92) and "Killian" (At 1208 – 10) concluded the perjuries violated due process (Napue v. Illinois 360 U.S. At 267 – 71[Due process violated when prosecutor failed to correct perjury]).

So it is in this case.Petitioner's conviction was "Obtained" through "False evidence",moreover,it had to be apparent to the prosecutor Rodriguez was lying through his teeth.His own implicit admissions of falsehood were corroborated by the circumstances of his "Lapage" and "Killian" like reversals,his demonstrated motive to lie,physical evidence,expert testimony and,finally,Petitioner's testimony.Simply put,Rodriguez' testimony simply could not stand with so much pointing to its falsity.As in "killian," "[Rodriguez']tesimony was the product of someone with incentives to lie for himself and his wife's sake"(Killian At 1209).Nevertheless,rather than correcting the perjury,the prosecutor <u>vouched</u> for it(RT – 649 – 50).

Regardless of whether the prosecutor knew Rodriguez was lying, "there is a reasonable <u>probability</u> that without all the perjury, "The Jury would have acquitted (Killian At 1208).As demonstrated more fully above (At 23-27     ),Rodriguez provided the <u>only</u> evidence contradicting self – defense.Absence of his testimony would necessarily have resulted in acquittal.

The Jury sought a read back of Rodriguez and Petitioner's testimony (RT – 702).This demonstrates it's concern with self – defense and likely reliance on Rodriguez's testimony.(Killian At 1209[perjury prejudicial when "Mass'es testimony was virtually the whole case

for the Government"] Lapage At 491 ["Reasonable likelihood" of acquittal

absent perjury when "case close" and "Jury had to buy [perjurer's]testimony

to convict Lapage"];see Napue At 1177[same when "had the jury been

apprised of the true facts,....,it might well have concluded hamer

had fabricated testimony in order to curry favor with the [prosecutor]"]

;U.S. v. Young 17 F.3d 1201,1203 - 05 - 9th cir. 1994[Conviction reversed

when false testimony impacted defendant's credibility and notwithstanding

whether witness "committed perjury or was simply mistaken"]).

GROUND TEN - PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED BY CONICTION
ON INSUFFICIENT EVIDENCE.

Due process is violated if no reasonable jury could have convicted
on the evidence presented.(Jackson v. Virginia 443 U.S. 307,319 -
1979.).Circumstantial evidence as consistent with innocence as with
guilt cannot support a guilt inferrence (Evans-Smith v. Taylor 19
F.3d 899,906 -10-4th Cir. 1994;Stallings v. Tansy 28 F.3d 1018,1021-
22-10th Cir. 1994;CALJIC No. 2.02 ["[I]f the circumstanial evidence
permits two reasonable interpretations,one of which points to the
defendant's guilt and the other to his innocence,you must adopt that
interpretation that points to the defendant's innocence,"].).The
prosecution was charged with disproving (I.E. contradicting) Petitioner's
self defense testimony beyond a reasonable doubt.A "reasonable
possibility" of self defense precludes conviction (People v. Rios
23 C.4th 462,525 fn. 9).

"Where the evidence is uncontroverted and establishes all of
the elements for a finding of self defense it may be held as a matter
of law that the killing was justified" (People v. Levitt 156 C.A.
3d 500,509 - 1984.)."People v. Toledo" (85 C.A. 2d 557-1948.) found
insufficient evidence disproving self defense.Toledo,who was convicted
of manslaughter,told police he killed to prevent the decedent from
stabbing him (AT 579.) "Toledo" concluded it could uphold the conviction
only if it improperly believed "only those words of the defendant's
statements and testimony wherein he acknowledges striking the decdent
and disbelieving all of the rest of his [Exculpatory] statements
and testimony [About events] leading up to the blows" (AT 581.).

The evidence was insufficient to disprove Petitioner acted in self defense.(1) The remaining testimony,physical evidence and expert testimony corroborates and/or does not contradict Petitioner's testimony; (2) The only contrary evidence was Rodriguez's testimony,which has no value (See above AT 58-62.);(3) There was no evidence Petitioner had a motive to murder Gardiner;The prosecutor and Court of Appeals' arguments are baseless and contradicted by the record.The evidence was insufficient to prove premeditation and deliberation.

A. PETITIONER'S TESTIMONY.

Petitioner's corroborated testmony establishes self defense as a matter of law.He testified as follows:

When he and Yarborough first encountered Gardiner,Gardiner was brandishing his weapon (RT-403-06.).Yarborough had told Petitioner Gardiner was known for carrying guns and had bragged about shooting people,including someone named Leo,and about committing a Murder (RT - 431-33,456).Yarborough discussed the Leo shooting with Gardiner but Petitioner tried to difuse the situation (RT-408-09.).When police drove by,the three men went into Kenya Smith's house and smoked marijuana.Gardiner kepy moving around and picking up and putting down his gun (RT-409-12.).Crack cocain was on a table (RT-413.).Out of courtesy,Petitioner told Gardiner he'd had sex with smith in the past (RT-434.).Uncomfortable,Petitioner and Yarborough left and went back to Petitioner's grandmother's house (RT-413-14.).

Gardiner showed up shortly thereafter.It appeared to Petitioner gardiner had come looking for them (RT - 487.).He indicated he was willing to kill or be killed and was "in charge" of the nieghborhood.

Gardiner told Petitioner and Yarborough to join his drug operation
or leave.Gardiner's statements,earlier brandishing of a firearm,and
violent reputation made Petitioner fearful (RT-415-19,459,461,485.).

Feeling the situation was "tense," Petitioner left.However,
concern for Yarborough made him pull his .25 automatic firearm and
return to the front yard.Gardiner was threatening Yarborough and
appeared to have something in his hand (RT-422,491.).Concerned,
Petitioner grabbed Gardiner and spun him around.Gardiner,it turned
out,had a gun,which he pointed at Petitioner.Given the circumstances
and the look on Gardiner's face,Petitioner believed Gardiner was
going to shoot him (RT-423-24,492-93,495-96.).

Gardiner raised his gun and Petitioner hit him and fired his
own gun (RT-402,424,492-93.).Gardiner again attempted to raise his
gun and petitioner shot him near the shoulder.Petitioner's gun then
malfunctioned (RT-425.).Gardiner kept trying to shoot Petitioner
as their struggle carried the men around the yard.Gardiner managed
to step back and take aim at Petitioner,but Yarborough shot him
(RT-426-27.).Petitoner grabbed Gardiner's gun hand.Their struggle
carried the men outside the gate,where Gardiner fell near a car
pulling Petitioner down with him.Gardiner tried to get up and Petitioner
believed that,if Gardiner succeeded,he would shoot Petitioner.Petitioner
thus grabbed Yarborough's nine millimeter gun (RT-402.) and shot
Gardiner twice.Petitioner later learned he had hit Gardiner in the
head (RT-427-28,508-10,500,512,515,436-37.).Petitioner believed
Yarborough had fired more than five times from mere feet away from
the struggling men & in order to protect Petitioner (RT-502-06.).

B.EVIDENCE CORROBORATING AND CONSISTENT WITH SELF DEFENSE AND
PETITIONER'S INNOCENCE.

Eyewitness testimony corroborated Petitioner.Lakeisha Jackson
testified Petitioner and Gardiner appeared to be fighting for possession
of something (RT-248,252,341.) and a third man (apparently Yarborough)
fired about three shots which did not stop the fight (RT-216-17,221,
246,248.).

Powder burn,ballistics,and autopsy evidence corroborated Petitioner.
Bullets of two diffrent calibers,consistent with 9mm & .25 caliber
bullets,were found in Gardiner's body (RT-76,68-69,291,313.).The
coroner testified the bullets came from "all diffrent directions"
(RT-76.) which,as an expert testified (RT 560),was consistent with
Gardiner being shot during a struggle..25 and 9 millimeter caliber
shell casings were found at the crime scene (RT-107;See People v.
Collins 189 C.A. 2d 575,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 [Self defense as a matter of
law when "autopsy report shows the injuries were exactly as one would
expect them to be from defendant's version of what occured"]).

Powder burns on Gardiner's head wounds demonstrate they were
inflicted at point blank range (RT-424,428-36;Attatched Ex. A AT
7-8 [Coroner's report]).The absence of powder burns on Gardiner's
torso,arm,and back wounds demonstrates they were inflicted by Yarborough
firing from a distance (RT-80,70-72.).An expert testified Gardiner
could have continued to struggle with multiple bullet wounds (RT-
555,575,556.).An expert testified the wound to Gardiner's spine
would have caused him to fall,but permitted him to continue fighting
or to fire his gun (RT-79-81.).

