1
2
3
4   IN THE UNITED STATES DISTRICT COURT
5   FOR THE NORTHERN DISTRICT OF CALIFORNIA
6
7
8   ELNORRIS STONE,
9                           Petitioner,          NO. C 07-6263 TEH (PR)
10          v.                                    **ORDER DENYING PETITION**
                                                  **FOR WRIT OF HABEAS CORPUS**
11  TONY HEDGPETH, Warden,                        **AND DENYING CERTIFICATE**
                                                  **OF APPEALABILITY;**
12                          Respondent.           **INSTRUCTIONS TO THE CLERK**
13
14                          **I. INTRODUCTION**
15          This is a petition for a writ of habeas corpus filed pro se by a state prisoner pursuant to
16  28 U.S.C. § 2254.  An Alameda County jury convicted Petitioner of first degree murder and
17  found true the allegation that he was armed with a firearm in the commission of the offense.
18  He was sentenced to twenty-six years to life in state prison.
19          The conviction and sentence were affirmed on appeal by the Court of Appeal of
20  California, with a minor clarification of the restitution obligation.  The Supreme Court of
21  California denied review.  Petitioner's state habeas petitions were denied.
22          On April 28, 2008, this Court dismissed the petition based on Petitioner's
23  representation that he had not exhausted his claims in state court.  Petitioner then filed a
24  motion seeking to stay the case pending the exhaustion of certain claims in state court, but
25  did not move to reopen the closed case.  Shortly thereafter he filed a motion requesting
26  "directed nunc pro tunc" and filed an amended petition informing the Court that all of the
27  claims had now been exhausted.  The Court construed Petitioner's motion as a motion to
28

1  reopen the case, granted it, and ordered respondent to show cause why the petition should not

2  be granted.

3      Respondent has filed an answer and memorandum of points and authorities in support

4  of it, and has lodged the record with the Court.  Petitioner has filed a traverse and a motion

5  for an evidentiary hearing.  For the reasons set out below, the motion for an evidentiary

6  hearing and the petition will be denied.

7                              **II.  FACTS**

8      Petitioner and Romeo Yarborough were jointly charged with first degree murder.  Ex.

9  5 (opinion of California Court of Appeal) at 19.[1]  Yarborough moved to change his plea prior

10 to trial, so Petitioner was tried alone.  *Id.*  His first trial, in September of 2003, ended in a

11 mistrial when defense counsel's wife died.  *Id.*  His second trial, which began in March of

12 2004, ended with his conviction.  *Id.*

13     The California Court of Appeal's opinion contains an unusually extensive and very

14 detailed description of the testimony at trial.  *Id.* at 1-19.  Summarizing, at the time of the

15 offense Petitioner was living in Sacramento, but he formerly was a drug dealer in Oakland,

16 and his friend Romeo Yarborough still was.  *Id.* at 2.  Petitioner's family owned a duplex on

17 a block of 52nd Avenue between International Boulevard and Bancroft Avenue.  *Id.*  He

18 periodically returned to the neighborhood to visit his family and see Yarborough.  *Id.*  On

19 one of these visits, Petitioner and Yarborough became aware of Noble Gardiner, the victim,

20 standing on 52nd Avenue, and approached him.  *Id.* at 3.  Gardiner had a pistol in his hand.

21 *Id.*  Yarborough, who knew Gardiner, introduced Petitioner; although Yarborough and

22 Gardiner were ostensibly friendly, both kept their guns out.  *Id.* at 4-5.  Yarborough had

23 earlier told Petitioner that Gardiner had shot a man named Leo Logwood, and bragged about

24 committed other shootings and murders.  *Id.* at 4.  The three adjourned to Gardiner's

25 apartment to smoke marijuana.  *Id.* at 5.  The group broke up when Kenya Smith, Gardiner's

26 girlfriend, came home.  *Id.* at 6.

27

28     [1] Citations to "Ex." are to exhibits in the record that respondent has lodged with the Court,
   unless otherwise indicated.

After Yarborough and Petitioner left, Gardiner was unable to find his cigarette lighter and said to Smith that he believed one of the other two men had taken it. *Id.* at 7. He went out and encountered Yarborough and Petitioner, who were standing inside a gate at Petitioner's family's residence. *Id.* The conversation was tense, and Petitioner believed Gardiner was attempting to position himself to keep both other men covered, although Gardiner was not showing a gun. *Id.* at 7-8. At some point Petitioner decided to "walk away;" he walked around the side of the building, but became anxious about his friend Yarborough being alone with Gardiner, took his gun out, and returned to where Yarborough and the victim were. *Id.* at 8-9. There, Yarborough and Gardiner appeared to be in some sort of close confrontation; Petitioner spun Gardiner around, and saw that Gardiner had a gun concealed in his "beanie" cap in his left hand. *Id.* at 9. Yarborough grabbed Gardiner's gun hand and kept him from shooting Petitioner. *Id.* Petitioner hit Gardiner in the face with his gun, then opened fire. *Id.*

Appellant's version of the ensuing struggle was that Gardiner broke free from Yarborough, still holding his pistol in his left hand, and started to bring it to bear on appellant. Appellant grabbed Gardiner's wrist, and fired off at least one more shot while they were struggling, but soon after that, his gun jammed and would not fire any more. Meanwhile, Gardiner, who had apparently been hit in the left shoulder, grabbed appellant with his right hand while continuing to try to break his left wrist free from appellant's grasp. The two men then struggled together toward the front steps of the house, where appellant tripped slightly on the steps, allowing Gardiner to break his pistol hand free. Gardiner then stepped one foot back and tried to shoot appellant, who was still holding Gardiner's other shoulder.