Seargent Dunakin testified Gardiner's gun was found in "very close proximity" to his body (RT-330.)indicating he was armed when killed.Contrary evidence the gun was found some distance away (RT-97,104.) does not contradict Petitioner or disprove self defense. Petitioner's testimony indicates he was unsure if Gardiner still had his gun when Petitioner fired the final time (RT-508,512.).Petitioner's uncontradicted testimony was that he actually <u>believed</u> Gardiner was still armed and dangerous.Under the circumstances,his belief was reasonable even if mistaken (CALJIC No.5.51 [Individual entitled to use force if danger is apparent but not real].).Even if Petitioner's belief was <u>un</u>reasonable,his acts constituted <u>manslaughter</u>,not murder (People v. Randle 35 C. 4th 987.995-2005.).

Evidence about Gardiner himself supports Petitioner's testimony Gardiner was dangerous,known to be so,and had in fact attacked Petitioner and Yarborough.Smith confirmed that,just before the shooting, an angry Gardiner left her home intent on confronting Petitioner and Yarborough (RT-141,155,158-60.).There was testimony he exhibited symptoms consistent with cocaine induced agitation and paranoia (RT-140,412,406,376-77,382-84,392-94.).An expert testified cocaine intoxication would have increased the likelihood of violent behavior (RT-377,370,386.).

The fully loaded Nine-millimeter weapon found at the scene (RT-110-11,119-20.) was shown conclusively to be the gun Gardiner attempted to kill Leo Logwood with just <u>four day's</u> before (RT-539,157,618-19, 624.).Gardiner shot Logwood <u>Six times</u> (RT-618-19.).His motivation was to eliminate his criminal competition (RT-616.). This corroborates

Petitioner's testimony that Gardiner's assualt on Petitioner and
Yarborough was similarly motivated (RT-417-19.).

On the other hand,there was no evidence Petitioner had a motive,
other than self defense,to shoot Gardiner.There was no prior relationship
and Petitioner knew Gardiner only by his violent reputation (RT-406-07.).
Contrary to the Prosecutor and State court of Appeals' arguments
(See below),the mere existance of a possible motive is not alone
evidence the defendant was so motivated (People v. Toledo AT 582
[Self defense not disproved when no evidence killing motivated by
decedent's prior assualt on Toledo].).

C. STATE COURT OF APPEALS OPINION.

1. Self Defense.

As to self defense,the court of Appeals concluded Rodriguez's
testimony provided sufficient basis to reject self defense,"at least
with respect to the final shots [Pet] fired" (CT. opinion AT 22.).
The court claimed Rodriguez testified Petitioner walked away from
the car,then returned and "fired two final,point-blank shots into
the back of [a "collapsed"] Gardiner's head" (id AT 21-22.).The
court's reliance on Rodriguez is misplaced.As explained more fully
above (AT 58-62 ),his testimony was false and thus of no evidentiary
value.Moreover,Rodriguez testified he saw the gun fired once,not
twice and that he did not see a body (RT-172-74.).He did not,and
could not,testify he saw Gardiner shot"in the head."Nor is it inferable
the shot Rodriguez allegedly saw was to the head.As explained (Above
AT 61-62),evidence regarding Gardiner's positon on the ground,powder
burns,and bullet trajectory demonstrate none of Gardiner's wounds

could have been inflicted in the way Rodriguez testified.Thus,either

Rodriguez was lying or evidence proves the shot he saw did not hit

Gardiner. Either way,Rodriguez does not disprove self-defense (See

Tapia v. Tansy 926 F.2d 1554,1562-10th Cir. 1991 [Guilt cannot be

shown by "testimony as to facts that the witness physically could

not have possibly observed or events that could not have occured

under the laws of nature"] Mitchell v. Prunty 107 F.3d 1337,1341

fn. 8-9th Cir. 1997 [Guilt not proven when no evidence shots fired

were cause of death]).

The court of Appeal also cited alleged evidence "Gardiner was

shot in the torso from above" as proving Petitioner "continued to

attack Gardiner after he had succeeded in disabling him" (CT. OP.

AT 22.).The court was mistaken.There was no evidence Petitioner,

rather than Yarborough,inflicted that wound (People v. Allen 165

C.A. 3d 616,626-1985 [Evidence insuffifient Allen shot victim when

accomplice armed and equally likely to have done so];U.S. v. Hall

999 F.2d 1298,1299-8th Cir. 1993 [Similar]).

There were two torso entry wounds,T-1 and T-7 (ATT.Ex. A AT 16,

24-25).For T-7 to have been inflicted "from above," Gardiner would

have had to have been on his back.The T-7 bullet traveled straight

back from it's entry in the groin to exit the Gluteal area (T-3)

(id AT 24-25.).Gardiner was found on his side,not on his back(ATT.

Ex.  S-2,4).As to T-1,which entered the lower right back and exited

the front,left torso (T-6) (ATT. Ex. A AT 16,22.),there is nothing

beyond speculation demonstrating it was inflicted after,rather than

before,Gardiner was down (Kelly v. Roberts 998 F.2d 802,808-10-10th

Cir. 1993 [Precluding arbitrary reliance on one of two equally likely

inferences]).

2. MOTIVE

The court of Appeal cited as evidence of motive,(1) An alleged desire to prevent Gardiner from taking over the nieghborhood drug trade,(2) Jealousy over Gardiner's business relationship with smith, and (3) "Revenge for Gardiner's having killed Logwood" (CT OP. AT 22.).

Motive number one is pure speculation and contrary to the record (RT-522.).The jury was <u>not</u> "entitled to disbelieve" (id AT fn. 25.) Petitioner's uncontradicted testimony he no longer dealt drugs (RT-430,439-42.).His was the only testimony on the subject.The jury could not arbitrarily disregard it absent contrary evidence (People v. Toledo AT 581; See Footnote one below AT 75-76.).There was no evidence Petitioner would have <u>killed</u> to protect <u>Yarborough's</u> business.Such would have been contrary to Petitioner's uncontradicted testimony his criminal life was behind him (RT-418-21,430;Stallings v. Tansy AT 1022 [Inference of criminal intent precluded by defendant's "uncontra<b>dict</b>ed testimony" to the contrary]).

There was no evidence Petitioner was jealous that Smith was prostituting for Gardiner,much less that he was jealous enough to <u>kill</u>.Petitioner's uncontradicted testimony was to the contrary (RT-522,129-31,434.).

As to Logwood,Petitioner's uncontradicted testimony was that he did not <u>Know</u> Logwood (RT-433.).There was certainly no evidence Petitioner was angry about Logwood,who was <u>not</u> killed (ATT. EX. J-4,6.), much less that he was angry enough to kill.Theres no evidence Yarborough's <b>statement</b> to <u>Gardiner</u> that Logwood was "our" friend (RT-408-09.) was true.(People v. Mercer 210 C.A. 2d 153,160-1962 [Self defense not disproven absent evidence of other motive]).

3. PREMEDITATION AND DELIBERATION.

The court of Appeals concluded premeditation and deliberation was shown by Petitioner's "damaging admission that he walked away unscathed from the encounter with Gardiner...and then changed his mind and returned with his gun drawn" (CT.OP AT 21.).

This passage assumes the jury was entitled to divorce Petitioner's action from his stated intent.It was not (Toledo AT 581;People v. Collins AT 591 [Prosecution is "Bound" by the self defense statement of the defendant "in the absence of proof to the contrary"]).Petitioner testified he came back with "gun drawn" to protect Yarborough,not to unlawfully kill Gardiner (RT-422-23.).Self defense,even if "premeditated" is not murder,the court of Appeals conveniently omits the fact that, between Petitioner pulling his gun and Gardiner's death,Gardiner tried to shoot Petitioner (See People v. Hecker 109 C. 463,464 [Even if defendant is the initial agressor,he has right to defend against opponent's unreasonable response]).

To the extent the court relies on rodriguez's (CT.OP AT 21.), that reliance is misplaced (Above AT 58-62 .).


b. PROSECUTOR'S ARGUMENTS.

The prosecutor attempted,and failed,to show that shell casing and autopsy evidence proved Petitioner a liar.

The prosecutor claimed Gardiner must have been on the ground and helpless when wound T-7 was inflicted (RT-651.).The T-7 bullet entered his groin and exited at T-3,his gluteal area (ATT. EX. A AT 24-25.).

To the contrary, the T-7 bullet traveled downward in Gardiner's body
at a 10 degree angle (id). The prosecutor suggested the angle was
upward (RT -651.). Moreover, the prosecutor's apparent assumption
Petitioner, rather than Yarborough, fired that shot (id) was unfounded
(RT-425-30,291-94,313.). Because T-7 lacked firearm soot, it was
consistent with being inflicted by Yarborough from a distance (ATT.
EX. A AT 25.).