At that point, appellant testified, Yarborough started shooting Gardiner, firing at least three times, and appellant was able to regain his grasp on Gardiner's gun hand, though he could not get the gun away from him. Gardiner responded by grasping appellant's shoulder with his other hand, and pulled him back down the walkway to the street. [FN13. Photographs of the crime scene taken by the police, and introduced by the prosecution at trial, showed a trail of blood leading from the front steps, through the front gate, and across the sidewalk to the car where the body was found.] After Gardiner pulled appellant out through the gate, Gardiner fell down near a car that was parked in front of the house, and nearly pulled appellant down with him. By that time, Yarborough had followed the other two men out of the front yard and was standing very close to appellant, but was not still shooting at Gardiner. Appellant was able to break away from Gardiner by bracing himself on the car when Gardiner fell, and he then took a step back, grabbed Yarborough's gun, and shot Gardiner twice in the head with it.

3

Appellant testified that during the entire duration of the struggle, and even after it was over, he believed that Gardiner was about to kill him, and that he had to kill Gardiner in self-defense in order to prevent that from happening. He explained that the reason he fired the last two shots was that when he had hesitated to shoot earlier during the struggle, it had almost cost him and Yarborough their lives. He stressed that the bullet wounds Gardiner received did not seem to affect him, and that even after Gardiner had been shot repeatedly and had fallen down near the car, Gardiner was still moving and trying unsuccessfully to get up, and appellant "figured that if he had movement in him[,] he would shoot me." [FN14. This testimony was consistent with that of the prosecution's pathologist, who testified . . . that Gardiner was still alive at the time each of the gunshot wounds was inflicted on him, and that only the final shots to the back of Gardiner's head would have incapacitated him completely. Appellant also introduced testimony from an expert on the use of deadly force in self-defense, who confirmed that it would not be unusual for a person to continue to struggle violently after receiving several bullet wounds, and even after being paralyzed from the waist down by a spinal cord wound. The same expert opined that if the facts were as described by appellant, appellant acted reasonably.] He acknowledged that he could not be sure Gardiner had his gun pointed at him when he fired the last two shots, but explained that at the time, he was no longer thinking, just reacting, and averred that his decision to "wasn't a case of making a choice or anything like that. It was reaction. Split-second, instantaneously survival [ sic ]."

*Id.* at 10-11.

Petitioner claimed that the shooting was in self-defense. The evidence to the contrary – the evidence that supports the verdict – includes that Gardiner got off no shots; that his gun was found in his beanie cap near the gate, far from his body; and the testimony of a reluctant witness, Juan Rodriguez, who heard the shots and saw a man who appeared to be Petitioner walk a bit away from the scene, then return and fire a final shot into what the witness thought was a car tire, but which in fact may have been the victim.

## III. DISCUSSION

### A. Motion for Evidentiary Hearing

Petitioner has moved for an evidentiary hearing to introduce into the record the exhibits he has filed in support of his petition and an exhibit attached to his traverse.

An evidentiary hearing is held in federal habeas cases only under the most limited circumstances. *Baja v. Ducharme*, 187 F.3d 1075, 1077-79 (9th Cir. 1999). An evidentiary hearing on a claim for which the Petitioner failed to develop a factual basis in state court can be held only if Petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review,

or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense. 28 U.S.C. § 2254(e)(2)(A)-(B). In short, if Petitioner did not attempt to present in state court the facts he wishes to present now, for instance by attempting to develop them in his state habeas proceedings, he cannot do so now unless he can show that he meets the provisions of section 2254(e)(2) outlined above.

A prisoner "fails" to develop the factual basis of a claim, triggering § 2254(e)(2), if "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000). "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. Accordingly, where the prisoner has met the burden of showing he was diligent in efforts to develop the facts supporting his claims in state court, an evidentiary hearing may be held without regard to whether the "stringent" requirements of § 2254(e)(2) apply. *Id.* at 437; *Jaramillo v. Stewart*, 340 F.3d 877, 882 (9th Cir. 2003); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997).

It is Petitioner's burden to show that he attempted to develop the facts in state court but was prevented from doing so. *Hutchison v. Bell*, 303 F.3d 720, 747 (6th Cir. 2002) (requiring Petitioner to demonstrate "sufficient diligence"); *Baja,* 187 F.3d at 1078-79.

Petitioner does not demonstrate in his motion that he acted with due diligence in attempting to develop the facts in state court, whether by requesting an evidentiary hearing in state court or submitting declarations there. He thus has failed to develop facts in state court, and because he has not attempted to show that the exceptions of Section 2254(e)(2)(A)-(B) apply to him, is not entitled to an evidentiary hearing.

Furthermore, in ruling on issues where the attachments are relevant, such as those involving the declarations of Rodriguez and Segura, the Court has taken the attachments into account and nevertheless concluded that the claims are without merit. Thus, even if

Petitioner had shown that he attempted to develop the facts in state court and was prevented from doing so, he would not be entitled to an evidentiary hearing under the pre-AEDPA standard. *See Williams v. Calderon*, 52 F.3d 1465, 1484 (9th Cir. 1995) (to establish right to evidentiary hearing, Petitioner must provide allegations of fact that, if proven, would establish right to relief).

The motion for an evidentiary hearing will be denied.

**B. Merits**

As grounds for habeas relief, Petitioner asserts that: (1) his counsel was ineffective in failing to call Yarborough as a witness; (2) the prosecution violated his due process rights by failing to turn over exculpatory evidence about a shooting in which the victim may have been involved (the "Bancroft shooting") until after the trial; (3) the prosecution violated his due process rights by failing to turn over Bancroft shooting evidence at the preliminary hearing; (4) the prosecution violated his due process rights by failing to turn over all the exculpatory evidence from the Bancroft shooting; (5) counsel was ineffective in failing to discover information about the Bancroft shooting; (6) the trial court's denial of Petitioner's motion for more information about a altercation in which the victim was involved while incarcerated violated his rights; (7) the prosecution violated his due process rights by failing to turn over a diagram of the shooting scene; (8) counsel was ineffective in cross-examination of Rodriguez; (9) the prosecution knowingly used perjured testimony; (10) there was insufficient evidence to support the conviction; (11) his rights were violated in connection with the trial court's failure to give an instruction on inability to withdraw from mutual combat; (12) his rights were violated by the failure to give the instruction involved in claim eleven insofar as it had an impact on his "imperfect self-defense" argument; (13) his rights were violated by the failure to give the instruction involved in claim eleven in that it affected the mutual combat instructions; (14) his rights were violated by the trial court's failure to give a proposed instruction on the victim's violent character; (15) his counsel had a conflict

///

///

at a *Marsden*[2] hearing and in preparing a motion for new trial; (16) his appellate counsel was ineffective in not raising the claims presented here on appeal; (17) his trial counsel was ineffective in not asking for a continuance until after a co-defendant was sentenced; (18) some jurors were biased, the prosecutor discriminated in his use of peremptory strikes, and defense counsel was ineffective in not objecting to the discriminatory use of peremptory strikes; (19) the superior court violated his rights by denying his motion for a transcript of jury voir dire and for copies of the juror questionnaires; and (20) his trial counsel was ineffective in not locating a witness named Felix Segura and in not calling him to testify.