The prosecutor argued wound T-1 was necessarily inflicted after
Gardiner was down (RT-651.). The T-1 bullet entered the right side
of the back and exited the "Left front.....torso" (ATT. EX. A AT
16,22.). The prosecutor claimed Petitioner would have had to have
been "squating down" to inflict T-1 on an upright Gardiner (RT-651.).
However, like T-7, the T-1 bullet traveled downward and lacked gunpowder
soot (EX. A AT 22.). Yarborough could thus have inflicted T-1 while
an upright Gardiner struggled with Petitioner.

The prosecutor cited wound T-2 (caused by a bullet entering
Gardiner's "right gluteal area" and lodging in his "left lower back"-
EX. A AT 23.). The prosecutor cited the upward angle of the bullet,
claiming Gardiner must have been already down when T-2 was inflicted
(RT-651-52.). Not so. The upward angle was consistent with Gardiner
being bent over, mid-struggle, as Jackson stated (RT-227;ATT. EX. R
AT 5 [Transcript of Jakson's police statement]) when Yarborough fired.
T-2 also lacked gunpowder soot (ATT. EX. A AT 23.).

The prosecutor cited the downward angles of T-4 and T-5 (Both
were on Gardiner's shoulder and caused by .25 caliber bullets (ATT.
EX. A AT 24,17;RT-69.). The prosecutor argued Gardiner would have

- 74 -

had to have been "on the ground leaning down [and] defenseless" when T-4 & T-5 were inflicted (RT-652).Even if Gardiner were bent over,Jackson indicated he was during the struggle.Moreover,he would have been far from defenseless with a nine millimeter weapon in his hand.

The prosecutor argued that,contrary to petititoner's testimony,the nine millimeter,not the .25 automatic,was fired first (RT-654).The prosecutor cited the two nine millimeter shell casings near where the incident commenced (id).However,an expert testified shell casings land randomly & are thus unreliable indicators of where a gun was fired (RT-124,305-06,562-63).Moreover,it is obvious casings were likely displaced during the struggle.Indeed,in accord with expert testimony (RT-563-64), [The .25 casing found under Gardiner (RT-93,98-99)] could have been ejected where the struggle commenced and transported to the curb in Gardiner's clothes.

The prosecutor argued Gardiner was already down when the fatal head wounds were inflicted (RT-655).Petitioner testified he was still a threat (RT-508-11).As the Coroner testified however (RT-77),there was NO basis to infer the prosecutor,rather than Petitioner,was right.

The prosecutor argued Petitioner inflicted the 9mm bullet wound to Gardiner's chest (T-8) after he was down (RT-655).However,the Prosecutor had already argued,more sensibly and in accord with Coroner's testimony (RT-79,81),The T-8 bullet caused Gardiner to fall in the first instance (RT-655;ATT EX. A AT 25 [Showing that T-8 bullet damaged spine]). This accords with Petitioner's testimony indicating Gardiner fell while Yarborough was shooting (RT-427-28).

Footnote One - In "People v. Estrada" (60 C.A. 477-1923),the only direct evidence of the circumstances of the killing was Estrada's statement to

police that he stabbed the decedent as he tried to kill Estrada.The
court found insufficient evidence to disprove self defense,noting
that Estrada's statement supported only the conclusion he acted in
self defense and that "nothing in any of the other evidence presented...
tends to contradict or dispute defendant's version of the affair"
(AT 481-82 [Noting that physical evidence was "wholly consistent
with the story told by the defendant"];People,v. Salaz 66 C.A. 173,
181 [Wherein jury could not have found "That the killing was done
by Appellant except upon the latter's admissions,which carried,in
close and immediate connection with proof of the killing,circumstances
of necessary self defense "]).

In "People v. Collins" (189 C.A. 2d 575-1961.),the Defendant
told police he killed to prevent the decedent's assault (AT 578-79.).
The court found self defense established as a matter of law when
other evidence corroborated Collins and "There was nothing inherently
improbable in defendant's account of the affray and no evidence that
it occured in any [Other] manner" (AT 590-91;People v. Mercer 210
C.A. 2d 153,161-1962 [Same]).


FOOTNOTE ONE-Petitioner's testimony he had left the area and given
up selling drugs(RT-430) was corroborated by Smith and Jackson,
who testified they had not seen Petitioner in the area for a long
time and that he had possibly moved away(RT-250,148,403).

GROUND **ELEVEN** - PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO JURY
TRIAL,DUE PROCESS AND EFFECTIVE COUNSEL WERE VIOLATED.

Petitioner was denied the opportunity for a self defense acquittal.

A killing is not unlawful if committed in lawful self defense
(P.C.   197.).A person kills in self defense if he actually and
reasonably believes the force used is necessary to prevent a killing,
Great bodily injury,or a felony (CALJIC No. 5.13;CT - 863-64.).The
danger must be imminent or appear so to a reasonable person.The
person killer must act on those fears alone (CALJIC No. 5.12,5.51,
5.30.).

However,self defense is unavailable to one who provokes an assualt
from the victim and then kills in response thereto (People v. Williams
75 C.A. 3d 731,740 -1977).Self defense "May not be invoked by a defendant
who through his own wrongful conduct (E.G. initiation of an assualt
or felony) had created the circumstances under which his adversary's
attack or pursuit is legally justified" (In Re Christian S. 7 C.4th
768,773 fn. 1-1994;People v. Roe 189 C. 548,560 - 1872.).

The instant jury was instructed that self defense is only
available to one who initiates an assualt if (1) He has tried to
refuse to continue fighting and (2) clearly informed his opponent
both that he wants to stop fighting and that he has stopped fighting,
if after these acts,his opponent continues to fight,the initial agressor
has the right to self defense (CALJIC No. 5.54;CT - 876;See People v.
Williams At 739-40;See footnote one AT 82      ).

However,the jury was not instructed on the "Hecker". "Hecker"
holds: "where the original agressor is not guilty of a deadly attack,

but of simple assault or trespass,the victim has no right to use
deadly or other excessive force.If the victim uses such force,the
agressor's right to self defense arises.For his acts did not justify
upon the part of the other,use of deadly Means for their prevention,
his killing by the other would be criminal,and one may always defend
himself against a criminal,intent to take his life."(109 C.463,464.)

    Ordinarily,the first agressor must first attempt to withdraw.
"If,however,the counter assualt be so sudden and perilous that no
opportunity be given to decline or make known to his adversary his
willingness to decline the strife,if he cannot retreat with safety,
then as the greater wrong of the deadly assualt is upon his opponent,
he would be justified in slaying forthwith,in self defense" (Hecker
AT 464; Accord People v. Roe 189 C. AT 557;People v. Hardin 80 C.A.
4th 625,634 -35 - 2000.).

    In other words,the decedent's use of unreasonable force in
response to the conduct of the first agressor allows the agressor
the right of self defense.Moreover,in order to exercise that right,
the defendant need not communicate an intent to withdraw if given
no opportunity to do so (People v. Crandall 46 C.3d 833,870 -72.).
"There is no doubt that a man has a legal right to defend himself...
but if the assualt does not seriously injure him nor contain in
itself circumstances of imminent danger to him,...He has no right
to take advantage of the opportunity which such an assualt gives
him to slay his assailant" (Williams At 742.).This principle necessarily
applies to unreasonable responses short of. deadly force (people v.
Ceballos 12 C.3d 477 - 1974.).

The instructional omission in this case wrongfully foreclosed a valid basis of acquittal,there was evidence Petitioner,suspecting that Gardiner was threatening Yarborough,grabbed Gardiner and spun him around (thus committing simple assualt),after which Gardiner tried to shoot Petitioner.Gardiner's act was sudden,leaving no opportunity for Petitioner to disclaim any dangerous intent.Gardiner was shot in the ensuing struggle (RT - 422 - 29,493.).Petitioner was justified in defending himself if he reasonably believed Gardiner intended to shoot (People v. Humphrey 13 C. 4th 1073,1083 - 1996 [Humphrey could reasonably have feared for life,and acted in self defense,based on indication decedent might have shot her]).

However,in light of CALJIC 5.54,the jury might have concluded (1) Petitioner "Initiated" Gardiner's assualt by Grabbing him and (2) His failure to "withdraw" denied him the right to defend against Gardiner's assualt (regardless of the reasonableness of Petitioner's fear) (People v. Quach 116 C.A. 4th 294,301 - 2004 [Court's emphasis] [Noting that failure to give "Hecker" instruction might unjustifiably result in "categorical denial of the [Self defense] defense to anyone who has not succeeded in clearly informing his opponent that he is no longer fighting and wishes to stop"]).

Had they been properly instructed,the instant jury could reasonably, indeed only,have concluded (1) Gardiner's armed response and actual or apparent intent to shoot was an unreasonable response to Petitioner's act which did not threaten injury, (2) Gardiner's death resulted from lawful self defense (I.E. a reasonable belief Gardiner was going to shoot),and (3) The failure to withdraw was no bar to acquittal because there was no opportunity to withdraw (Hecker,supra).