### 1. Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") limits the authority of federal courts to issue a writ of habeas corpus. Under AEDPA, a district court may only grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court if the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). The first prong of the Act applies both to questions of law and to mixed questions of law and fact. *Williams v. Taylor*, 529 U.S. 362, 407-07 (2001). The second prong applies to decisions based on factual determinations. *Miller-El v. Cockrell*, 537 U.S. 332, 339 (2003).

A state court has "adjudicated" a Petitioners claim on the merits for purposes of 2254(d) when it has decided the Petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). It is error for a federal court to review *de novo* a claim

---

[2] "So named after *People v. Marsden*, 2 Cal. 3d 118 (1970), it is a motion permitting a defendant to articulate why he is dissatisfied with his court-appointed counsel and why counsel should be relieved." *McNeely v. Blanas*, 336 F.3d 822, 825 n. 3 (9th Cir. 2003).

that was adjudicated on the merits in state court. *See Price v. Vincent*, 538 U.S. 634, 638-43 (2003).

"Clearly established federal law, as determined by the Supreme Court of the United States . . . refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. The "some evidence" standard identified in *Hill* is clearly established federal law in the parole context for AEDPA purposes. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1128-29 (9th Cir. 2006). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. Additionally, a state court decision is contrary to federal law if it "applies a rule that contradicts the governing law." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). Importantly, state court decisions are not required to cite Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.*

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412-13. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously and incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it. *Holland v. Jackson*, 542 U.S. 649, 651 (2004) (per curiam). Moreover, the "unreasonable application" clause is objective, and the federal court should ask only if it the state court decision was reasonable, not whether other federal courts have applied federal law in the same manner as the state court. *Williams*, 529 U.S. at 409.

///

A federal court reviewing a state prisoner's habeas corpus petition may also grant the writ if it concludes that the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative relevant evidence, central to Petitioner's claim, that was properly presented and made part of the state-court record. *Taylor v. Maddox*, 366 F.3d 992, 1005 (9th Cir. 2004). A district court must presume correct any determination of a factual issue made by a state court unless the Petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**2. Failure to Call Yarborough**

Petitioner contends that his counsel was ineffective in failing in failing to call Yarborough as a witness. This is ground one in the Amended Petition.

**a. Standard**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the Petitioner cannot even establish incompetence under the first prong. *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Similarly, a court need not determine whether counsel's performance was deficient

before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *Strickland*, 466 U.S. at 697.

### b. Analysis

Romeo Yarborough was Petitioner's co-defendant, but he pled guilty to voluntary manslaughter on September 11, 2003, before the first trial was to begin. Petitioner's motion to postpone commencement of the first trial until after Yarborough's sentencing was denied. Yarborough still had not been sentenced when the second trial began on March 17, 2004. The record contains orders signed by the trial judge on the 17th and 18th of 2004, ordering Yarborough transported to court, but he did not testify.

One ground for Petitioner's post-trial *Marsden* motion was that counsel failed to call Yarborough. At the hearing on the motion, Petitioner contended that Yarborough would have supported his self-defense claim if called. Ex. 4C at 740. Petitioner contended that defense counsel told him that Yarborough did not want to testify and did not support Petitioner's story, whereas a defense investigator "said that [Yarborough] did want to testify." *Id.* The investigator was present at the *Marsden* hearing, and when asked by the court whether that was correct, said: "We had a number of conversations back and forth. Mr. Yarborough probably would have testified perhaps but there was a question whether he was going to testify or not. There was a question whether he was going to take the Fifth, a number of issues were going on with Mr. Yarborough. I believe Mr. Pyle spoke with him and in that conversation it was determined that he would not be helpful to Mr. Stone's defense." *Id.*

The trial court held that the decision was a trial tactic "that I'm not going to second guess Mr. Pyle on." *Id.* This was the only reasoned state court ruling on this claim, hence is the one that Petitioner must show was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d).

**United States District Court**
For the Northern District of California

Petitioner has provided a declaration from Yarborough. Pet., Ex. Q. Assuming for the sake of decision that it can be considered here, it provides no new information. The declaration for the most part conforms very closely to the summary of Petitioner's testimony that the court of appeal used as the basis for its statement of the facts, which in turn was the basis for this court's facts as set out above.

As was brought out at the *Marsden* hearing, Yarborough says in his statement that he had told a defense investigator that he was willing to testify. Yarborough then says:

> Mr. Stone's lawyer Walter [P]yle, summoned me from San Quentin prison in order to testify on Mr. Stone's behalf. However, when I arrived in court on the day of the trial only moments before it started, Mr. Pyle asked me some questions. I felt uncomfortable because I didn't know what my rights were in this situation, my lawyer was not present to advise me and I was concerned that the D.A. might take my deal away if I testified. I told Mr. Pyle all the things that I have stated in above statement & was prepared to testify before the court as to the truth of this matter, however I was not called to testify and was given no expl[a]nation as to the reason for the inconv[enie]nce.