The failure to instruct was thus error (See People v. Quach
AT 300 - 03[Error to omit "Hecker" instruction when jury instructed
on withdrawal in "Mutual combat" case];People v. Roe,supra;As the
prosecution was required to prove absence of self defense (I.E. an
unlawful killing) beyond a reasonable doubt (CALJIC No. 5.15),the
error constituted an unconstitutional failure to instruct on all
elements of the charged offense (U.S. v. Gaudin 115 S. ct. 2310,
2313 - 1995.

Counsel objected to the giving of CALJIC No. 5.54 (RT - 634 -
35;CT - 823 - 25.). However,once the trial court insisted on giving
5.54,counsel should have insured the jury was fully instructed on
withdrawal principles by requesting the "Hecker" instruction.Given
the evidence,counsel should have recognized the unmodified 5.54
could prejudice Petitioner.Counsel was thus ineffective.

An attorney is ineffective if his performance falls below an
objective standard of reasonableness (Strickland v. Washington 466
U.S. 668,687 - 1984).Accordingly,"U.S. v. Span" (75 F.3d 1383 - 9th
Cir. 1996) Found counsel therein deficient for not requesting
instructions explaining the spans' self defense defense or objecting
to erroneous instruction which,like CALJIC 5.54 in this case,foreclosed
their self defense claim (AT 1389.).

Instant counsel's equally unreasonable failure had the same
prejudicial impact on self defense.As in "Span," instant counsel's
error was not a strategic decision.A "Hecker" instruction was
perfectly consistent with counsel's self defense argument (RT - 660 -
81;See ᵖt - ᵕ73 - 74[Counsel arguing Petitioner grabbed Gardiner to
merely protect Yarborough]).

PREJUDICE

Omission of an element of the charged offense is ¬ prejudicial
" Where the defendant contested the omitted element and raised evidence
sufficient to support a contrary finding" (Neder v. U.S. 527 U.S.,
19 - 1999.).Ineffective counsel is prejudicial if,absent counsel's
error,it is reasonably probable the jury would have acquitted.(U.S. v.
Span At 1386 - 87[Counsel's error prejudicial when,"given the facts
to which the two independent witnesses testified,it is highly likely
that a properly instructed jury would have found the Spans were...
defending themselves"]).

As in "Span," the instructional error herein likely caused
jurors to conclude Petitioner had lost any right to self defense.
Because there was substantial evidence Gardiner was the first to
resort to deadly force,a properly instructed jury would likely
have concluded CALJIC 5.54 did not preclude a self defense acquittal.
Moreover,there was ample basis in the record for such an acquittal.
This included Petitioner's entirely plausible testimony and a wealth
of corroborative evidence,a lot from the prosecutor's case (See above
AT 68-70      ).

The prosecutor presented no evidence to contradict or disprove
Petitioner's testimony he and Gardiner struggled over Gardiner's
gun,eventually falling at the curb in front of Petitioner's grandmother's
house (RT- 424 - 28  ).The only portion arguably contradicted was
Petitioner's account of how the incident ended.Petitioner testified
he shot and killed Gardiner in self defense (RT - 428,436.).In
contrast,the prosecutor argued,citing Rodriguez' testimony,that the
final shots,if not the initial ones,constituted premeditated murder

(RT - 649 -50,655 -56.).However,Rodriguez' testimony was problematic, contradicted by physical evidence and subject to rejection (See Above AT 58-62    ).

One need raise only a reasonable doubt the shooting was unlawful, I.E. A "reasonable possibility" of self defense (People v. Roe AT 561,564;People v. Rios 23 C. 4th 462,525 - fn. 9;See Chapman v. California 386 U.S. 18,23 - 24_ 1967.).Petitioner more than met that standard.Moreover,the prosecutor specifically invoked CALJIC 5.54 (RT - 694.).As such,the instructional error was very prejudicial (Patterson v. Gomez 223 F.3d 959,967 - 68 -9th Cir. 2000[instructional error "Necessarily played an important role in...determination of guilt" when it impacted central issue in case on which much evidence presented.];Ho v. Carey 332 F.3d 587,596 -9th Cir. 2003 [Deeming prejudicial failure to instruct on element of murder charges]).


**Footnote one** - The ineffectual attempt or failure to communicate a withdrawal does not restore the right of self defense if the opponent's counter attack is reasonable (Hecker AT 463 - 64.).Absent a communication, the circumstances would continue to appear to justify the opponent's force,thus render it lawful and any rsponse thereto unlawful (id; Williams AT 739 - 40 CALJIC 5.51).

GROUND <u>TWELVE</u> - PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO JURY
TRIAL, DUE PROCESS, AND EFFECTIVE COUNSEL.

The absence of a "hecker" instruction prejudiced Petitioner
as to <u>unreasonable</u> self-defense as well and foreclosed a manslaughter
verdict.

As the jury was instructed (CT - 868.), a killer with an actual,
but unreasonable, belief in the need to defend (U.S.b.) lacks malice
and has commited manslaughter, not murder (People v. Randle 35 C. -
4th 987,994 - 2005). The jury was also instructed that a usb manslaughter
verdict is denied one who "created the circumstances which legally
justified" his adversary's attack (CT -868; caljic No. 5.17; Accord
Randle at 1000; in RE Christian S. 7 C. 4th 769,773 fn 1 -1994). This
is the USb analog to the reasonable self -defense "initiation" rule
(Christian S., id). The caljic No. 5.17 "Legal justification" language
incorporates the "Hecker" rule that an adversary may not unreasonably
respond to a defendant's initial assualt (above At 77-78    ; see People
v. Hardin 85 C.A. 4th 625,632 - 2000[noting that 'Christians' footnote
"makes the connection to 'Hecker'"]).

Petitioner maintains that Gardiner's response (trying to shoot
Petitioner for grabbing him) was not legally justified. However, the
jury may have wrongly found 5.17 justification by equating it with
"Initiation of an assualt" under Caljic 5.54 which, in turn, triggered
the withdrawal rule. If so, the absence of instruction regarding the
lack of opportunity to withdraw was prejudicial. The jury could
have concluded Petitioner's failure to withdraw after "creating the
circumstances" foreclosed a manslaughter verdict.

This was constitutional error, proof of malice, the key element
of murder, requires proof beyond a reasonable doubt USb is <u>absent</u>
(People v. Rios 23 C. 4th 450,462 - 2000 citing Mullaney v. Wilbur

421 U.S. 684,703 - 04 - 1975[Constitution requires state to prove
absence of factors negating malice]).As such,misinstruction on USb
was unconstitutional.Misinstruction on malice (People v. Breverman
19 C,4th 142,189 -90-1989 dissent["Given the manner in which California
has structured the relationship between murder and voluntary manslaughter,
the complete definition of malice[for constitutional purposes includes]
the absence of both heat of passion and unreasonable self-defense"]).

The error was prejudicial.One need only raise a reasonable doubt
as to malice(Rios At 462.).There was near conclusive evidence Petitioner
actually believed in the need to defend (Above At 66-67   ).Petitioner
maintains that belief was reasonable.However,citing evidence Gardiner
may have dropped his gun before infliction of the fatal wounds,the
Prosecutor implied any belief he was a threat was unreasonable
(RT - 653,693 -97,644 -45[stating that USb is shown if "there is
not actually a weapon there"]).If this court accepts that argument,the
error was prejudicial (Randle At 738[failure to fully instruct on
Usb prejudicial when evidence "susceptible of the interpretation"
defendant's belief in the need to defend was real but not reasonable]).

For the above reasons,counsel was ineffective for not requesting
a "hecker" instruction.

GROUND <u>THIRTEEN</u> - PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO JURY
TRIAL,DUE PROCESS,AND EFFECTIVE COUNSEL WERE VIOLATED.

The trial court instructed,over objection,that the right of
self-defense is available to one who engages in mutual combat only
if he has (1) tried to refuse to continue fighting,(2) clearly informed
his opponent he has stopped fighting,and (3) has given his opponent
the opportunity to stop fighting (CALJIC 5.56;CT - 879.).However,
the court failed to qualify CALJIC 5.56 with the aforementioned
"Hecker" instruction (Above At 77-78 ).As a result,the jury may have
unreasonably rejected the self-defense defense.As the error affected
an element of the offense (I.E. absence of self - defense),Petitioner's
constitutional right to jury trial on the elements of the offense
was violated (U.S. v. Gaudin 515 U.S. 506,522 - 23 - 1995.).

Analagous is "People v. Quach" (116 C.A. 4th 294 - 2004),"Quach"
engaged in a gunfight with rival gang members which resulted in his
conviction of attempted murder and assualt.The court of appeal concluded
the trial court erred in giving the CALJIC 5.56 withdrawal instruction
but omitting the "Hecker" limitation."Quach" found the jury could
reasonably have concluded the circumstances constituted mutual combat.
"If they did so,they would have likely referred to CALJIC No. 5.56
for the test to be applied,and been misinformed on the crucial test
to be applied to such facts.The error thus requires reversal" (Quach
At 301).