*Id.*

The quoted portion of the declaration is somewhat inconsistent, in that Yarborough seems to have been at least reluctant to testify, but also says that he was prepared to do so.[3] In determining whether it was deficient performance for counsel not to call Yarborough, the ambiguous declaration must be set against the fact that counsel interviewed Yarborough and made a conscious decision not to call him, and that Yarborough's testimony would have done no more than confirm that of Petitioner himself. Such testimony would have been of little value, since it would come from a person who clearly was deeply involved in the crime. On these facts, the decision not to call Yarborough was not deficient performance, and because if he had been called he would have done no more than provide weak support for Petitioner's version of events, the failure to call him was not prejudicial. And certainly the state courts' rejections of this claim were not contrary to, or an unreasonable application of, clearly-established United States Supreme Court authority.

### 3. Late Disclosure of Information About Bancroft Avenue Shooting

[3] The declaration is dated May 16, 2006, long after Yarborough's sentencing on December 13, 2004, and long after Petitioner's trial in March of 2004. It thus was made when Yarborough no longer faced the pressures he did at the time of Petitioner's trial.

In his second ground for relief, Petitioner contends that the prosecutor failed to turn over evidence of a shooting at 96th and Bancroft in Oakland, in which the victim, Gardiner, may have been implicated, until after the trial.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is "material" under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682. "There are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Gardiner's resume was found in a car involved in the 96th and Bancroft shooting and two witnesses said that someone named "C" opened fire on two victims. Gardiner went by the nickname "C-note." This information could have been relevant to Petitioner's state of mind, to the question whether he acted in self-defense, but only if there was evidence that Petitioner was aware of the 96th and Bancroft shooting at the time of the murder. There is no evidence in the record that Petitioner was aware of that shooting, so the evidence that was not disclosed was not material for that reason. In addition, the parties entered into a stipulation that the victim had bragged to his girlfriend about having shot Leo Logwood, a friend of Petitioner and of Yarborough, and of having committed the Bancroft shootings. Ex. 4C at 540. This stipulation, and the information that the victim was a drug dealer and had

threatened Petitioner and Yarborough, was before the jury.  In light of this, even if the State's information about the Bancroft shooting had been turned over, the result of the proceeding would not have been different – that is, the information was not material.  *See Bagley*, 473 U.S. at 682 (definition of "material" for *Brady* purposes).

For these reasons, the rejections of this claim by the state courts were not contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

### 4. Preliminary Hearing *Brady* claim

In ground three, Petitioner contends that it was a *Brady* violation for the prosecution not to turn over the evidence about the Bancroft shooting in time for the preliminary hearing. The Court has determined above that information about the Bancroft shooting was not material, so failure to turn it over, whether in time for trial or in time for the preliminary hearing, was not a constitutional violation.  This claim is without merit.

### 5. Undisclosed *Brady* Material

In ground four, Petitioner speculates that there must have been additional information about the Bancroft shooting that was never turned over.  Petitioner has failed to establish that there was evidence that was not turned over.  Furthermore, the analysis in section two, above, shows that information about the Bancroft shooting was not material, and that analysis also applies to this claim.  This claim is without merit.

### 6. Counsel's Failure to Discover Facts of Bancroft Shooting

In ground five, Petitioner contends that counsel was ineffective in not discovering the facts of the Bancroft shooting.  The standard set out above in section 2(a) for ineffective assistance claims applies to this claim.  *See Strickland v. Washington*, 466 U.S. 668, 686, 694 (1984) (to prevail on an ineffectiveness of counsel claim, Petitioner must establish that counsel's performance was deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). Because there is no evidence that Petitioner knew of the Bancroft shooting at the time of his confrontation with Gardiner, and because the Bancroft information was not material, he

1    could not have been prejudiced by any hypothetical failure of counsel to discover it.  This

2    claim is without merit.

3          **7. Request for Prison Information**

4          Before Petitioner's first trial, the trial court reviewed the victim's prison record.  It

5    contained a record of a fight between the victim and another prisoner in 2002.  The prison

6    record evidently quoted Gardiner as saying that he and the other prisoner had just been

7    "messing around," and that they were friends.  The court declined to reveal the name of the

8    other prisoner to counsel so counsel could contact him to determine whether Gardiner had

9    been the aggressor.  Petitioner's sixth ground for relief in the Amended Petition is that the

10   refusal of the court at the first trial to release the information violated his rights under *Brady,*

11   his right to compulsory process, and his right to effective assistance of counsel.  Pet. P&A

12   48-49.

13         The second and third grounds are frivolous; in the absence of a similar request at the

14   second trial, his right to compulsory process was not triggered, and the court at the second

15   trial did nothing with respect to this issue that hampered his counsel's representation.  And

16   although it apparently is true that the prosecution did not turn over the prison records as

17   *Brady* material at the time of the second trial, even if the other prisoner involved in the

18   incident could have been contacted and had blamed Gardiner as the aggressor, that relatively

19   minor piece of information would not have created a reasonable probability that, had the

20   evidence been disclosed to the defense, the result of the proceeding would have been

21   different.  *See Bagley*, 473 U.S. at 682.  This claim is without merit.

22         **8. Suppression of Diagram**

23         In his seventh ground for relief, Petitioner contends that his *Brady* rights were violated

24   by the prosecution's failure to turn over a diagram of the shooting scene which he believes

25   must have existed.  Petitioner has not established the existence of such a diagram, so this

26   claim is without merit.