"Quach" noted:"[S]elf-defense is available to an assailant or
mutual combatant if he first 'really and in good faith [has] endeavored
to decline any further struggle before the homicide was committed'
[Pen. Code    197].Somehow,the instruction transmogrified the requirement
of a good faith endeavor to decline further combat <u>into a categorical</u>
<u>denial</u> of the defense to anyone who has not <u>succeeded</u> in clearly
informing his opponent that he is no longer fighting and wishes to

to stop....and we cannot find such a rule in penal Code section 197"
(Quach At 301 citing People v. Hernandez III C.A. 4th 582,589 - 2003
[Describing CALJIC 5.56 as "AMbiguous"]).

     "Quach" also relied on "Hecker" as a correct statement of law
in the mutual combat context,I.E.,a combatant met with unreasonable
force and no opportunity to withdraw "would be justified in slaying
forthwith,in self defense" (Quach At 301 - 02.)."Quach" concluded
that unmodified 5.56 would seem "clearly to reject a self-defense
claim" when a combatant had no opportunity,and thus failed,to withdraw
(At 302;see people v. Gleghorn 187 C.A. 3d 196,201 - 1987 & People
v. Sawyer 256 C.A. 2d 66,75 fn. 2 - 1967[Both recognizing import of
informing jury of legal effect of lack of opportunity to withdraw]).

     As in "Quach",the instant facts implicated 5.56 and the "Hecker"
rule.The jury could reasonably have concluded (1)Petitioner and
Gardiner were mutual combatants (he testified to an extended struggle
over Gardiner's gun) and (2) that Petitioner did not withdraw (the
record demonstrates Gardiner gave Petitioner no opportunity to withdraw).
without benifit of the "Hecker" modification,the jury could only
conclude Petitioner's failure to withdraw denied him the right of
self-defense(Quach At 300 -01.).The state court of appeal in this
case agreed there was "Hecker" error(CT.OP. At 30).


     The error was prejudicial."Quach" found prejudice when there
was a reasonable possibility the jury had believed Quach's version
of the facts:that his adversary suddenly escalated their confrontation
by pulling a gun,after which Quach pulled his own gun and fired.The
court,in effect,concluded a jury believing Quach and instructed with
"Hecker" would have acquitted (At 303.).

So it is in this case.Petitioner's testimony he grabbed Gardiner after which Gardiner attempted to shoot him was uncontradicted.That testimony demonstrated there was no opportunity to withdraw (RT - 423 - 27.).Given the prosecutor's burden to disprove evidence of self defense(CALJIC 5.15,the jury was bound to accept Petitioner's version up to that point (see People v. Toledo 85 C.A. 2d 577,581 - 82 - 1948[fact - finder is bound by self defense testimony absent contrary evidence];People v. Collins 189 C.A. 2d 575,588 - 92 - 1961] [SAME]).That it nevertheless convicted suggests prejudicial reliance on CALJIC 5.56.

The state court of appeal deemed the error harmless,reasoning the jurors rejected self defense,not due to 5.56,which applied to commencement of the struggle,but by concluding "Gardiner had been disabled" by the time the final shots were fired (CT.OP. At 30.). The court is wrong.

Initially,unqualified CALJIC 5.56 constituted an illegal,unconstitutiona theory of guilt,I.E.,that self defense could be rejected merely because Petitioner had not succeeded in withdrawing from the fight (Quach At 301;see Griffin v. U.S. 502 U.S. 46,53 - 1991 [Noting that an example of an inadequate theory is one that "fails to come within the statutory definition of a crime"]).Instructions with an illegal theory is not harmless unless it is "absolutely certain" the jury did not rely therein (Ficklin v. Hatcher 177 F.3d 1147,1152 - 9th Cir. 1999).Contrary to the court of appeals' assumption,there is no assurance the jury did not rely on 5.56 (Stromberg v. California 283 U.S. 359,368 - 1931 [reversing conviction because possibly based on unconstitutional theory];Suniga v. Bunnell 998 F.2d 664,669 - 9th Cir. 1993 [Same with murder conviction];Martinez v. Garcia 379

F.3d 1034,1039 - 41 - 9th Cir. 2004 [Same with attempted murder];

Any evidence supporting the valid theory cannot render the error

harmless (Ficklin At 1152).

Moreover,the conclusion the final shots were unjustified and/or

that Gardiner was disabled was not compelled by rational necessity.

Petitioner testified that Gardiner was not disabled and at least

appeared to still be armed when Petitioner shot him (RT - 428,436,

508 - 11.).If believed,this supported a self defense acquittal (CALJIC

No. 5.51 [Appearance of danger,even if danger is not real,justifies

self defense]).The credibility of the single witness arguably

contradicting Petitioner on this point,witness Rodriguez,was seriously

tattered(see above At 58-62    ),as such,there was a substantial

probability the jury would have concluded Petitioner's acts were

justified but for CALJIC 5.56 (Quach At 30;Neder v. U.S. 527 U.S.

1,18 - 1999[Error instructing on offense elements not harmless if

"The defendant contested the omitted element and raised evidence

sufficient to support a contrary finding"]).


For the above stated reasons,counsel was ineffective for not

requesting a "Hecker" instruction (Strickland v. Washington 466 U.S.

668.).

**GROUND FOURTEEN - PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS,COMPULSORY PROCESS,AND JURY TRIAL WERE VIOLATED.**

Petitioner was prejudiced when the trial Court (RT - 626) denied petitioner's request for the following pinpoint instruction: "evidence of the character trait for violence of Noble Gardner in the form of specific instances of conduct and opinions of people who knew his reputation may be considered by you as relevant to the issue of whether Noble Gardner was acting in conformity with his character trait for violence on December 5, 2002"(forcite F5 - 12d;CT - 795).

The admitted evidence of Gardner's propensity for violence (RT - 615 - 24,539)was critical to the defense,which asked the Jury to believe Gardner had threatend petitioner and Yarborough and pulled a gun and **attempte**d to shoot petitioner(RT - 420 - 36).The trial court gave self - defense - related instructions,including a pinpoint instruction relating,not to Gardner's propensity for violence,but to petitioner's mental state (CT - 863 - 77,878).

However,a key component of the defense theory was not addressed in the instructions given.Evidence code section 1103 states: "in a criminal action,evidence of the character or a trait of character (in the form of an opinion,evidence of reputation,or evidence of specific instances of conduct) of the victim of the crime for which the defendent is being prosecuted is not made inadmissible by section 1101 if such evidence is ....[o]ffered by deffendant to prove conduct of the victim in conformity with the character or trait of character." On a specific occasion (accord People v. Wright 39 C.3d 576,587 - 1985). The specific occasion in this case was the night Gardner died.The conduct "in conformity with" his past behavior was his attempt to shoot petitioner and Yarborough.The requested instruction explained

the specific use of the prior conduct.Accordingly,the court of appeal agreed the trial court should have given the instuction(CT.OP. At 26 citing People v. Wright At 587).

The failure to instruct violated due process. "[T]he state must prove every element of the offense,and a Jury instruction violates due process if it fails to give full effect to that requirement" (Middleton v. Mcneil 541 U.S. 433,437 - 2004),I.E.,if there is a "Reasonable likelihood" the instructions were applied in an unconstitutional manner(id). That is what occured herein.The prosecution was required to disprove self - defense,and evidence in support thereof,beyond a reasonable doubt(CALJIC No. 5.15;People v. Leavitt 156 C.A. 3d 500,509 - 1984["Where the evidence is uncontroverte and establishes all of the elements for a finding of self - defense, it may be held as a matter of law that the killing was justified"]). The instructional error unfairly lightened the prosecutor's burden by,in effect,depriving the Jury of evidence tending to prove self - defense.No other instruction apprised the Jury of the critical inference arising from the evidence (Crane v. Kentucky 476 U.S. 683, 691 - 1986[due process violated by exclusion of evidence "central to the defendant's claim of innocence"];Boyde v. California 494 U.S. 370,380 - 1990 [same if instruction "Prevents the consideration of Constitutionally relevant evidence"]).

Analogous is "Bradley v. Duncan" (315 F.3d 1091 - 9th cir. 2002) Wherein the state trial Court failed to instruct that the defendant's evidence of entrapment,if believed,justified acquittal."Bradley" found due process was violated(At 1098 - 100 quoting California v. Trombetta 467 U.S. 479,485 - 1984 (Courts emphasis)[Constitution requires "Criminal defendants be afforded a meaningful opportunity to present a complete defense"])."The right to present a defense would be empty if it did not entail the further right to an

- 90 -

instruction that allowed the Jury to consider the defense"
(Bradley At 1099[Emph. added]).