27   ///

28   ///

### 9. Cross-Examination of Rodriguez

In his eighth ground for relief, Petitioner contends that his attorney was ineffective in his cross-examination of witness Rodriguez. The standard set out above in section 2(a) for ineffective assistance claims applies here. *See Strickland v. Washington*, 466 U.S. 668, 686, 694 (1984) (to prevail on an ineffectiveness of counsel claim, Petitioner must establish that counsel's performance was deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

Rodriguez was the only witness to the shooting who was not a member of Petitioner's family. The California Court of Appeal set out the facts regarding his testimony:

> The eyewitness whose testimony was most damaging to appellant's case was Juan Rodriguez, who testified at the trial through an interpreter.
>
> Rodriguez was a carpenter who was remodeling a house on 52nd Avenue during December 2002. On December 5, 2002, he was working on the house late in the evening, when it was dark out, with his wife and children present in the house. He testified that he heard two shots from inside the house, and then looked out the window, but saw nothing. He then went into another room in the house where his wife was, heard two more shots, and looked out the window again. He then saw two men next to a car, near the tire, and "a light like a little flame coming out right next to the tire of the car" when the taller of the two men [FN16. Appellant is a few inches taller than Yarborough.] fired the fifth and last shot. Rodriguez did not see anyone other than the two men, and thought that they had just fired at the car tire.
>
> Rodriguez testified that the taller man walked away, turned around and walked back to the car to fire the final shot, and then walked away again with the other man, laughing. He also said that before firing the final shot, the tall man made a backward motion with his hands, as if pulling a gun out of his waistband, but acknowledged that he did not actually see the gun. At an earlier hearing, however, Rodriguez had testified that only seconds elapsed between the fourth shot and the fifth shot.
>
> Rodriguez testified that at the time of the shooting, he recognized the two men as the same ones he had seen in the area two days earlier, when they asked him for a cigarette and a light, but that by the time of trial, he no longer remembered what they looked like, except that one was taller and darker-skinned, and the other was shorter and lighter-skinned. [FN17. A police officer who interviewed Rodriguez on December 19, 2002, testified that at that time, Rodriguez said he had seen a tall person with a dark face standing over the victim, with another person next to him, and that he had seen these two men in the neighborhood prior to the shooting.] He did not identify appellant when shown a photo lineup containing appellant's photograph, and did not recognize appellant as the shooter at the trial.
>
> Rodriguez testified at trial that when he was shown a photo lineup, he identified one of the photographs as resembling, but not necessarily being, the

shooter. [FN18. This testimony was corroborated by one of the officers who were present at the time Rodriguez viewed the photo lineup.] The photograph Rodriguez identified in this manner did not depict either appellant or Yarborough. Rodriguez admitted that at appellant's earlier trial, he had testified that he was "a hundred percent sure" that the photograph depicted the shooter, but contended that he had meant to say he was a hundred percent sure that the photograph resembled the shooter. Rodriguez had testified at appellant's preliminary hearing, at which he did not have the assistance of an interpreter, that the man who did the shooting was the lighter-skinned of the two men, but at trial, he denied having made that statement. At trial, he recalled that the shooter was the taller and darker of the two men.

Rodriguez acknowledged at trial that it was dark out at the time of the shooting, and that it was not possible to really see clearly outside through the closed window of the living room, in which the lights were on. He said that there was moonlight at the time, but the court later took judicial notice of the fact that on the day of the shooting, the moon set at 6:14 p.m. Appellant's investigator testified that the distance from the front steps of the house Rodriguez was working on to the location where Gardiner's body was found was 160 feet, but acknowledged on cross-examination that the area in front of appellant's family home was visible from the window through which Rodriguez said he observed the shooting.

In his defense case, appellant presented the testimony of the police officer who interviewed Rodriguez on the night of the crime. The officer's notes indicated that Rodriguez told him he had heard five loud pops, and that his wife had then looked out the window and said she saw two men walking away from the area. Rodriguez then looked out the window himself, and saw two men he recognized from seeing them hanging around in the area during the previous couple of days. The men walked until they reached the house across the street from the one in which Rodriguez was working, and then ran through its yard in a westbound direction. Rodriguez was able to describe the two men. The officer described Rodriguez as being nervous and somewhat rattled during the interview, and in a hurry to leave the area, and although he spoke enough English to communicate with the officer, he sometimes had to search for words to use to describe things. [FN19. Rodriguez also described himself as having been extremely nervous when he spoke to the officer, and did not remember very well what he had said. He testified on direct examination that he did not read his statement before signing it, but admitted on cross-examination that he had looked it over. He admitted at first that the officer had read at least some parts of the statement to him before he signed it, as he had testified at the earlier trial, but then said he did not remember whether this had occurred or not.] During the interview, which lasted about 15 minutes, Rodriguez never mentioned having actually seen anyone doing any shooting.

Ex. 5 at 12-13.

This ground for relief contains two separate claims. Counsel did impeach Rodriguez on a number of points, namely that at the preliminary hearing Rodriguez had identified Yarborough as the shooter, had told police that he did not see the shooting, had claimed to be 100% certain that a person he picked out of a photo array – who was neither Petitioner nor

Yarborough – was the shooter, and had not mentioned at the preliminary hearing his trial claim that the shooter walked away from the victim's body, then returned to fire another shot. Petitioner contends, however, that counsel was ineffective in not "demonstrating through questioning that the inconsistencies were not innocent," Pet. P&A at 52, but rather were lies meant to aid the prosecution. Petitioner suggests that this could have been done by asking Rodriguez to "explain" the inconsistencies, something experienced litigators know is not good cross-examination. Doing so would not have been any more effective than what counsel did, namely bring out inconsistencies from which the jury could have concluded that Rodriguez was a liar. This subclaim is without merit.

The other subclaim in this ground for relief is a contention that counsel was ineffective in not using cross-examination to point out prior inconsistent statements by Rodriguez. The first of these is that Rodriguez identified Yarborough as the shooter at the preliminary hearing, but at trial identified Petitioner. *Id.* at 6e. Defense counsel did, however, bring that out in his cross-examination. Ex. 4A at 203-04. Petitioner also contends that counsel should have elicited that Rodriguez had "little or no difficulty understanding questions at the preliminary hearing," which would have undermined the prosecution's theory that Rodriguez's flip-flop as to the identity of the shooter was becuase of a language barrier. Pet. at 6e. Petitioner provides no basis for the contention that Rodriguez had no language difficulty at the preliminary hearing; the bare transcript references he provides do not prove or disprove the point, because a witness's difficulty understanding would not necessarily appear in the record, and a reading of the entire examination and cross-examination of Rodriguez in fact reveals many misunderstandings and communication difficulties.