        The error was prejudicial.The instructional omission,in effect,
excluded the critical propensity evidence on the issue of whether
Gardner acted as petitioner testified(people v. Humphrey 13 C. 4th
1073,1089 - 1996[Finding instructional error limiting use of
self - defense "in effect,..excluded some evidence as to one
element of the defense"])."Humphrey" found an instructional
exclusion prejudicial when "the evidence,including defendant's
corroborated testimony....,presented a plausible case for
perfect self - defense"and the excluded testimony was "directly
responsive" to prosecutor argument against the self - defense
claim(At 1089 - 90;People v. Minifie 13 C.4th 1055,1071 - 1996 -
[same when excluded evidence "Central to the defense" and "would
have strengthened the defense considerably"];Bradley v. Duncan
At 1099 - 1000[Failure to instruct had "substantial and injurious
effect" on verdict when "Ample evidence" supported defense];
Barker v. Yukins 199 F.3d 867,873 - 75 - 6th cir. 1999[error in
failing to tailor self - defense instruction to defense theory
prejudicial when reasonable Juror might otherwise have acquitted];
Conde v. Henry 198 F.3d 734,741 - 42 - 9th cir. 1999[Violation of
right to present defense prejudicial when Jury [otherwise]"may very
well" have acquitted]).

        In this case,the cited evidence was central to petitioner's
more than plausible defense.Petitioner's testimony was significantly
corroborated(Above At          ).The excluded evidence(the Logwood
shooting and Gardner's reputation for violence)would have rebutted
prosecution argument that petitioner lied about Gardner's attack
and had killed Gardner in cold blood(RT - 647 - 48,650 - 52,656 -
57,692).

Proper use of the propensity evidence may well have tipped the scales

to acquittal.The inference precluded was a strong one.The evidence

demonstrated Gardner had shot someone just four days before the instant

incident for the same reason(eliminating his believed criminal

competition)he acted violently in this case(RT - 616,415 - 19).

The inference he acted in conformity with the Logwood shooting would

have been compelling if presented to the Jury.


    The Court of Appeal found the error harmless,citing the instuction

"which told the Jury it could consider Gardner's past threats and

harmful acts... in determining the reasonableness of appellant's

beliefs and conduct"(Court opinion At 27 [emphasis added]).However,

there is a diffrence between the defendant's mental state and the

decedent's conduct.The cited instruction related the evidence to

the former,not the latter.Indeed,the instruction given implied the

evidence was relevant only if petitioner was aware of it(CT - 878).

While that is true as to reasonableness,it is not as to conduct.

Obviously,Prior violent conduct can make subsequent violent conduct

more likely even if the defendant were ignorant of the prior conduct

(CT - 795[use note to forecite F.5 - 12d];compare Humphrey At 1089

[wherein trial Court erroneously limited consideration of evidence

to a single element of self - defense claim]).

    The Court also cited the Jury's rejection of an unreasonable

self - defense manslaughter verdict as demonstrating the Jury concluded

Petitioner did not actually believe(reasonably or unreasonably)he

needed to defend himself (CT. Op. At 27 - 28).Because,in the Court's

eyes,the error affected only the reasonableness requirement,it did

not effect the verdict(id).

    However,the Court of Appeals unreasonably divorces the "Actual

belief" element from the "Reasonableness" element(See Humphrey At

1082 - 87[Holding lower Court erred in concluding evidence relevent

to actual belief but not reasonableness]).As noted,the Gardner evidence was relevant to prove Gardner's conduct which,in turn,bore on whether petitioner actually felt threatened.In other words,a Jury believing Gardner attacked Petitioner would more likely believe his use of force was motivated by fear and reasonable,leading to acqittal or a manslaughter verdict(People v. Humphrey At 1083[in determining reasonableness,Jury must "consider all the facts and circumstances" confronting the defendant]).


Footnote One - See U.S. v. James 169 F.3d 1210,1214-15-9th Cir. 1999 [En Banc] [Concluding trial Court erred in excluding evidence of decedent's history of violence merely because defendant unaware of it.Evidence relevent to prove decedent behaved as defendent testified]; U.S. v. Saenz 179 F.3d 686,689-9th Cir. 1999 [Trial court erred in excluding evidence regarding victim's history of violence]).

GROUND 15 - PETITIONER'S SIXTH AMENDMENT RIGHTS WERE VIOLATED BY
DENIAL OF COUNSEL AND A CONFLICT OF INTREST.

"Prejudice is presumed when counsel is burdened by an actual
conflict of intrest.In those circumstances,counsel breaches a duty
of loyalty,perhaps the most basic of counsel's duties" (Strickland v.
Washington 466 U.S. 668,692 - 1984.).Reversal is required if counsel
actively represented conflicting intrests that adversely affected
his performance (Strickland AT 691      ;Cuyler v. Sullivan 446
U.S. 335,348 - 50 - 1980.).There need not be a "Reasonable probability"
counsel's error altered the verdict,only that a conflict prevented
his pursuit of a plausible option "Which a zealous advocate would
reasonably persue" (Lopez v. Scully 58 F.3d 38,41 - 42 - 2nd Cir.
1995 [Failure to request lenience "adverse affect" of conflict despite
judge's suggested hostility to such a request];Cuyler v. Sullivan
AT 349 - 51 [Adverse affect when counsel "failed to resist the
presentation of arguably inadmissable evidence"]).

In this case,after Petitioner was convicted,his trial attorney,
Pyle,suffered an actual conflict.The trial court held a "Marsden"
hearing on Petitioner's request to have counsel replaced.Petitioner
expressed his desire that a new trial motion be filed (apparently
by a new attorney based on Pyle's ineffectiveness (RT 709.).
However,counsel could not openly admit facts at the "Marsden"
hearing demonstrating ineffectiveness as they might provide grounds
for the new trial motion and expose Pyle to malpractice liability
and Bar discipline.Pyle's position was thus fatally inconsistent
with Petitioner's interest in obtaining an effective attorney for
his new trial motion and the remaining proceedings.Petitioner's

interest,of course,require Pyle to <u>admit</u> his failings.

Once the "Marsden" hearing ended (with Pyle still representing Petitioner-RT-749.),his conflict carried over with respect to the new trial motion,in which claims of his ineffectiveness should have been raised.Again,counsel and Petitioner's interest were manifestly at odds.Counsel obviously was strongly disinclined to aid in a finding of his own ineffectiveness.

By Petitioner raising his "Marsden" concerns post-conviction and expressing his desire to raise claims of ineffectiveness,this case differs from cases with the run of the mill <u>pre</u>-trial "Marsden" hearings.In those cases,the attorney **is** only risking removal from **the case** because an ineffectiveness claim can't be made out absent a conviction (Strickland v. Washington AT 691 [Requiring proof counsèl's errors had "effect on the judgement"]).In this case,Petitioner had concrete evidence of prejudice:his murder conviction.

## A. ACTUAL CONFLICT.

1. CASELAW.

"U.S. v. Miskinis" (966 F.2d 1263 - 9th Cir. 1992) found the serious possibility of a conflict when Miskinis had a potential defense,based on his trial attorney's advice:"If [The attorney's] testimony,had he been called and testified,would have been adverse to a defense that Miskinis might have offered,a conflict of interest existed.The conflict would have been particularly acute if the advice Mitchell supposedly gave would have constituted a violation of the rules of professional ethics" (AT 1269.).

In "U.S. v. Morris" (259 F.3d 894 - 7th Cir. 2001),Morris created a conflict when he alleged his attorney's bad advice invalidated

his gultiy plea.The seventh Circuit stated: "[The attorney] would seem to have a self-interest in protecting himself from a malpractice claim" perhaps by undermining Morris' motion (AT 899.).

"U.S. v. Ellison" (798 F.2d 1102 - 7th Cir. 1986.) similarily found a conflict when Ellison had alleged his guilty plea was invalid due to his attorney's inadequate and unethical advice.In this context, "counsel was not able to pursue his client's best interest free from the influence of his concerns about possible self incrimination" (AT 1107.).By denying Ellison's allegations,counsel acted as both counsel and witness for the prosecution.These rules are inherently inconsistent" (id).

"Lopez v. Scully" (58 F.3d 38 - 2nd Cir. 1995) found a conflict when lopez alleged his attorney had coerced his guilty plea.The attorney was limited to admitting the ethical violation or (as he did) undermining Lopez's motion to withdraw his plea (AT 41 - 42;U.S. v. Gonzalez 113 F.3d 1026,1028 - 9th Cir. 1997 [Finding district court "created" conflict when "[C]ourt invited [Attorney] to contradict his client and to undermine" Gonzalez' motion to replace attorney]; U.S. v. Wadsworth 830 F.2d 1500,1510 - 11 - 9th Cir. 1987 [Concluding defendant denied counsel at hearing on motion to replace consel when attorney "had taken an adversary and antagonistic position" on motion and "provided the most damaging evidence against his client's demand that the court substitute competent counsel"]).