Petitioner also contends that counsel was ineffective in not asking Rodriguez why he had initially failed to mention that Petitioner walked away from the victim, then came back and fired again, and in not "impeaching" Rodriguez with the fact that the prosecutor had to lead him to obtain that testimony. The prosecutor's questions at the preliminary hearing would not have been a proper basis for impeachment, not being a prior inconsistent statement

by the witness, and it is generally not effective representation to ask "why" in cross-examination.

Petitioner also contends that counsel should have impeached Rodriguez with his inconsistent statements about whether he saw a muzzle flash from the gun; his inability to identify Petitioner at trial, after identifying him at the preliminary hearing; and his statement at the preliminary hearing that he'd seen a body or "shadow" falling, which was inconsistent with his trial testimony that he did not see anyone other than Petitioner and Yarborough.

As to the last two of these three, clearly it would have been counterproductive to emphasize testimony unfavorable to Petitioner, even if inconsistent, by repeating it as a cross-examination question. As to the muzzle flash, Petitioner is correct that the witness said in the preliminary hearing that he did not see a gun flash, Ex. 1A at 113, and at trial that he did, Ex. 4A at 180, 199. Counsel did, however, effectively used the many other inconsistencies between Rodriguez's preliminary hearing testimony and his trial testimony. *See* Ex. 4A at 197-204. The failure to use the gun flash inconsistency was quintessentially the sort of tactical decision by counsel which the Court should not second-guess. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984) (tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available).

For these reasons, counsel was not ineffective in his cross-examination of Rodriguez

**10. Perjured Testimony**

In his ninth claim, Petitioner contends that admission of Rodriguez's allegedly perjured testimony violated his due process rights.

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also United States v. Bagley*, 473 U.S. 667, 678-80 (1985) ("Deliberate deception of the court by the presentation of false evidence is incompatible with rudimentary demands of justice" and a resulting conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the jury verdict.").

Prosecutors will not be held accountable for discrepancies in testimony where there is no evidence from which to infer prosecutorial misconduct. *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir.1995). Here, it is undisputed that there were inconsistencies between Rodriguez's statement to police at the time of the offense, his testimony at the preliminary hearing, and his testimony at trial. Petitioner has not, however, established that any of the testimony was a deliberate lie, nor that it was the testimony at trial, as opposed to the other testimony, that was untrue. But most importantly, even if it is assumed for purposes of decision that the testimony at trial was untrue, Petitioner has not established that the prosecution knew it. This claim is without merit. *See Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir.2004) (factual basis for attributing knowledge to the government that the testimony was perjured must be established).

**11. Sufficiency of the Evidence**

In his tenth ground for relief, Petitioner contends that there was insufficient evidence to disprove self-defense and prove premeditation and deliberation.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *id*. at 324. The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *Id*. at 324.

Here, Petitioner's own evidence was that he walked away from the confrontation, but once he got around the side of the house changed his mind, drew his gun, and returned to the scene. Petitioner does not dispute that he fired the last two shots into the victim's head at

close range, and Rodriguez's evidence would support the conclusion that Petitioner paused, then decided to finish off the victim execution-style. And the victim's gun was found, unfired, some distance from where he fell when his spinal cord was severed.

Rodriguez's statements to the police, at the preliminary hearing, and at trial were undoubtedly inconsistent, but when considering a sufficiency of the evidence claim the Court must "view[] the evidence in the light most favorable to the prosecution," *id.* at 319, so must assume that the jury believed the prosecution witnesses. The evidence summarized above was sufficient to support the verdict.

**12. Failure to Instruct on Inability to Withdraw**

In his eleventh ground for relief, Petitioner contends that his due process rights were violated when the trial court did not give the jury an instruction. He also contends that his counsel was ineffective in failing to request it. Because counsel did in fact request the instruction, the ineffective assistance part of this claim clearly is without merit. *See* Ex. 1D at 823-25; 4C at 634-35.

This issue was raised on direct appeal. The California Court of Appeal explained the context:

> Finally, appellant argues that even if warranted, the mutual combat instruction was incomplete and therefore misleading. His argument rests largely on *[People v.] Quach* [(2004)] 116 Cal.App.4th 294. In *Quach*, a group of people composed of members of two rival gangs emerged from a bar. An argument broke out between the defendant and a member of the rival gang. Shots were exchanged between both men. The eyewitness accounts failed to agree as to who drew a weapon first, but there was substantial evidence that the rival drew first, and perhaps even fired, before the defendant drew his gun. Based on this specific set of facts, Division Three of the Fourth District determined that CALJIC No. 5.56 had probably misled the jury by omitting an exception to the general rule requiring mutual combatants or initial aggressors to withdraw in order to regain the right to self-defense. [FN31. CALJIC No. 5.56 was subsequently revised in light of *Quach, supra*, 116 Cal.App.4th 294. (CALJIC No. 5.56 (2004 Re-revision).) The mutual combat instruction included in the Judicial Council Criminal Jury Instructions also includes an optional paragraph reflecting the holding in *Quach*, to be used, when the facts warrant, in both initial aggressor and mutual combat situations. (CALCRIM No. 3471.)] This exception is that " 'when a defendant engages in a simple assault and his opponent responds with deadly force so suddenly that the person cannot withdraw, a defendant may immediately use deadly force in self-defense.' " (*Id.* at p. 301.)

Here, one possible view of the evidence is that appellant committed a simple assault by grabbing Gardiner's shoulder, and that Gardiner suddenly responded with deadly force by raising his previously concealed gun and pointing at appellant, giving appellant no opportunity to withdraw. Under this view of the evidence, the *Quach* exception then came into play, and appellant became entitled to respond with deadly force in self-defense. Thus, the facts of this case may well have justified including in the instruction the *Quach* exception, as appellant's trial counsel requested.

Nonetheless, we find the error harmless. Even if appellant initially started shooting Gardiner out of self-defense, the jury's rejection of appellant's self-defense claim, and its finding of premeditated murder, reflect a finding that by the time appellant fired the final, fatal shots, Gardiner had been disabled, and appellant had thus lost his right to continue to use deadly force. (*See* CALJIC Nos. 5.52, 5.53.) It is therefore not reasonably probable that including the *Quach* proviso in the mutual combat instruction would have resulted in an outcome more favorable to appellant.