2. THE INSTANT FACTS.

As with the attorneys in "Miskinis", "Morris", "Ellison",and "Lopez", counsel in this case could not advocate Petitioner's cause free from concerns about his own malpractice liability and Bar discipline.

Although the "Marsden" motion was denied (RT - 749.),counsel's conduct
had given rise to several viable claims of ineffectiveness justifying
his removal (RT 704 - 49;See grounds 1,5,6,8,11,12,13;People v. Marsden
2 C.3d 118,123 - 1970 [Requiring removal of ineffective attorney]).
Counsel's desire to avoid a new trial motion is further evidenced
by his telling Petitioner there was no such remedy (RT - 728.) and
Pyle's reluctance to file one (RT - 728 - 29.).


### B. ADVERSE EFFECT.

1. CASELAW.

For an attorney's omission in this context to violate the Sixth
amendment,it must be "likely" the omission was caused by the conflict
(U.S. v. Miskinis AT 1268.).The conviction is invalid if "The attorney's
behavior seems to have been influenced by the suggested conflict"
(Sanders v. Ratelle 21 F.3d 1446,1452 - 9th Cir. 1994 [Finding omission
resulted from conflict although attorney had "never explained his
actions"];Fitzpatrick v. McCormick 869 F.2d 1247,1251 - 52 - 9th Cir.
1989 [Same despite attorney's protestations to the contrary]).


2. INSTANT FACTS.

In this case,Pyle's evasiveness in response to Petitioner's complaints
and the trial court's inquiries "likely" resulted from his conflict
and thus constitutes "adverse effect." That evasiveness and selective
memory defeated the "Marsden" motion.Had he been forthcoming,counsel
would have provided bases for his removal.For example,counsel failed
to explain why Romeo Yarborough was not called to testify (See Ground 1),
instead leaving his investigator to speculate on the matter (RT - 740.)

Petitioner complained about Pyle's failure to obtain a police diagram possibly showing Gardiner's gun near his body (such was critical to the self defense defense see ground 7) (RT - 719,721, 724.).Pyle claimed both that he "Believed" he'd asked the district attorney for the diagram (RT - 719) and,contradictorily,that he didn't know if there was a diagram (RT -721.).The existence of which was established by sworn police testimony (RT - 88 - 89,95).

Pyle did not ask for the diagram and lied to obscure this fact. said omission was clearly deficient,given the diagram's importance, and justified Pyle's removal (Hart v. Gomez 174 F.3d 1067,1070 - 71 - 9th Cir. 1999 [Attorney deficient for failure to investigate exculpatory documentary evidence]).

Petitioner complained about Pyle's failure to authorize investigation in time to locate exculpatory evidence and witnesses (RT - 710 - 11.). In this,Pyle was deficient.He again hemmed and hawed,claiming he could not remember when he'd authorized investigation (RT - 715 - 16.).

Petitioner complained about Pyle's failure to locate Mike Hall, a critical witness to Gardiner's violent conduct,despite Pyle having been provided with Hall's first name and other information (RT 743; See Ground Five.).Counsel claimed not to remember if he'd recieved the name (RT - 717 - 18.).

Petitioner pointed out that Pyle had claimed,in a letter,he would attempt to find the Gardiner evidence (RT 720.).Counsel initially claimed not to recall writing such a letter(id.).However,he did (ATT. EX. T [Letter from Pyle to Petitioner dated 11-22-03]).

Petitioner complained about Pyle's failure to get an Affidavit

from Movita Patterson for the New Trial Motion after Petitioner told
Pyle Patterson had seen enough to contradict prosecution testimony
about the shooting (RT - 730 - 31.).Petitioner recieved this information
after he was convicted (RT - 736 - 38;See Pen. Code   1181.8 [Newly
discovered evidence a basis for New trial]).Pyle first claimed not to
recall being told about Patterson's information or Petitioner's
request an affidavit be obtained (RT -731.).Pyle knew about Patterson
but failed to interview her.This was obviously deficient (Avila v.
Galaza 297 F.3d 911,919 - 21 - 9th Cir. 2002 [Attorney deficient
for failure to interview witnesses with potentially exculpatory
information]).

Counsel then implied he'd spoken with Patterson but couldn't
recall if she'd seen the shooting (RT - 729 - 30.). Counsel then
claimed he could not recall if he or his investigator had spoken
to Patterson about the shooting (RT 730 - 31.).However,the investigator
revealed Pyle indeed had not directed Patterson be interviewed
about the shooting (RT -734 -35.).The Court then ordered counsel
to interview Patterson (RT - 738,746.).

Pyle's memory lapses on issues of such importance were highly
suspicious and further demonstrate he was indeed deficient on each
point.

Pyle's evasions and uncooperativeness were "adverse effects"
resulting from his conflict which led to denial of the "Marsden"
motion and to Pyle's continued representation.By clamming up,Pyle
also precluded a subsequent new trial motion (By a new Attorney)
based on h∮s ineffectiveness.(See U.S. v. Miskinis AT 1268 [Possible
adverse effect in attorney's  refusal to testify about conversation
possibly incriminating to him]).

An unconflicted attorney would have vindicated his client's interest

in effective post-trial assistance.As a new attorney and a new trial

motion were viable options,The Sixth Amendment was violated (See

U.S. v. Tatum 943 F.2d 370,378-80-4th Cir. 1991 [Sixth Amendment

violated when attorney's pretrial conflict "infected" Tatum's defense

at trial];Sanders v. Ratelle 21 F.3d 1446,1453-9th Cir. 1994 [Same]).


Given the above,counsel's failure to raise viable claims of

ineffectiveness in his new trial motion obviously resulted from his

conflict (U.S. v. Stoia 22 F.3d 766,769-7th Cir. 1994[Failure to

file motion constituted adverse effect from conflict];Lopez v. Scully

AT 41 [Failure to make motion adverse effect].).

Another likely adverse effect was counsel's post trial failure

to locate and/or interview Patterson,Hall,and other Bancroft shooting

witnesses (see Ground Five).Declarations from the witnesses in the

new trial motion was a viable,indeed advisable,tactic.Pyle had five

months between the "Marsden" hearing and the new trial hearing to

locate the witnesses (RT-709,761.).Had counsel done so (and the

witnesses testified favorably) it would have proved a Brady violation

as to the Bancroft witnesses (See Ground Two.).However,location of

the witnesses would also have proven Pyle ineffective for spot obtaining

those witnesses for trial.This was sufficient reason for Pyle to

sit on his hands (Sanders v. Ratelle 21 F.3d AT 1455 [Sixth Amendment

violated when "only the tug of conflicting interests ...reasonably

can explain" Failure to  call witness]).


Pyle's conduct placed him in the "inherently inconsistent" role of

protecting the conviction by protecting himself (U.S. v. Ellison AT 1107).

It created a deplorable circumstance,leaving Petitioner to fend for himself,in effect,<u>without counsel</u> during the Marsden hearing:"courts have presumed prejudice in such situations" (U.S. v. Morris AT 849 [Noting "Morris was forced against his wishes to choose between allowing [His conflicted attorney] to speak for him or arguing the motion Pro Se"];U.S. v. Ellison AT 1108-09 [Concluding that fact Ellison"was forced to present his motion without the assistance of counsel....clearly calls for the application of Cuyler's presumption of prejudice"];U.S. v. Gonzalez 113 F.3d AT 1028 [Finding denial of counsel under same circumstances];U.S. v. Wadsworth 830 F.2d AT 1510 [SAME].).

C. REMEDY.

The remedy for this 6th Amendment violation should be tailored to the injury suffered (U.S. v. Morrison 449 U.S. 361,364-1981.). Petitioner should be afforded new counsel to file a proper new trial motion (U.S. v. Morris AT 899 [Remanding for new hearing on Morris' motion to withdraw plea];U.S. v. Ellison AT 1109 [SAME];Lopez v. Scully AT 43 [Lopez granted resentencing when attorney at previous sentencing conflicted].).

**GROUND <u>SIXTEEN</u> - PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE APPELLATE COUNSEL.**

An Appellate attorney may omit claims only in accord with "Reasonable professional judgements" (Jones v. Barnes 463 U.S. 745,751,754 - 1983).This usually involves "winnowing out weaker arguments on appeal... with a view to selecting the most promising issues for review" (id At 751 - 52;see Banks v. Reynolds 54 F.3d 1508,1515 - 10th Cir. 1995 [Omission of claim may be ineffective "even though counsel may have presented strong but unsuccessful claims"[;U.S. v. Manino 212 F.3d 835, 843 - 3rd Cir. 2000[Attorney ineffective for failure to raise clearly meritorious claim]).