Ex. 5 at 30-31.

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *Id.* The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *Walker v. Endell*, 850 F.2d 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. at 155). Thus, a habeas Petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

Here, it is established by the court of appeal's opinion that the trial court's failure to give Petitioner's proposed addition to the instructions was state law error. The reasons upon which the court of appeal relied for concluding that the error was harmless, however, also establish that failure to give the instruction did not so infect the trial as to deprive Petitioner of a fair trial. That is, the fact that the jury found Petitioner guilty of premeditated murder and rejected his self-defense argument on the instructions that were given means that, on these facts, the proposed addition to the self-defense instruction was surplusage. The failure to give it thus could not have deprived Petitioner of a fair trial. This claim is without merit.

///

### 13. Imperfect Self-Defense

In his twelfth ground for relief, Petitioner contends that the trial court's failure to give the additional instruction discussed in section twelve, above, also had the effect of denying him the benefit of a concept under California law known as "imperfect self-defense." Imperfect self-defense occurs when a defendant subjectively believes in the need to defend, but that belief or the resulting conduct is unreasonable. Ex. 5 at 27. The trial court's failure to give the proposed addition did not affect the fairness of the trial for the reason discussed above, so this claim is without merit.

### 14. Mutual Combat Instructions

In this thirteenth ground for relief, Petitioner contends that the trial court's failure to give the additional instruction discussed in section twelve, above, also had the effect of undermining a jury instruction that includes a provision restricting application of self-defense in mutual combat situations. *See* CALJIC 5.56. The trial court's failure to give the proposed addition did not affect the fairness of the trial for the reason discussed above, so this claim is without merit.

### 15. Instruction on Decedent's Violent Character

Petitioner's fourteenth ground for relief is a claim that his rights were violated by the trial court's failure to give his requested instruction that a decedent's character for violence "in the form of specific instances of conduct and opinions of people who knew his reputation may be considered by you as relevant to the issue of whether Noble Gardiner was acting in conformity with his character trait for violence. . . ." Ex. 1D at 795. The California Court of Appeal held that failure to give the instruction was state law error, but that the error was harmless:

> As is clear from our statement of the facts, appellant was permitted to introduce ample evidence tending to prove Gardiner's violent character. The jury was given guidance as to the import of this evidence by appellant's pinpoint instruction which was given, and which told the jury that it could consider Gardiner's past threats and harmful acts against appellant and others in determining the reasonableness of appellant's beliefs and conduct. Although this instruction did not expressly use the term "violent character," it did implicitly permit the jury to consider Gardiner's character, as demonstrated by

the evidence of his past behavior, in determining whether appellant's fear of Gardiner was reasonable.

Moreover, appellant's trial counsel repeatedly drew the jury's attention to Gardiner's violent character in his closing argument. He stressed that Gardiner "claimed to be a shooter and a killer"; noted that Gardiner told appellant and Yarborough "how tough a guy he was, [and that] he shoots people"; drew inferences from Gardiner's tattoos about "what kind of guy" he was; and reminded the jury of Smith's testimony that Gardiner had several guns, and always carried one with him.

In addition, the jury was instructed not only on self-defense, but also on imperfect self-defense, using CALJIC 5.17. Under this instruction, if the jury believed that appellant subjectively feared Gardiner, but deemed that fear unreasonable, it would have convicted him of voluntary manslaughter rather than first-degree murder. Conversely, the jury's verdict finding appellant guilty of first-degree murder implies that it rejected appellant's testimony that he believed he was acting in self-defense. If the jury had believed appellant's description of his own state of mind, but found his fear of Gardiner or his resulting conduct unreasonable, the refused instructions on Gardiner's violent character would have had more bearing on the jury's decision, because the instructions were directly relevant to the reasonableness of appellant's beliefs and actions. The first-degree murder verdict, however, implies that the jury simply did not believe that appellant was motivated solely by self-defense when he killed Gardiner. (*See People v. Crandell* (1988) 46 Cal.3d 833, 874 (*Crandell* ), disapproved on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365 [finding errors in jury instructions on self-defense harmless, where jury's verdict finding murders to have been committed with premeditation and deliberation "indicate[d] a complete rejection of the evidence on which defendant relied to establish self-defense"].) As to the fundamental question whether defendant's self-defense claim was credible, the rejected instructions did not materially add to the self-defense instructions that were actually given.

For all of the foregoing reasons, even if the trial court erred in refusing to give the victim's violent character and awareness of victim's violent character instructions, we are not convinced that it is reasonably probable that a result more favorable to appellant would have been reached in the absence of the error. ( *People v. Watson, supra*, 46 Cal.2d at p. 836.)

Ex. E at 27-28.

The standard applicable here to Petitioner's constitutional claim is that set out above in section twelve: he must show that the failure to give that instruction denied him a fair trial. For the reasons set out by the court of appeal in concluding that the state law error was harmless, the Court concludes that failure to give the instruction did not deny Petitioner a fair trial.

///

///

**16. "Conflict of Interest"**

Petitioner's fifteenth ground for relief is that his counsel allegedly had a "conflict of interest" in the *Marsden* hearing and in preparing a motion for new trial. In essence, Petitioner's claim is that counsel was unable to admit his failings at the *Marsden* hearing out of fear of malpractice liability or bar discipline – that counsel had a conflict between self-interest and the interest of his client – which resulted in the *Marsden* motion being denied and in counsel filing a motion for new trial that omitted any claims that he had been ineffective.