Appellate counsel was ineffective for failing to raise the following claims which were obvious from the record and requested by Petitioner in his letters(see Grounds 1,2,3,4,5,6,7,8,9,10,11,12,15;Delgado v. Lewis 223 F.3d 976,981 - 82 9th Cir. 2000[Counsel ineffective for failure to raise "deficiencies in the trial court proceedings significant enough to warrant reversal"];Carter v. Bowersox 265 F.3d 705,716 - 8th Cir. 2001 [Same];U.S. v. Williamson 183 F.3d 458,463 -64 5th Cir. 1999 [Same]).

It is clear that counsel's omission of the claims did not result from strategic "Winnowing," but,rather from counsel's conclusion that the claims lacked merit(see Att.Ex. K - 9[dated 8-29-05][Counsel agreeing that trial counsel was not ineffective];Ex. K-5[Dated 7-15-05] [Counsel stating there was"absolutely no evidence" trial counsel ineffective];Ex.K-21[Dated 7-3-06][Counsel stating "I do not believe there are any other meritorious issues to raise in connection with your trial"];Ex. K-4[Dated 5-24-05][Same];See U.S. v. Manino At 843

[Presumption that omission strategic overcome by attorney's admission claim simply overlooked or misjudged]).

Any tactical decision to omit a claim must itself be reasonable, I.E.,supported by counsel's full knowledge of the facts and applicable law (Wiggins v. Smith 539 U.S. 510,521 - 2003[Requiring "Strategic choices [Be] made after thorough investigation of law and facts relevant to plausible options").In this case,counsel's own words show her omission of some claims resulted from her <u>misunderstanding</u> of fact and law (See Kimmelman v. Morrison 477 U.S. 365,385 - 87 - 1986[Omission deficient when caused by ignorance of facts and law];Wiggins At 535[Same]

### A.BRADY CLAIM.

Counsel rejected Petitioner's repeated requests to attack the prosecutor's suppression of the Bancroft shooting information(Att. Ex. L-4-6,M-4-6;N -1-3 [Petitioner's letters];Banks v. Reynolds 54 F.3d 1508,1515 - 16 - 10th Cir. 1995[Attorney ineffective for not raising Brady violation "Obvious from the trial record"]).Counsel concluded the "Brady" claim would fail because the suppressed evidence was "cumulative" to the "plenty" of evidence Gardiner had "violent tendencies" and was "not a good person" and that the Bancroft evidence would not "make him seem worse" (Att.Ex. K-11 and K-16-17.).

Counsel missed the point.The intent was not to impugn Gardiner's character,but to show he was violent and thus more likely to have behaved        as Petitioner testified (See evidence Code 1103[evidence of violent acts of decedent admissible to prove conduct in conformity therewith]).Counsel's apparent ignorance of 1103 is further evidenced by her conclusion (1) that the Bancroft evidence was relevent <u>only</u> to (and cumulative regarding) Petitioner's mental state (Att.Ex. K-17).

- 103 -

However,as noted,the evidence was also probative of Gardiner's likely conduct. Evidence he committed two shootings,rather than one (and had a habit of violent shootings) was plainly probative as increasing the likelihood Gardiner behaved violently the night he died.This fact also underminds counsel's conclusion the Bancroft shooting was irrelevant because Petitioner was unaware of it(Att. Ex. K-18.).

Appellate counsel noted the jury had been "made aware" of the Bancroft shooting (Att. Ex. K-8 citing RT - 540,623 - 24.).However, counsel refers to Smith's hearsay testimony that Gardiner had admitted the Bancroft shooting (RT - 540.).Any reasonable attorney would realize eye witness testimony Gardiner had shot Hall would have been more persuasive.

Appellate counsel also cited the jury's alleged reliance (apparently according to trial counsel) on the "fact" Petitioner "walked  away, and then returned to shoot [Gardiner] Again....after [He] had disabled Gardiner" (Att. Ex. K-18-19.).This "fact" was established soley by the highly impeached,indeed perjurious,Juan Rodriguez (See ground nine).Had the jury heard the Bancroft evidence,it would more likely have disbelieved Rodriguez on this point.Moreover,Pyle's assessment was based on what the prosecutor had told pyle that the jurors said.

### B. INEFFECTIVENESS OF TRIAL COUNSEL.

Petitioner wanted counsel to address trial counsel's failure to locate Hall (Att. Ex. L-7;N-3-4.).Appellate counsel declined, stating trial counsel did not know about the Bancroft shooting prior to trial (Att. Ex. K-17.).To the contrary,the record shows counsel

did know about Bancroft and sought information about it from the
prosecutor prior to trial (RT -1-4,10-11.).Moreover,there were leads
and avenues counsel should have persued to identify and locate Hall
and other witnesses (See claim 5).

### C. PERJURY OF JUAN RODRIGUEZ.

Appellate counsel refused to address this issue,stating:"I have
no way to prove that Mr. Rodriguez comitted perjury" (Att.Ex. K-6)
and that counsel's cross-examination of Rodriguez "pointed out the
weaknesses in his testimony" (id).First,as shown in ground nine,a
careful review of the record should have alerted counsel that one
can only conclude Rodriguez lied.Second,as shown in ground eight,
counsel's cross-examination was defiecient and omitted many facts
which would have proven Rodriguez's perjury to the jury.

As such,counsel's factually and legally flawed reasoning did
not justify her omissions.

- 105 -

**GROUND 17. PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO EFFECTIVE COUNSEL, DUE PROCESS, AND COMPULSORY PROCESS WERE VIOLATED.**

Counsel failed (1) to move for a continuance until after Romeo Yarborough was sentenced (See Ground one .);(2) to assure that Yarborough would testify for the defense after he was sentenced; (3) to seek charging and sentencing immunity related to the fact and content of Yarborough's testimony.The above would have removed any obstacles to Yarborough testifying.The record indicates Yarborough's attorney advised Yarborough not to testify before he was sentenced (PTRT - 143 - 44).The Attorney apparently believed (and likely told Yarborough) his testimony could adversely affect his sentence.

Compulsory  due process was violated when (1) the prosecutor and/or Yarborough's Attorney (a state - employed public defender (PTRT - page 1. ) requested,and the trial court granted,continuances for over a year to delay Yarborough's sentencing until after petitioner's trial (CT - 688,1012); (2) The Attorney advised Yarborough not to testify,and that his testimony might affect his sentencing; (3) The prosecutor told Yarborough and/or his Attorney that testifying would or might affect Yarborough's sentence.The foregoing was intended to intimidate Yarborough into not testifying for the defense.

Petitioner respectfully requests evidentiary hearings and fact - developement as to his claims.

## CONCLUSION

Therefore, based upon the foregoing reasons Petitioner is entitled to a Writ of Habeas Corpus.

DATE:  7/29/08

Respectfully submitted,

Name, Petitioner

//
//
//

107

## PROOF OF SERVICE BY MAIL

I  Elnorris Stone          , AM A RESIDENT OF FOLSOM STATE PRISON IN THE
COUNTY OF SACRAMENTO, STATE OF CALIFORNIA. I AM OVER THE AGE OF 18 YEARS,
AND I AM / A~~M NOT~~ A PARTY TO THIS ACTION.
MY PRISON NUMBER IS: V67067
MY PRISON ADDRESS IS; **P.O. BOX 950, Folsom, Ca. 95763**


ON  July  29th          , 2008, I SERVED A COPY OF THE FOLLOWING
DOCUMENT: Habeas Corpus with attached Memorandum of points and
authorities in support of Petition for Habeas Corpus,Prisoner's
Application to proceed In Forma Pauperis, Notice of Motion &
Motion for Directed NUNC PRO TUNC And Proposed Order.


ON THE FOLLOWING PARTIES BY PLACING THE DOCUMENTS IN A SEALED
ENVELOPE WITH POSTAGE FULLY PAID, IN THE UNITED STATES MAIL, IN A DEPOSIT
BOX SO PROVIDED AT FOLSOM STATE PRISON (MAILBOX RULE), FOLSOM,
CALIFORNIA, ADDRESSED AS FOLLOWS: U.S. District Court
                                   Northern District of California
                                   450 Golden Gate Ave.
                                   San Francisco, California 94102

Attorney General
Jerry Brown
1300 I St. Suite 125
Sacramento, CA. 95814


THERE IS DELIVERY SERVICE BY THE UNITED STATES MAIL AT THE PLACE SO
ADDRESSED, AND/OR THERE IS REGULAR COMMUNICATION BY MAIL BETWEEN THE
PLACE OF MAILING AND THE PLACE SO ADDRESSED.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
AND CORRECT.

EXECUTED    July  29 th  , 2008, AT FOLSOM, CALIFORNIA..