The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and is properly considered in federal habeas. *Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir. 1994), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc). The Ninth Circuit has held that when a defendant voices a seemingly substantial complaint about counsel, the trial judge should inquire into the reasons for the defendant's dissatisfaction. *Id.* at 1475-76. The inquiry need only be as comprehensive as the circumstances reasonably would permit, however. *King v. Rowland*, 977 F.2d 1354, 1357 (9th Cir. 1992) (record may demonstrate that extensive inquiry was not necessary). The ultimate inquiry in a federal habeas proceeding in which a petitioner contends new counsel should have been appointed is whether the Petitioner's Sixth Amendment right to counsel was violated. *Schell*, 218 F.3d at 024-25.

The standard set out above in section 2(a) above for ineffective assistance claims applies to this claim. *See Strickland v. Washington*, 466 U.S. 668, 686, 694 (1984) (to prevail on an ineffectiveness of counsel claim, Petitioner must establish that counsel's performance was deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

Petitioner contends that his ineffective assistance claims should have been raised in a motion for new trial, and that it was ineffective assistance not to raise them. The claims he says should have been raised are largely those discussed in sections one, five, eight,

seventeen, and eighteen of this order. They are without merit. Because petitioner has not shown any instances in which counsel was ineffective at or before trial, it was not ineffective assistance for his attorney not to raise those claims in the motion for new trial.

In addition, this claim is, in essence, a claim that the Sixth Amendment requires appointment of different counsel to represent a criminal defendant on his or her motion to replace counsel, something that has never been considered, much less required, by the United States Supreme Court. As a consequence, the state courts' denials of this claim cannot be contrary to, or an unreasonable application of, clearly established Supreme Court authority.

### 17. Ineffective Appellate Counsel

In his issue sixteen, Petitioner contends that his appellate counsel was ineffective in failing to raise "the claims in this petition" on direct appeal. As the claims are rejected on the merits in this ruling, this ground for relief is without merit.

### 18. Counsel's Failure to Ask for Continuance

In ground seventeen of the amended petition, Petitioner contends that his counsel was ineffective in not asking for a continuance until after Yarborough's sentencing, when Yarborough might have been more willing to testify, and that the prosecutor and Yarborough's attorney intimidated Yarborough into not testifying.

As respondent points out, a motion to continue the trial until after Yarborough's sentencing had been denied before the first trial, suggesting that such a motion would have had little chance of success. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (trial counsel cannot have been ineffective for failing to raise a meritless motion). Furthermore, although in his declaration Yarborough refers to his concern that his plea bargain would be withdrawn if he testified, he provides no indication that his testimony, had been able to give it freely, would have been anything other than what he describes in the declaration, i.e., duplicative of Petitioner's own. For these reasons, counsel's failure to move for a continuance until after Yarborough's sentencing was not deficient performance, nor could it have prejudiced Petitioner.

///

As to Petitioner's claim that Yarborough was intimidated into not testifying, there simply is no evidence of that in the record, and in fact there is evidence to the contrary -- that it was defense counsel's decision not to use Yarborough. *See* Ex. 4C at 740.

The claims in ground seventeen are without merit.

**19. *Batson* Claim**

In his ground for relief eighteen, Petitioner contends that some jurors were "biased," that the prosecutor used peremptory strikes to remove "minority" jurors from the panel, and that his counsel was ineffective in not challenging the strikes on *Batson*[4] grounds. There is nothing in the record to support this claim. It is rejected.

**20. State Court Denial of Petitioner's Postconviction Request for Juror Voir Dire Transcripts and Questionnaires**

In his nineteenth ground for relief, Petitioner contends that the superior court's denial of his motion for a transcript of jury voir dire and for copies of the juror questionnaires violated his due process rights. The California rule requiring an indigent defendant to show a specific need for a complete voir dire transcript does not violate clearly established federal law, *Boyd v. Newland*, 467 F.3d 1139, 1150-51 (9th Cir. 2006), and in view of Petitioner's complete failure to provide any factual basis from his own recollection for his claims regarding jury prejudice or discriminatory use of peremptory strikes, the denial of his motion did not violate due process. This claim is rejected.

**21. Witness Segura**

In his twentieth claim, Petitioner contends that his trial counsel was ineffective in failing to investigate to discover a witness named Felix Segura, and in failing to call him to testify.[5] Petitioner has provided a declaration by Segura. Am. Pet., Ex. W. As discussed above in the ruling on Petitioner's motion to dismiss, he has not established that he exercised

---

[4] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[5] The standard set out above in section 2(a) for ineffective assistance claims applies to this claim. *See Strickland v. Washington*, 466 U.S. 668, 686, 694 (1984) (to prevail on an ineffectiveness of counsel claim, Petitioner must establish that counsel's performance was deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

due diligence in attempting to present the Segura declaration to the state courts, and thus it cannot be considered here. *See* 28 U.S.C. § 2254(e)(2)(A)-(B).

Alternatively, assuming for purposes of decision that the declaration can be considered, it does not suffice to show ineffective assistance.

Segura says in his declaration that he was interviewed "by a man and a woman who I believed were working with the defense." Am. Pet., Ex. W. Thus, defense counsel did discover Segura. Segura's evidence was that he heard shots but did not see the shooting. *Id.* Although Segura does say that the shots came in rapid succession, this minor discrepancy is not sufficient to generate a reasonable probability that the outcome of the trial would have been different. He thus was not prejudiced by counsel's failure to call Segura.

This claim is without merit.

**C. Appealability**

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly known as a certificate of probable cause to appeal). *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. *See id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S.Ct. 1595, 1604 (2000).

///

This was not a close case. For the reasons set out above, jurists of reason would not find the result debatable or wrong. A certificate of appealability will be denied. Petitioner is advised that he may not appeal the denial of a COA, but he may ask the court of appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a), Rules Governing § 2254 Cases.

## IV. CONCLUSION

Petitioner's motion for an evidentiary hearing (document number 44 on the docket) is DENIED. For the reasons set out above, his petition for a writ of habeas corpus also is DENIED. A certificate of appealability is DENIED. *See* Rule 11(a) of the Rules Governing Section 2254 Cases (eff. Dec. 1, 2009).

The Clerk shall enter judgment in accordance with this order and close the file.

**SO ORDERED.**

Dated:  01/11/10  

_____
THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT